GEORGE D. YARON, ESQ. (State Bar #96246)
JAMES I SILVERSTEIN, ESQ. (State Bar #143543)
gyaron@yaronlaw.com; jsilverstein@yaronlaw.com
YARON & ASSOCIATES
601 California St, 21st Floor
San Francisco, California 94108
Telephone: (415) 658-2929
Facsimile: (415) 658-2930

Attorneys for Plaintiff
PROBUILDERS SPECIALTY INSURANCE COMPANY, RRG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROBUILDERS SPECIALTY INSURANCE COMPANY, RRG, a District of Columbia, Risk Retention Group,<br><br>Plaintiff,<br><br>v.<br><br>VALLEY CORP. B., a California Corporation formerly known as R.J. HAAS CORP.; RONALD J. HAAS, an individual; TY LEVINE, an individual; and KAREN LEVINE, an individual,<br><br>Defendants. | CASE NO.:5:10-cv-05533-EJD<br><br>**PROBUILDERS SPECIALTY INSURANCE COMPANY, RRG'S NOTICE OF MOTION AND MOTION FOR (1) SUMMARY JUDGMENT ON THE LEVINES' COUNTERCLAIM AND R.J. HAAS' COUNTERCLAIM, OR, IN THE ALTERNATIVE, A MOTION FOR PARTIAL SUMMARY JUDGMENT; AND (2) PARTIAL SUMMARY JUDGMENT ON PROBUILDERS' SECOND AMENDED COMPLAINT**<br><br>Date: November 2, 2012<br>Time: 9:00 a.m.<br>Judge: Edward J. Davila<br>Courtroom: 1 |

**Table of Contents**

I. NOTICE OF MOTION . . . . . 1

II. MEMORANDUM OF POINTS AND AUTHORITIES . . . . . 2

A. Summary of Argument . . . . . 2

B. Statement of Facts . . . . . 3

1. R.J. Haas Corp.'s Work on the Levine Residence . . . . . 3

2. Haas Corp.'s Application and The Issuance of The Policy . . . . . 6

3. The *Levine* Action . . . . . 8

4. The Judgment in the *Levine* Action . . . . . 11

C. Argument . . . . . 12

1. This Court Should Rescind the PBSIC Policy . . . . . 12

a. California Law Re Rescission . . . . . 12

b. Misrepresentations Made by Haas Corp. . . . . . 13

i. There Were no Written Indemnity Agreements . . . . . 13

ii. Subcontractors Worked Without Procuring Certificates of Insurance and Additional Insured Endorsements . . . . . 13

iii. The Application failed to Disclose the Levine Project and that Haas Corp. had no Workers' Compensation Policy . . 14

iv. The Misrepresentations Were Material . . . . . 14

2. The Policy Does Not Insure Defective or Incomplete Work . . . . . 15

3. PBSIC has No Duty to Satisfy any Portion of the Judgment . . . . . 16

a. The CSC Endorsement Precludes All Coverage . . . . . 16

b. If the Court Holds that the CSC Endorsement Does Not Preclude All Coverage, then the "Work Product" Exclusions Would Preclude Coverage for the Judgment . . . . . 18

i. Exclusions "J(5)" and "J(6)" . . . . . 18

ii. Exclusion "L" "M" and "N" . . . . . 20

iii. Other Parts of the Judgment are not Covered . . . . . 21

III. CONCLUSION . . . . . 22

## Table of Authorities

**State Cases**

*Bank of the West v. Sup. Ct.*, 2 Cal.4th 1254 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Baroco West, Inc. v. Scottsdale Ins. Comp.*, 110 Cal.App.4th 96 (2003) . . . . . . . . . . . . . . . . . . 19

*Clarendon Am. Ins. Co. v. Gen. Sec. Indem. Comp. of AZ*, 193 Cal.App.4th 1311 (2011) . . 18, 19

*Collett v. Insurance Co. of the West*, 64 Cal.App.4th 338 (1998) . . . . . . . . . . . . . . . . . . . . . . . 15

*F&H Const. v. ITT Hartford Ins. Comp. of the Midwest*, 118 Cal. App.4th 364 (2004) . . . . . 2, 15

*Fort Bragg USD v. Colonial Amer. Cas. & Surety Comp.*, 194 Cal.App.4th 891 (2011) . . . . . . 22

*Holz Rubber Co., Inc. v. American Star Ins. Co.*, 14 Cal.3d 45 (1975) . . . . . . . . . . . . . . . . . . . . 13

*LA Sound USA, Inc. v. St. Paul Fire & Marine*, 156 Cal.App.4th 1259 (2007) . . . . . . . . . . . . . 12

*Maryland Cas. v. Reeder*, 221 Cal.App.3d 961 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 21

*Mitchell v. United National Ins. Co.*, 127 Cal.App.4th 457 (2005) . . . . . . . . . . . . . . . . . . . . . . 12

*North American Capacity Ins. Co. v. Claremont Liab. Ins. Co.*, 177 Cal.App.4th 272 (2009) . 17

*Thompson v. Occidental Life Ins. Co.*, 9 Cal.3d 904 (1973) . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

*Proulx & Company v. Crest-Liners*, 98 Cal.App.4th 182 (2002) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Robinson v. Occidental Life Ins. Co.*, 131 Cal.App.2d 581 (1955) . . . . . . . . . . . . . . . . . . . . . . 13

*Scottsdale Ins. Co. v. Essex Ins. Co.*, 98 Cal.App.4th 86 (2002) . . . . . . . . . . . . . . . . . . . . . 16, 17

*Travelers Cas. & Surety Comp. v. The Superior Ct.*, 63 Cal.App.4th 1440 (1998) . . . . . . . . . . 16

**Federal Cases**

*McNeilab, Inc. v. North River Ins. Co.*, 645 F. Supp. 525 (D. N.J. 1986) . . . . . . . . . . . . . . . . . . 21

*N.H. Ins. Co. v. Viera*, 930 F.2d 696 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15, 21

*St. Paul Fire & Marine Ins. Co. v. Futura Coatings, Inc.*, 993 F.Supp. 1258 (D. Minn. 1998) . 21

**Statutes**

Insurance Code §§ 331, 334, 359 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## I. NOTICE OF MOTION

NOTICE is hereby given that on Friday, November 2, 2012, at 9:00 a.m., or as soon thereafter as counsel may be heard, by the above-entitled Court, located at 280 South First St., San Jose, California, in Courtroom 1, Plaintiff ProBuilders Specialty Insurance Company, RRG ("PBSIC") will and hereby moves for (1) complete and/or partial Summary Judgment on its Second Amended Complaint against Ronald J. Haas ("Haas"), Karen Levine, and Ty Levine, as to (a) rescission of the policy, and (b) PBSIC's claim that the policy does not cover the judgment, or, in the alternative, a portion of the judgment the Levines obtained, in the case captioned *Ty Levine, et al. v. R.J. Haas, et al.*, Santa Clara County Superior Court, Case No. 07-CV081016 ("*Levine* action") against Valley Corp. B formerly known as R.J. Haas Corp. ("Haas Corp.") and Haas; and (2) Summary Judgment on the Counterclaims filed by Haas, and Karen and Ty Levine, or, in the alternative, a Motion for Partial Summary Judgment on Haas' Counterclaim and the Levines' Counterclaim as to PBSIC's claim that the policy does not cover the judgment or, in the alternative, a portion of the judgment.

PBSIC seeks an Order that (1) PBSIC has no duty to indemnify Haas Corp. and Haas against the judgment in the *Levine* action; (2) PBSIC is entitled to rescind policy no. COM 5010992 issued to Haas Corp. such that the policy is void ab initio, provides no insurance coverage for any claims alleged in the *Levine* action, and PBSIC had no duty to defend Haas and Haas Corp. against the *Levine* action; (3) Ty and Karen Levine cannot prevail on their Counterclaim against PBSIC, or, in the alternative, an Order as to what portion of the *Levine* action judgment is not covered under the policy; (4) Haas cannot prevail, on his Counterclaim against PBSIC, or, (a) in the alternative, an Order that Haas cannot prevail on his claim for breach of contract/duty to indemnify, or, (b) in the alternative, an Order as to what portion of the *Levine* action judgment is not covered under the policy. This Motion is based upon this Notice of Motion and the accompanying Memorandum of Points and Authorities; the Declarations of Sherrianne Hanavan, George Yaron, James Silverstein, Andrea Griggs, Celestino Aguiar, Bill Lynch, Michael Creeden, and Steve Suissa; PBSIC's Request for Judicial Notice; PBSIC's Appendix of Exhibits; all pleadings and papers on file in this action; and upon such other matters as may be presented to the Court at the time of hearing.

# II. MEMORANDUM OF POINTS AND AUTHORITIES

## A. Summary of Argument

This lawsuit arises out of the *Levine* action, which was filed on March 1, 2007. The Levines obtained a judgment against ProBuilders' insureds for the faulty construction of their home. ProBuilders refused to pay the judgment for a number of reasons including the facts that: (1) ". . . a liability insurance policy is not designed to serve as a performance bond" (*F&H Construction v. ITT Hartford Ins. Comp. of the Midwest,* 118 Cal.App.4th 364, 373 (2004)), and (2) the costs incurred to repair and replace defective work, including damages to other property caused by the repair, also do not constitute "property damage." (*N.H. Ins. Co. v. Viera*, 930 F.2d 696, 701-702 (9th Cir. 1991).)

The Levines hired Haas Corp. to act as the general contractor for virtually a complete demolition and remodel of their residence in Los Altos. However, Haas Corp. did not complete the construction of the residence. In approximately February of 2007, Haas Corp. stopped working on the Levine residence, at the direction of the Levines, and the Levines hired Flegel Construction to complete the construction. Ultimately, the Levines obtained an amended judgment against Haas Corp. and Haas, the President of Haas Corp., in the amount of $1,989,649.07.

PBSIC issued Haas Corp., policy no. COM 5010992, which was to be effective from August 29, 2006 to August 29, 2007 ("policy"), coincidentally while the construction of the Levine residence was already underway. Haas Corp. and Haas tendered their defense against the *Levine* action to PBSIC. Despite the fact that certain policy provisions precluded its duty to defend, PBSIC provided them with a "courtesy defense", pursuant to a "reservation of rights" through trial.

It was later discovered that Haas Corp. made materially false representations in its policy application. In the policy application, Haas Corp. represented, among other things, that (1) it did not allow any of its subcontractors to work without providing Haas Corp. with a certificate of insurance; (2) it did, and would, have a written contract with its subcontractors that included a "hold harmless" agreement for work performed by its subcontractors; and (3) it was named as an additional insured on its subcontractors' insurance policies. As detailed below, PBSIC learned that those representations were false. Consequently, PBSIC requests that this Court (1) rescind the policy and hold that PBSIC had no duty to defend or indemnify Haas Corp. and Haas against the *Levine* action;

and (2) hold that Haas and the Levines cannot prevail on their Counterclaims against PBSIC.

If the Court declines to rescind the policy, given that Haas Corp. was the general contractor for the entire construction project, Exclusions "J(5)" and "J(6)" preclude coverage for all "ongoing operations" property damage. (*See Clarendon America Ins. Comp. v. General Security Indem. Comp. of Arizona,* 193 Cal.App.4th 1311, 1325-1326 (2011).) Both "ongoing operations" and "completed operations" coverages are also precluded under the policy by the Contractors Special Condition Endorsement ("CSC Endorsement"), which, in part, required Haas Corp. to obtain from independent contractors that worked on the Levine residence both written indemnity agreements and certificates of insurance indicating that Haas Corp. was an additional insured under their CGL policy. As detailed below, Haas Corp., acting merely as a paper general contractor, hired subcontractors to perform all of the construction work on the Levine residence. However, Haas Corp. did not receive a written indemnity agreement from any of the subcontractors. Moreover, Haas Corp. obtained a very limited number of Certificates of Insurance indicating that Haas Corp. was named as an additional insured under its subcontractors' liability policies. Consequently, all coverage for Haas Corp. and Haas is necessarily precluded by the CSC Endorsement, leaving no possibility of coverage.

Haas testified that Haas Corp. had no employees. In the event that the Court holds that one or more subcontractors employed by Haas Corp. were actually Haas. Corp.'s employees then, as discussed below, other "Work Product" or "Business Risk" Exclusions, including Exclusion "L" (the "your work" exclusion), would preclude any "completed operations" damages theoretically caused by Haas Corp.'s "employees". No "subcontractor" exception would then apply.

**B. Statement of Facts**

**1. R.J. Haas Corp.'s Work on the Levine Residence**

This lawsuit arises from the *Levine* action, a construction defect lawsuit, concerning Haas Corp.'s work on the construction of a residence in Los Altos, CA. [Paragraph ("par.") 16 of PBSIC's Second Amended Complaint in the instant action ("PBSIC's SAC"), and par. 11 of the Levine' Answer to PBSIC's SAC ("Levine Answer"), which are contained in the Appendix of Exhibits ("App.") at nos. 1 and 2.] Haas testified that, during the existence of Haas Corp., Haas was its President, sole shareholder, sole officer, and sole director, but not its employee. [See Deposition of

Haas, volume 1, ("H, vol. 1"), at pp. 45:4-46:17, which is in App. no. 3.] Haas testified that Haas Corp. never had any employees. [H, vol. 1, at p. 78:5-7, at App. no. 3.] Haas testified that all of Haas Corp.'s work on the Levine residence was not performed by employees; instead, all of the work was performed by suppliers, service givers, and independent contractors.[H, vol. 1, at p. 98:5-16, at App. no. 3.] Haas also testified that, at the time Haas Corp. worked on the Levine residence, all of the work performed at the Levine residence was performed by Haas Corp.'s independent contractors, not its employees. [H, vol.1, at p. 71:6-12, at App. no. 3.]

Haas Corp. was hired as the general contractor for the demolition and reconstruction of the Levines' home for a contract price of $821,078. [Par. 16 of PBSIC's SAC and par. 11 of the Levine Answer to PBSIC's SAC at App. nos. 1 & 2; H, vol. 1, at pp. 58:14- 59:7, at App. no. 3.] A contract, dated October 27, 2005, was entered into between (a) the Levines, and (b) Haas Corp. for the demolition and construction of 700 Benvenue Ave. in Los Altos. [H vol.1, at pp. 58:4-59:19, at App. no. 3 and exhibit ("ex.") 7 attached thereto.] Haas Corp. was hired to demolish the prior residence down to the original foundation, modify the original foundation, add some additional foundation, and complete the new residence, including the driveway. [H, vol. 1, at pp. 58:14-59:7; 100:20-101: 3, at App. no. 3.]

The Levines moved out of their residence before December 1, 2005, prior to the commencement of the construction. [Mrs. Levine's trial testimony ("TT"), at p. 40: 9-19, at App. no. 4.] Haas testified that (1) construction on the Levine residence began in January or February of 2006, (2) the course of construction was expected to last approximately 330 days, (3) Haas Corp. was working on the Levine residence in August of 2006, and (4) he stopped working on the Levine residence in January or February of 2007. [H, vol. 1, at pp. 84: 2-86: 4 at App. no. 3]

Haas testified concerning all of the subcontractors and suppliers that worked on the Levine residence. They included, but are not limited to, the following entities: (1) AM Drywall installed drywall, (2) AK Construction installed interior doors and trim, (3) Nelson Castrillo Heating and Air installed the furnaces, ducting and the air-conditioning equipment, (4) Concrete Ready Mix, Inc. delivered concrete, (5) Diamond Fencing, Inc. installed fencing on the street, (6) Fonseca Construction performed framing work on the project, including installing exterior windows, (7) Leon

Concrete installed additional foundation systems, (8) Marco Roofing installed roofing product, (8) Randazzo Enterprises demolished some of the residence, (9) Rich Voss Trucking, Inc., delivered gravel or sand to the residence, (10) Roof Roofing performed installation of a roofing product, (11) Trojan Systems installed a security system, (12) United Plumbing Contractors was the plumbing contractor for water and sewer plumbing, (13) Valley Insulation installed fiberglass insulation on the walls, ceiling, and floor, (14) West Coast Plastering was the stucco plastering contractor, (15) Western Hardwood Floor supplied and installed hardwood floors, and (16) Atom Electric installed electrical systems. [Haas Deposition Volume 2 ("H, vol. 2"), at pp. 200: 3-227:25, at App. no. 5, and Exhibit 28 attached thereto at Bates No. HAAS00003201 (Interrogatory no. 1) and Bates no. HAAS00003459 to HAAS00003471 (Haas' Response to Interrogatory no. 1).] The demolition work included taking away the roof and walls, some of the sub-floor, and perhaps a bit of the foundation. [H, vol.2 at p. 227: 6-14, at App. no. 5.] After the demolition, approximately 1,000 square feet of the original foundation remained, which was modified, and an additional 2,000 square feet of foundation was constructed. [H, vol.1 at pp. 66:3-71:3 at App. no. 3.] Haas stated that, while Haas Corp. worked on the project, the Levines retained Flegel Construction to install cabinets. Haas stated he had no knowledge of him or anyone working on his behalf damaging Flegel's cabinet work, and he did not recall anyone claiming that Haas Corp. damaged Flegel's cabinet work. [H, vol.2 at pp. 249:18-251:1 at App. no. 5.]

Haas testified that he did not receive written hold harmless agreements and additional insured endorsements from Concrete Ready Mix, and Diamond Fence Company, Inc. [H, vol. 2, at pp. 208:6-11; 209:2-9, at App. no. 5]. Haas also testified that he did not recall seeing any written hold harmless agreements from any contractor that worked on the Levine residence. [H, vol. 2, at p. 228:9-12, at App. no.5.] Haas testified that Haas Corp. did not receive written indemnity agreements from each subcontractor that Haas Corp. retained to work on the Levine residence. [H, vol. 2, at p. 199:18-21, at App. no. 5.] Haas also testified that he did not recall whether contractors that worked on the Levine residence provided him with additional insured endorsements, except he stated that he had some recollection that West Coast Plastering did. [H vol.2, at p. 228:20- 25, at App. no. 5.]

Haas testified that, when he stopped working at the Levine residence, Haas Corp. was

approximately 70 to 75 percent done with its work on the residence. [H, vol.1 at p. 124:4-7 at App. no. 3.] The Los Altos Construction permit job card reveals that the foundation was inspected and approved on February 23, 2006, the underfloor frame was inspected and improved on March 15, 2006, the roof sheathing was inspected and approved in April of 2006, and the house's frame was inspected and approved on August 29, 2006. [Haas' TT at pp. 367:21- 369:2 at App. no. 4 and trial ex. 105 attached thereto.] After Haas Corp. stopped working on the residence, the Levines hired Flegel Construction to complete the residence. [Mrs. Levine's TT at p. 52:2-9 at App. no. 4.] In October of 2007, the construction was completed, and the Levines moved into the residence. [Mrs. Levine's TT at p. 54:7-9, and Mr. Levine's TT at p. 250:15-17 at App. no. 4.]

**2. Haas Corp.'s Application and The Issuance of The Policy**

By application, signed by its President, R.J. Haas, and dated August 20, 2006 ("the Application"), Haas Corp. applied to PBSIC for the issuance of a CGL policy that would afford coverage for the business of residential remodeling and new home construction. [PBSIC's First Set of Request for Admissions propounded on Haas and his response to nos. 2, 7, and 8, attached as App. nos. 6 and 7; PBSIC's First Amended Complaint, par. 8, and Exhibit A attached thereto, at App. no. 8; and Haas' Answer to the First Amended Complaint, paragraph 8, at App. no. 9.]

In 2006, James E. McGovern, Inc. ("McGovern") was the insurance agent/broker for Haas Corp., and Steve Suissa of McGovern was the employee responsible for procuring the PBSIC policy for Haas Corp. [Declaration of Steve Suissa ("Dec. Suissa"), at paragraphs 1-4.] Suissa filled out the Application based solely upon information provided by Haas, and he believes that he requested Haas to review the Application prior to Haas signing it. [Dec. Suissa at paragraphs 1-4, 8, and 9.] In the Application, Haas Corp. made representations including, but not limited to, the following: that Haas Corp. (1) did not allow any of its subcontractors to work without providing Haas Corp. with a certificate of insurance; (2) did, and would, have a written contract with its subcontractors that included a hold harmless agreement for work performed by its subcontractors; (3) was named as an additional insured on its subcontractors' insurance policies; and (4) carried workers' compensation insurance for all of its employees. [H, vol. 1, at pp. 71:13-78:11, at App. 3, and Ex. 6 [the Application] attached thereto.] Moreover, the Application inquired about "the three largest projects

that are in progress or will be completed during the proposed policy period" and asked for the gross receipts. In response, Mr. Haas only identified two projects, that had gross receipts of $500,000 and $400,000 and failed to identify the Levine project, despite the fact that the contract price, as mentioned above, for the Levine project was in excess of $800,000. Haas Corp.'s signed Application, in part, provided:

> 1. The applicant warrants that the above statements and particulars together with any attached or appended documents or materials ("this application") are true and complete and do not misrepresent, misstate, or omit any material facts.
>
> 2. The applicant understands that this company relied upon the information contained within this application to determine acceptability, rates and coverage.
>
> 3. The applicant understands that any misrepresentation or omission shall constitute grounds for rescission of coverage and denial of claims or, at the option of the company, the assessment of additional premium charges.
>
> * * *
>
> The undersigned, being authorized by and acting on behalf of the prospective insureds, represents that the answers given are true. Failure to provide truthful answers and all material information can result in the company electing to cancel, reform and/or rescind the policy. [App no. 22 [the Application].]

In reliance upon the truth and accuracy of the contents of the Application, PBSIC issued the policy, which was effective from August 29, 2006 to August 29, 2007. [The concurrently filed Declaration of (1) Andrea Griggs ("Dec. of Griggs") at paragraphs 1-8, and (2) Sherrianne Hanavan ("Dec. of Hanavan") at para. 8.] PBSIC has since determined that certain representations in the Application were false. At the time that Haas signed the Application, Haas Corp. did <u>not</u> have written contracts with its subcontractors that included a written hold harmless agreement for the work of each subcontractor, did <u>not</u> receive Certificates of Insurance from all of its subcontractors, and was <u>not</u> named as an additional insured under all of its subcontractors' CGL policies. As discussed above, Haas Corp.'s subcontractors included (1) Randazzo Enterprises, Inc. ("Randazzo"), (2) AM Drywall, Inc., ("AM Drywall") and (3) Marco Roofing. The concurrently filed Declarations of Bill Lynch, Celestio Aguiar, and Michael Creeden all indicate that these three subcontractors began working on the Levine residence prior to August of 2006. [Dec. Lynch at paragraphs 1-3, Dec. Aguiar at paragraphs 1-3, and Creeden Dec. at paragraphs 1-4.] Randazzo, AM Drywall, and Marco Roofing did not enter into any written indemnity agreements with Haas Corp. holding it harmless for any liabilities arising out of their work on the Levine residence. [Lynch Dec., at par. 4, Aguiar Dec., at

par. 5, and Creeden Dec., at para. 6.] Haas Corp. was not named as an additional insured under any of AM Drywall's insurance policies with respect to AM Drywall's work on the Levine residence. [Aguiar Dec. at para. 6.] Marco Roofing did not provide Haas Corp. with any Certificates of Insurance for its work on the Levine residence and did not name Haas Corp. as an additional insured. [Creeden Dec. at paragraphs 5 and 7.]

Despite PBSIC's requests, Haas has not produced a single agreement between Haas Corp. and any subcontractor on the Levine project that contained a written hold harmless agreement in favor of Haas Corp. [Dec. of Silverstein, at para. 12; H, vol.1 at pp. 111:11-113:25 at App. no. 3, and the fifth page of ex. 8 attached to his transcript; and H, vol. 2 at pp. 196:20-197:14; 235: 22-236:21, at App. no. 5, and ex. 5 attached thereto (the Fourth Amended Deposition Notice for Haas ("H Notice")) including demand no. 4 in attachment A thereto; and Haas' response to PBSIC's Request for Admission, Set One, No. 6, at App. nos. 6 and 7.] Moreover, in response to PBSIC's Request for Admission, Set One, No. 17, Haas, in part, stated "Haas admits that to date he has not identified any written contracts with subcontractors on the Levine project that include hold harmless agreements for work performed by those subcontractors". [App. nos. 6 and 7.]

In response to PBSIC's Request for Admissions, Set One, No. 22, Haas admitted that some of the insurers of the subcontractors that worked on the Levine residence denied that Haas Corp. was an additional insured. [App. nos. 6 and 7.] Haas has also admitted, in response to PBSIC's Request for Admissions, Set One, Nos. 39, 52, 60, 64, 72, 80, 88, 100, 130 and 141, that he has not identified any certificates of insurance from the following subcontractors indicating that Haas Corp. was an additional insured: AM Drywall, A.K. Construction, Atom Electric, United Plumbing, Diamond Fence, Roof Roofing, Leon Concrete, Nelson Castrillo, Marco Roofing, and Valley Insulation [App. nos. 6 and 7.] Haas also admitted that Fonseca Construction did not name Haas Corp. as an additional insured with respect to its work on the Levine residence. [Haas' response to PBSIC's Request for Admissions, Set one, number 26, App. nos. 6 and 7.]

### 3. The *Levine* Action

On March 1, 2007, the Levines filed the *Levine* action. [*Levine* Action Complaint, App no. 10.] Paragraph 7 of the Complaint alleged, "[i]n mid-2005, the Levines decided to do a major

remodel of their existing home on the Property, and build their dream home in its place." Paragraph 9 alleged, "[u]nfortunately, Mr. Haas and his Company failed to live up to the promises. Instead of having a completed, quality-built home, the Levines ended up with an incomplete home built with low quality materials and a serious lack of attention to detail that also is riddled with defects." Paragraph 27 alleged that Haas Corp. breached its duty of care by, among other things:

> (a) Failing to install and failing to properly install foundation footings, piers and posts, resulting in, among other things, the sub-floor being out of level;
>
> (b) Failing to properly frame the roof per the construction plans and applicable building codes, and causing the roof to sag and bow in numerous areas;
>
> (c) Cutting numerous structural rafters in the roof contrary to, among other things, the construction plans and applicable building codes and industry standards in a failed attempt to repair the situation, thereby creating the need, on information and belief, for removal of the roof to repair the cut rafters;
>
> * * *
>
> (j) Failing to properly install the exterior stucco underlayment resulting in excessive cracking of the stucco, which will result in the need, on information and belief, to remove the stucco in order to correct it.

The Levines had only one retained expert testify during the *Levine* action trial: Patrick Kelley. [Dec. of Silverstein at para 2.] Mr. Kelley has a degree in civil engineering and is a residential construction defect expert. [Deposition of Kelley, ("Dep. K") at pp. 5:17- 9:9, at App. no. 11.] The Levines initially contacted Mr. Kelley, in November 2006, to provide them advice with regard to Haas Corp.'s construction of their residence and later hired Mr. Flegel to replace Haas Corp. as the general contractor and to complete the Levine residence. [Dep. K at pp. 10:14-11:23; 12: 20-15:7, at App. no. 11.] Mr. Kelley testified that, as of approximately November of 2006, 75 to 80 percent of the Levine residence was completed; the windows were installed, the framing was completed, exterior stucco was on the residence, and the roof, rough plumbing, and electrical had all been installed. [Dep. K. at pp.16:12-17:4., at App. no. 11.] Mr. Kelley testified that, after Haas Corp. was terminated, he worked with Flegel to coordinate the completion of the project and visited the residence at least 8 or 10 times. Flegel was retained to repair Haas Corp.'s defective work and complete the project. [Dep. K. at pp. 18:12-19:3; 81:7-11, at App. no. 11.]

At trial, the Levines submitted a spreadsheet detailing the repair costs to the Levine residence. [*Levine* action TT, at pp. 188:1-190: 21 attached as App. no. 4 and exhibit 29 attached thereto.) The

spreadsheet reveals the total cost for Mr. Flegel to repair and finish the Levine residence was $629,336.57. [Dep. K. at pp. 21:3-26:4, attached as App. no. 11 and exhibits 35 and 36 attached thereto.] [Exhibit 35 is the same as trial exhibit no. 29.] Mr. Kelley testified about the items contained in the spreadsheet, and stated that the repair and completion costs included: (1) the cost to remove and replace the stucco, because it was cracked and too thin, (2) reworking defective framing, (3) renting equipment to repair and finish the residence, (4) removing the drywall to repair the defective framing, part of this included costs related to debris removal, (5) repairing defectively installed windows, (6) replacing the damaged front door, (7) repairing and/or replacing defective HVAC work, (8) replacing insulation that was removed to fix the framing, (9) replacing defectively installed architectural sheet metal, (10) repairing and replacing defective plumbing work, (11) painting the house, which Haas Corp. failed to finish, (12) replacing defective exterior trim, (13) installing a stoop, a shower pan, hardwood floors, electrical trim, fixtures, appliances, custom millwork, shower enclosures, mirrors, finished door hardware, security items, marble and tile that Haas Corp. failed to install, (14) the cost to repair a roof over the entry way which was defective, (15) placing a security fence around the project until completed, and (16) repairing the deflection in the roof caused by the installation of tile that were too heavy for the roof. [Dep. K. at pp. 28:17-50:11, attached as App. no. 11, and Exhibit 35 attached thereto.] Mr. Kelley stated that the scope of repair and completion work was work that Haas Corp. originally installed and which had to be repaired or completed. [Dep. K. at pp. 56:3-59:7, at App. no. 11 and Exhibit 35 attached thereto.]

No repair work was performed on the portion of the original foundation that became part of the Levine residence. [Dep. K. at pp. 53:6-54:17, at App. no. 11.] Mr. Kelley also stated that, as far as he knows, none of the work by Haas Corp. caused any damage to any of the work contracted for directly by the Levines. [Dep. K. at p. 59:8-21, at App. no. 11.] Mr. Kelley stated that Haas' defective framing damaged the subflooring, which was part of the pre-existing structure that was not torn down. Haas Corp. placed framing on top of the subflooring, which was supposed to support the subflooring, which caused deflection of the subfloor. The damage was discovered while Haas was still working on the project. [Dep.K. at pp. 59:22-62:25, at App. no. 11.]

### 4. The Judgment in the *Levine* Action

The *Levine* action was tried in November of 2010, and the Levines obtained a judgment against Haas and Haas Corp. in the amount of $1,989,649.07, which is comprised of an underlying judgment of $1,470,858.78; attorneys fees of $465,766.58; costs awarded, on February 25, 2011, in the amount of $14,174.10; and costs awarded, on December 3, 2010, in the amount of $38,850.51. [App. no. 13, [the Amended Judgment], and App. no. 14. [The Levines' Initial Disclosure in the instant action.]] The Statement of Decision, dated January 13, 2011, in part, provides:

> The court finds that Plaintiffs shall recover from Defendants the following;
>
> A. $533,239.21 for construction repair costs, additional engineering and architect costs and additional costs of completion;
>
> a. Damages for Substandard Work: $112,702.26
>
> b. Damage to other Work caused by the Defective Work: $295,115.45
>
> c. Completion Costs: $125,421.50
>
> B. $150,451.19 in consequential damages incurred by Plaintiffs as a result of being displaced from their home for an additional year after agreed-to completion date set forth in the construction contract;
>
> C. $197,955.93 prejudgment interest on construction damages, Westfall Engineering costs and Flury Bryant costs at 10% per annum from the date of the filing of the complaint on March 1, 2007 to November 15, 2010;
>
> D. $22,077.45 prejudgment interest on consequential damage (costs of alternate housing, rental insurance, moving expenses, PODS storage, public storage and PG&E transfer costs from the date Plaintiffs returned to their home on October 27, 2007 to November 15, 2010);
>
> E. $12,500 for the Contractor's Bond; and
>
> F. $554,635 in disgorgement of payments made to R.J. Haas Corp. by Plaintiffs for failure to obtain workers compensation insurance. [App. no. 15.]

Mr. Kelley did not know where the *Levine* action Statement of Decision award of "Damage to Other work caused by Defective Work: $295,115.45" and "damage for substandard work of $112,702.26." came from. Mr. Kelley did not recall testifying about damage to other work caused by defective work. [Dep.K. at pp. 63:1-65:18 at App. 11, and Exhibit 37 attached thereto.]

C. **Argument**

1. **This Court Should Rescind the PBSIC Policy**

Cal. CCP Section 1691 provides that, by service of the instant action on Haas and Haas Corp., PBSIC gave them notice of the rescission. [App. no. 8 [PBSIC's First Amended Complaint ("FAC")], and App. no. 23 [documents re service of the FAC on Haas and Haas Corp].] PBSIC expended more defending Haas and Haas Corp. against the *Levine* action, in excess of $200,000, than the premium for the policy: $17,295. [Dec. of Hanavan at para. 10.] Thus, in order to effectuate the rescission, PBSIC does not need to refund any premium.

a. **California Law Re Rescission**

Sections 331 and 359 of the Cal. Insurance Code provide that material misrepresentations or concealments in an application for insurance are grounds for rescission of the policy. Section 334 specifies that "[m]ateriality is to be determined . . . solely by the probable and reasonable influence of the facts upon the party to whom the communication is due . . . ."

> [S]ections 331 and 359 are part of a larger statutory framework that imposes "heavy burdens of disclosure" "upon both parties to a contract of insurance, and any material misrepresentation or the failure, whether intentional or unintentional, to provide requested information permits rescission of the policy by the injured party." . . . [P] Requiring full disclosure at the inception of the insurance contract and granting a statutory right to rescind based on concealment or material misrepresentation at that time safeguard the parties' freedom to contract. "[An insurance company] has the unquestioned right to select those whom it will insure and to rely upon him who would be insured for such information as it desires as a basis for its determination to the end that a wise discrimination may be exercised in selecting its risks." (*Mitchell v. United National Ins. Co.*, 127 Cal.App.4th 457, 468-469 (2005) [citations omitted].)

Under these principles, "[c]ourts have applied [] sections 331 and 359 to permit rescission of an insurance policy based on an insured's negligent or inadvertent failure to disclose a material fact in the application for insurance . . . . One authority has noted that under [] sections 331 and 359, 'misstatement or concealment of 'material' facts is grounds for rescission even if unintentional. The insurer need not prove that the applicant-insured actually intended to deceive the insurer.'" (*Id.*, at 469,[citations omitted].) "The fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law." (*Thompson v. Occidental Life Ins. Co.* 9 Cal.3d 904, 915-916 (1973).) The insurer need not prove that the applicant-insured actually intended to deceive the insurer. (*See LA Sound USA, Inc. v. St.*

*Paul Fire & Marine,* 156 Cal.App.4th 1259, 1270 (2007).) Moreover, the *LA Sound* Court stated:

> Plaintiff furthers claim St. Paul could not rescind the policy because the misrepresentations were unintentional. Not so, according to the Insurance Code, case law and leading commentary. "Concealment, whether intentional or unintentional, entitles the insured party to rescind insurance". (*Id.* at 1269 [citation omitted].)

"[An insurance company] has the unquestioned right to select those whom it will insure and to rely upon him who would be insured for such information as it desires as a basis for its determination to the end that a wise discrimination may be exercised in selecting its risks." (*Robinson v. Occidental Life Ins. Co.*, 131 Cal.App.2d 581, 586 (1955).) In *Holz Rubber Co., Inc. v. American Star Ins. Co.*, 14 Cal.3d 45, 61 (1975), the Court wrote: "Materiality is determined by the probable and reasonable effect that truthful disclosure would have had upon the insurer in determining the advantages of the proposed contract. [Citations.] Essentially, we must decide whether the insurer was misled into accepting the risk or fixing the premium of insurance. [Citations.]"

**b. <u>Misrepresentations Made by Haas Corp.</u>**

**i. <u>There Were no Written Indemnity Agreements</u>**

Were there any material misrepresentations in the Application? The Application, <u>dated August 20, 2006</u>, provides that Haas Corp. has and will have a written subcontract with its subcontractors that includes a hold harmless agreement relative to work performed by each subcontractor. Please recall that (a) the Application was submitted virtually in the middle of Haas' involvement on the Levine project, and (b) the Levine project was the largest Haas Corp. was involved with in 2006, though it was never disclosed in the Application. Haas has produced no hold harmless agreements for Haas Corp.'s subcontractors' work on the Levine residence. Also, Marco Roofing, AM Drywall, and Randazzo, acknowledged that they had no written hold harmless agreement with Haas Corp. for their work. These entities' agreements predate August 20, 2006.

**ii. <u>Subcontractors Worked Without Procuring Certificates of Insurance and Additional Insured Endorsements</u>**

Marco Roofing and Fonseca Construction did not provide Haas Corp. with a Certificate of Insurance for their work on the Levine residence. Haas has not identified any certificate of insurance provided to Haas Corp. for a number of the subcontractors, including AM Drywall, A.K. Construction, Atom Electric, United Plumbing, Diamond Fence, Roof Roofing, Leon Concrete,

Nelson Castrillo, Marco Roofing and Valley Insulation. Haas has only produced (1) Certificates of Insurance for the following subcontractors: Randazzo Enterprises; Rich Voss Trucking; West Coast Plastering; and Western Hardwood, and (2) additional insured endorsements under a Rich Voss Trucking policy. [Dec. of Silverstein at paragraphs 12 and13; H vol. 2, at pp. 196:20- 197:14; 235:22-237:24; 246:1-18, at App. no. 5 and Exhibit 32 attached thereto (insurance documents); and App. no. 3 (H, Vol 1. at Ex. 5 attached thereto (H Notice attached thereto including Demand nos. 24 and 39 in attachment A to the H Notice)).]

**iii. <u>The Application failed to Disclose the Levine Project and that Haas Corp. had no Workers' Compensation Policy</u>**

Even though the Application inquired about the three largest projects (using gross receipts) that were in progress or would be completed during the proposed policy period, Haas Corp. did not disclose that it was working on the Levine residence, which was larger then the two projects listed. Given that Haas Corp. did not obtain written indemnity agreements, additional insured endorsements, and certificates of insurance for the Levine residence, it is not surprising that Haas did not disclose the project. Moreover, Haas did not have any workers' compensation insurance at the time he obtained the subject policy only. [Dec. of Silverstein, par. 14; H, vol. 2 at pp. 240:18-20; 242: 23-243:17, at App. no. 5.] On or about April 29, 2006, Haas Corp. requested an exemption from workers' compensation from the Contractors State License Board contending that he did not employ anyone in a manner that made him subject to workers' compensation laws. (App. no. 24.)

**iv. <u>The Misrepresentations Were Material</u>**

If an insurer demands answers to specific questions in an application for insurance, then that fact is usually sufficient to establish materiality as a matter of law. (*Thompson,* 9 Cal.3d at 915-916.) In this case, PBSIC specifically requested the applicant to answer questions regarding whether the applicant's subcontractors had written subcontract agreements that included a hold harmless agreement relative to work performed by the subcontractors. Haas produced no evidence that Haas Corp. obtained any written hold harmless agreements from any of its subcontractors that worked on the Levine residence. Also, Haas, despite his representation that subcontractors are not allowed to work without providing a Certificate of Insurance, has produced no evidence that all of its

subcontractors provided a Certificate of Insurance. Furthermore, Haas's Application failed to disclose his largest project (the Levine residence), which hid the project from any post-policy audit process, wherein the final policy premium is determined. Thus, this Court should rescind the policy.

The Dec. of Griggs establishes that the misrepresentations were material. PBSIC would not have issued the policy if it had known that Haas Corp. was not procuring written hold harmless agreements and Certificates of Insurance from its subcontractors, and identifying its largest project. PBSIC intended, as evidenced by the questions in the Application, that Haas Corp.'s subcontractors would (1) be solely responsible for damages caused by their defective work, and (2) have insurance to cover their liability. Given that Haas Corp. failed to accurately answer the Application's questions, PBSIC's potential exposure was dramatically increased. There are no written indemnity agreements holding the subcontractors solely liable for the damages they caused, and there is little, if any, applicable subcontractor insurance. Thus, this Court should rescind the policy.

### 2. The Policy Does Not Insure Defective or Incomplete Work

Assuming *arguendo* that the policy is not rescinded, there still no coverage for the *Levine* action judgment, because CGL policies do not provide coverage for defective or unfinished work. In *Maryland Cas. v. Reeder*, 221 Cal.App.3d 961, 967 (1990), the Court stated:

> Generally, liability policies, such as the ones in dispute here, are not designed to provide contractors and developers with coverage against claims their work is inferior or defective. (Citation omitted.) The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer. (Citations omitted.) Rather liability coverage comes into play when the insured's defective materials or work cause injury to property other than the insured's own work or products. (*Id.*, at 967) [emphasis added.)

Coverage only applies to resulting "property damage" caused by the defective work of the insured. (*Collett v. Insurance Co. of the West*, 64 Cal.App.4th 338, 343-344 (1998).) "To be covered under a commercial general liability policy (CGL) policy, such as the policy in this case, the 'property damage' must be to tangible property other than the insured's own work, caused by the insured's defective work". (*Proulx & Company v. Crest-Liners*, 98 Cal.App.4th 182, 196 (2002).) The costs incurred to repair and replace defective work, including damages to other property caused by the repair, also do not constitute "property damage." (*Viera*, 930 F.2d at 701-702.) "In short, a liability insurance policy is not designed to serve as a performance bond". (*F&H Construction*, 118

Cal.App.4th at 373.) The *Levine* action judgment and the evidence detailed above reveal that the damages awarded to the Levines were entirely for Haas Corp.' defective or incomplete work. No damages were awarded to the Levines for Haas Corp. causing damage to the work of others.

### 3. PBSIC has No Duty to Satisfy any Portion of the Judgment

The Defendants have the burden to show the judgment is covered by the PBSIC policy. (*Travelers Cas. & Surety Comp. v. Superior Ct.*, 63 Cal.App.4th 1440, 1453 (1998).) The Levines and Haas, in response to PBSIC's written discovery, have produced no evidence that any portion of the *Levine* action Judgment is covered by the policy. [See (1) the Levines' responses to PBSIC's Interrogatories, Set No. Two, No. 7, which are attached at App. nos. 16 and 17, and (2) PBSIC's Second Set of Interrogatories, No. 9, propounded on Haas and Haas' supplemental response thereto, which are attached at App. nos. 18 and 19.]

#### a. The CSC Endorsement Precludes All Coverage

The policy contains the CSC Endorsement, which provides:

> As a condition precedent to this policy applying to any **claim** in whole or in part based upon the work performed by independent contractors, the **insured** must have prior to the date of the loss giving rise to the **claim**:
>
> (1) Received a written indemnity agreement from the independent contractor holding the **insured** harmless for all liabilities, including costs of defense, arising from the work of the independent contractors; and
>
> (2) Obtained certificates of insurance from the independent contractor indicating that the **insured** is named as an additional insured and that coverage is maintained equal to or greater than provided by this policy with limits of at least $1,000,000 per **occurrence**.
>
> (3) The **insured** has maintained the records evidencing compliance with subsections 1 and 2. [Emphasis added.] [App. No. 21 [the policy at endorsement no. 5].]

*Scottsdale Ins. Co. v. Essex Ins. Co.*, 98 Cal.App.4th 86 (2002), interpreted a similar endorsement and held that it entirely precluded coverage. The Court noted that these types of Endorsements were not unusual, and found that there was nothing illusory about the coverage. If the insured had complied with the Endorsement's terms, the policy would have provided coverage. The Court found that, as such, the Endorsement was simply a condition precedent to coverage. The Court

held that Essex had no duty to defend or indemnify the insured, due to the insured's failure to comply with the Endorsement. (*Id.* at 97-98.)

*North American Capacity Ins. Co. v. Claremont Liab. Ins. Co.,* 177 Cal.App.4th 272 (2009), also upheld the terms of a "Contractors Warranty Endorsement," and found that it applied to preclude coverage for the operations of those non-complying subcontractors. In particular, the Court held "[w]e find the 'clear and explicit' meaning of the contractors warranty endorsements, as used in their 'ordinary and popular sense' by a layperson establishes a precondition of coverage as to work done by subcontractors for whom JDG [the insured] failed to secure both a written hold harmless agreement and a certificate of insurance". (*Id.* at 290-291.) Moreover, in part, the Court stated:

> As in *Scottsdale*, [the insured] knew, or is presumed to have known, of this precondition prior to acceptance of the Claremont policies. [The insured] could have protected itself by obtaining from its independent contractors agreements for indemnity and certificates of insurance before entering into the policy or by seeking modification of this policy term, e.g., by paying a larger premium. Merely requiring that [the insured] continue its normal business practice of obtaining hold harmless agreements and certificates of insurance as a precondition to coverage did not render the Claremont primary or umbrella insurance contractors warranty endorsements impossible of performance. (*Id.*, at 290.)

In order for Haas Corp. to obtain coverage for any work performed by its subcontractors, Haas Corp. must satisfy the CSC Endorsement. Hence, under the circumstances, and based on *Scottsdale* and *North American Capacity*, to the extent that Haas Corp.'s subcontractors failed to satisfy the Endorsement, then there would be no coverage for all operations performed by those subcontractors.

Haas testified that everything that the Levines complained about, in the *Levine* action, was within the scope of work performed by a subcontractor of Haas Corp. (H. Depo. vol. 2, at pp. 258:9-259:10, at App. no. 5.) Haas admitted that he has been unable to locate, for any subcontractor Haas Corp. retained to work on the Levine residence, any written indemnity agreement from a subcontractor holding Haas Corp. harmless from all liabilities arising out of the work of the subcontractor. The CSC Endorsement required Haas Corp. to maintain these records. Moreover, Marco Roofing, AM Drywall, and Randazzo never entered into any written hold harmless agreement with Haas Corp. for their work on the Levine residence. Since all work was performed by Haas Corp.'s subcontractors and there is no evidence that a subcontractor provided Haas Corp. with a written indemnity agreement holding Haas Corp. harmless for all liabilities, including costs of defense, arising from the work of that

subcontractor, and Haas, at best, obtained Certificates of Insurance from four subcontractors, the PBSIC policy does not cover the *Levine* action Judgment.

**b. <u>If the Court Holds that the CSC Endorsement Does Not Preclude All Coverage, then the "Work Product" Exclusions Would Preclude Coverage for the Judgment</u>**

If the Court holds, contrary to Haas' sworn testimony, that all work was not performed by Haas Corp.'s subcontractors, then other provisions, including the "Work Product" Exclusions, in combination with the CSC Endorsement, would preclude all coverage for the Judgment.

**i. <u>Exclusions "J(5)" and "J(6)"</u>**

All "ongoing operations" damages would be precluded by Exclusions "J(5)" and "J(6)". ("Ongoing operations" damages would be damages that arose while Haas Corp. was working on the Levine residence. Damages that arose after Haas Corp. stopped working would be "completed operations" damages. The PBSIC policy defines "Products Completed Operations Hazard", in part, as:

> a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of your product or "your work" except:
>
> * * *
>
> (2) Work that has not yet been completed or abandoned.
>
> b. "Your work" will be deemed completed or abandoned at the earliest of the following times:
>
> * * *
>
> (4) When "you" [the named insured] refuse to continue performance of "your work" under any contract or when "your" continued work at the job site or "your" contract has been terminated by anyone for any reason. [Policy at App. no. 21, p. 24 of form PBG 0001 .]

Exclusion "J(5)" provides, in pertinent part, that there is no coverage for "property damage" to: "Any real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations. . . . " (Policy at App. no. 21, p. 5 of form PBG 0001.) Exclusion "J(6)" provides, in pertinent part, that there is no coverage for "any property that must be restored, repaired or replaced because your work was incorrectly performed on it." (Policy at App. no. 21, p. 5 of form PBG 0001.) The policy defines "your work" as including " a. [w]ork or operations performed by you or on your behalf". (Policy at App. no. 21, p. 24 of form PBG 0001.)

*Clarendon v. Gen. Security* at 193 Cal.App.4th 1311, discussed the scope and impact of

Exclusions "J(5)" and "J(6)", the "faulty workmanship" exclusions. The Exclusions discussed in *Clarendon* are substantially similar to PBSIC policy's Exclusions "J(5)" and "J(6)". Clarendon filed an equitable contribution action against General Security for equitable contribution for the amounts Clarendon paid to defend and indemnify Hilmor Development in the underlying construction defect suit. The *Clarendon* Court held that, because the contractor never completed or abandoned its work on the project, there was no coverage under the "Products-Completed Operations Hazard" provision. In part, the Court stated:

> The exclusion found in j(5) applies to works in progress. The insurer is not obligated to indemnify a policyholder for property damage that occurs while the insured is performing operations on that property. Thus, if the Revahs' claims encompassed property damage that occurred while Hilmor or its subcontractors were performing operations on the property, no coverage would exist.
>
> The exclusion found in j(6) excludes coverage for the physical injury to, or loss of use of, that part of the property that must be replaced because Hilmor's work was performed incorrectly. This precludes coverage for the claims asserted by the Revahs against Hilmor, which were based on alleged "defects and deficiencies" in the residence resulting from poor workmanship and/or materials. As such, the claims are specifically excluded from coverage under paragraph j(6) of General Security's CGL policy. The faulty workmanship provisions thus provide support for a grant of summary judgment in General Security's favor. (*Id.* at 1325-1326, emphasis added.)

The evidence discussed above reveals that Haas Corp.'s work was incomplete and/or defective, and that the defective work, at most, only damaged other work performed by Haas Corp.'s subcontractors. All damage that took place prior to the time Haas Corp. stopped work would be precluded by Exclusions "J(5)" and "J(6)", since Haas Corp. was the general contractor retained to build the entire Levine residence. (*See also Baroco West, Inc. v. Scottsdale Ins. Comp.,* 110 Cal.App.4th 96, 103, 104 (2003), [holding that coverage for a general contractor that was terminated before finishing the construction of a house was precluded by Exclusions "J(5)" and "J(6)".]

Any "competed operations' damages would either be excluded by the CSC Endorsement, if the damaged work was caused by a subcontractor that did not satisfy the CSC Endorsement, or the other "Work Product" Exclusions detailed below. There is no evidence that the Judgment includes damages for "completed-operations" damages to any work performed by a subcontractor directly retained by the Levines. Indeed, the evidence only bearing on that issue is to the contrary. [Dep. K. at p. 49:8-21 at App. no. 11.] There is also no evidence that the $295,000 awarded for "Damage to Work caused by

the Defective Work" is covered. Mr. Kelley testified that he did not know where the Statement of Decision award of "Damage to Other work caused by Defective Work: $295,115.45" came from. These damages would be excluded by the CSC Endorsement and "Work Product" Exclusions.

**ii. Exclusions "L", "M" and "N"**

If the Court holds, contrary to Haas' testimony, that some work was performed by Haas Corp. employees, Exclusion "L" would preclude coverage for all "completed-operations" damages arising of the work of those "employees". Exclusion "L" precludes coverage for:

> "Property Damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on "your" behalf by a subcontractor. [Policy at App. no. 21, p. 5 of form PBG 0001.]

Since "your work" is defined to include work or operations performed by the insured or on the insured's behalf, in this matter, "your work" would mean any of Haas Corp.'s work on the Levine residence. However, the Exclusion does not apply if the damaged work, or the work out of which the damage arises, was performed by a subcontractor of Haas Corp. To the extent that the judgment includes "completed operations" damage to work performed by Haas Corp.'s employees on the project, this Exclusion would preclude coverage. For any subcontractor that failed to satisfy the CSC Endorsement, there is also no coverage for damage caused by that subcontractor.

Exclusion "M" precludes coverage for:

> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>
> (2) A delay or failure by "you" or anyone acting on "your" behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion applies to property which is otherwise not physically injured or damaged but which must be demolished, removed, repaired, replaced, altered or damaged in order to remove, repair or replace "your work" or "your product". (Policy at App. no. 21, p. 5 of form PBG 0001.)

Exclusion "M" applies to incorporation defects, wherein there is no coverage to repair the insured's defective work, which has not (yet) caused resultant property damage. If this Court finds that

any part of the judgment is for "property damage" to "impaired property" or property that has not been physically injured arising out of a defect, deficiency, inadequacy or dangerous condition in Haas Corp.'s work, this Court should find Exclusion "M" precludes coverage for that part of the Judgment. (*See St. Paul Fire & Marine Ins. Comp. v. Futura Coatings, Inc.* 993 F.Supp. 1258, 1262 (D. Minn. 1998), holding Exclusion "M" precluded coverage where the insured retained a contractor to coat basins for one of the insured's clients and the coating was defective.)

Moreover, Exclusion "N" precludes coverage for:

> Damages claimed for any loss, cost or expense incurred by "you" or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
>
> (1) "Your product";
> (2) "Your work"; or
> (3) "Impaired property";
>
> if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it. (Policy at App. no. 21, p. 5 of form PBG 0001.)

If the Court determines that the Judgment includes costs to repair and replace Haas Corp.'s work product because of a known or suspected defect in its work product, Exclusion "N" would preclude coverage for that part of the judgment. (*See McNeilab, Inc. v. North River Ins. Co.*, 645 F. Supp. 525, 540-541 (Dist. N.J. 1986).)

**iii. <u>Other Parts of the Judgment are not Covered</u>**

CGL policies do not provide coverage (1) against claims that a contractor's work was inferior or defective, and (2) to replace and repair a contractor's defective materials or workmanship. (*Maryland Cas.*, at 221 Cal.App.3d 967.) Similarly, the costs incurred to repair and replace defective work, including damages to other property caused by the repair, also do not constitute "property damage." (*Viera*, at 930 F.2d at 701-702.) Thus, the portion of the Judgment for "damages for substandard work", in the amount of $112,702.26, and "completion costs", in the amount of $125,421.50, would never be covered. CGL policies also do not provide coverage for restitutionary recoveries such as disgorgement. (*See Bank of the West v. Sup. Ct.*, 2 Cal.4th 1254, 1266-1271 (1992).) Thus, there is no coverage for the part of the Judgment that awarded "$554,635 in disgorgement of payments made to R.J. Haas Corp. by Plaintiffs for failure to obtain workers compensation insurance."

The portion of the Judgment in the amount of $12,500, for the contractor's bond, is not covered. *Fort Bragg Unified School Dist. v. Colonial Amer. Cas. & Surety Comp.*, 194 Cal.App.4th 891 (2011), stated "there will seldom be overlapping coverage between such a [performance] bond, which guarantees performance of a contract, and the contractor's liability insurance policy, which indemnifies the contractor from injury claims based on negligence or accident". (*Id.* at 910.) The policy does not guarantee performance of Haas Corp.'s contract. Given the lack of coverage, there is no coverage for (1) damages awarded to the Levines, such as their damages for the Levines' displacement from their home and interest; and (2) costs, including attorneys' fees awarded to the Levines. The policy provides that under Supplementary Payments, no. 5, that PBSIC will pay "[c]osts awarded against **you** in a **suit** for damages but only if awarded on a cause of action or causes of action <u>covered by this insurance</u>". [Policy at App. no. 21, p. 14 of form PBG 0001 [emphasis added].]

## III. <u>CONCLUSION</u>

This Court should rule there is no triable issue of material fact, and PBSIC is entitled to judgment in its favor as a matter of law on (1) R.J. Haas' Counterclaim, and (2) the Levines' Counterclaim. Moreover, this Court should grant (1) Partial Summary Judgment on PBSIC's Second Amended Complaint against R.J. Haas, Karen Levine, and Ty Levine, (a) for rescission of the PBSIC policy, and (b) as to PBSIC's claim that the policy does not cover the judgment.

DATED: September 28, 2012

YARON & ASSOCIATES

By: [signature]

GEORGE D. YARON
JAMES I. SILVERSTEIN
Attorneys for Plaintiff
PROBUILDERS SPECIALTY INSURANCE COMPANY, RRG