Kim O. Dincel (SBN 131563)
Julie Bonnel-Rogers (SBN 176200)
DINCEL LAW GROUP
25 Metro Drive, Suite 600
San Jose, CA 95110
Phone: (408) 573-5700
Fax: (408) 573-5701
Email: kdincel@dincellaw.com, jrogers@dincellaw.com

Robert L. Sallander, Jr., (SBN 118352)
Robert Glenn Seeds (SBN 112026)
GREENAN, PEFFER, SALLANDER & LALLY LLP
6111 Bollinger Canyon Road, Suite 500
San Ramon, CA 94583
Telephone: 925-866-1000
Facsimile: 925-830-8787
Email: rsallander@gpsllp.com; rseeds@gpsllp.com

Attorneys for Ty Levine, Karen Levine,
Valley Corp. B. And Ronald J. Haas

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| PROBUILDERS SPECIALTY INSURANCE COMPANY, RRG, a District of Columbia, Risk Retention Group,<br><br>Plaintiffs<br><br>vs.<br><br>VALLEY CORP. B., a California Corporation formerly known as R.J. HAAS CORP; RONALD J. HAAS, an individual; TY LEVINE, an individual; and KAREN LEVINE, an individual,<br><br>Defendants | Case No. 5:10-CV-05533-EJD<br><br>**RESPONSE TO PROPBUILDERS' MOTIONS IN LIMINE; DECLARATION OF ROBERT SEEDS**<br><br>Date: October 18, 2013<br>Time: 9:00 a.m.<br>Judge: Edward J. Davila<br>Courtroom: 1 |

In this one document, Haas and the Levines (hereafter "the insureds") respond to ProBuilders' eleven motions in limine.

**RESPONSE TO MOTION IN LIMINE NO. 1**

The insureds oppose motion in limine no. 1. This motion seeks to exclude all of the testimony of David Reilly on the grounds that some of it might be inappropriate opinion on issues of law, and Reilly is not an attorney. ProBuilders makes this motion under FRE 702, which governs what is proper expert testimony. A district court has discretion to admit or exclude expert testimony under Rule 702. See *General Electric Co. v. Joiner*, 522 U.S. 136, 138 - 39, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) (decision to admit or exclude expert testimony is reviewed for abuse of discretion).

ProBuilders, which has designated a claims handling expert of its own, must concede that claims handling is an appropriate subject for expert testimony in a case like this one. Reilly will be testifying, from his perspective of having handled or supervised the handling of thousands of construction disputes, to rebut ProBuilders own claims handling expert's opinion that "In all material aspects, the claims handling by Probuilders and NBIS met the standard of care for similarly situated insurers."[1] As a claims handler, Reilly has been required to make determinations about whether an insurer has a duty to defend or indemnify, Seeds dec. exh. 2 at 25:22 – 26:14, so he is qualified to express opinions related to making such determinations.

Federal courts have often allowed testimony from such claims-handling experts in cases like this one. *Shepherd v. UNUMProvident Corp.*, 381 F. Supp. 2d 608, 612 (E.D. Ky. 2005) (allowing former claims adjuster to testify to "information and opinions concerning claims adjusting/management practices used by Defendants, disability claims review standards used by Provident and the industry generally, and her review of Shepherd's claim file".)

1. Seeds dec. exh. 1p. 9. ProBuilders' motion does not include McKinnon's opinions, which are exhibit 1 to the Seeds declaration. See Docket 218-1 exh. A, pp. 51 and 52 of 61 (omitting pages 4 – 8 of McKinnon's report)

It is even proper for such an expert to base testimony on application of law. Magistrate Judge Larson, in a thoughtful opinion, held that

> an expert in insurance bad faith may reasonably rely on the application of statutes in determining the reasonableness of a company's actions. [Citation omitted. It would be reasonable for experts in bad faith insurance practices to look to the relevant statutory and regulatory requirements in examining the reasonableness of an insurer's actions. *Hangarter v. Paul Revere Life Ins. Co*., 236 F. Supp. 2d 1069, 1089 (N.D. Cal. 2002), *aff'd, Hangarter v. Provident Life & Accident Ins. Co*., 373 F.3d 998 (9th Cir. 2004).

That Court also noted that "California Supreme Court has allowed expert testimony on 'the conduct and motives of an insurance company in denying coverage'", citing *Neal v. Farmers Ins. Exch*., 21 Cal. 3d 910, 924 (1978). With these legal principles in mind we will now address the propriety of Reilly's testimony.

**1. His Role as a Rebuttal Witness Allows Him to Testify about Any Aspect of ProBuilders' Claims Handling**

ProBuilders correctly notes that Reilly was designated to rebut the testimony of its expert Ed McKinnon, and argues that Reilly should be limited to rebutting McKinnon's "evidence on the same subject matter", citing FRCP 26(a)(2)(D)(ii). Functionally, that allows Reilly to testify to any aspect of ProBuilders' claims handling. McKinnon has opined, broadly, that "In all material aspects, the claims handling by Probuilders and NBIS met the standard of care for similarly situated insurers." This allows Reilly to offer opinions about "all material aspects" of "the claims handling by Probuilders and NBIS".

For instance, McKinnon opined that Haas and Haas Corp had not complied with the Contractor's Special Condition endorsement, that this conclusion caused ProBuilders to conclude that "the CSC Endorsement eliminated any potential for coverage under its policy", as a result ProBuilders "concluded that it had no obligation to pay damages on behalf of [Haas Corp] or Haas", Seeds dec. exh. 1 at p, 7, and that

> Probuilders' decision not to pay money to settle Levine's claim and not to pay any portion of Levine's judgment were reasonable and consistent with the standard of care and the decisions I would expect similarly situated insurers to make. *Id*. at p. 8.

If McKinnon testifies to those opinions, Reilly is entitled to rebut them. Therefore, he is entitled to testify, as he did in deposition, that ProBuilders' delay in asserting that the

Contractors' Special Condition endorsement eliminated coverage was inconsistent with the standard of care, showing that it did not actually believe in this coverage defense at all. Seeds declaration exh. 2 at pp. 30:8 – 31:24, see also docket 218-1 page 9 of 61.[2] His insight as a claims adjuster allows him to testify on ProBuilders' motives. He is also allowed to testify that he believed that, contrary to McKinnon's opinion, there were covered damages.

Another example of Reilly rebutting McKinnon is Reilly's testimony that

> In the third paragraph on page 8, I disagree with his conclusion that Probuilders and NBIS met the standard of care for similarly situated insurers; that they were somehow magnanimous for continuing a defense; that they characterize late in the game as a courtesy defense, which they had never mentioned at the outset. I don't think that that comports with the standard of care. Seeds dec. exh. 2 at p. 74: 16 – 23.

ProBuilders plans to have McKinnon testify broadly that ProBuilders claims handling met the standard of care in all material respects. This allows Reilly to provide testimony that its claims handling did not meet the standard of care.

**2. His testimony regarding control of the defense**

Reilly provided useful insight, based on his experience, regarding ProBuilders' conduct of the defense it purported to provide. He testified, essentially, that from the beginning, ProBuilders had all of the information on which it relied, two years later, to conclude the Contractor's Special Condition eliminated coverage, and that defending for a couple of years and then taking a "no coverage" position breached the standard practice of claims handling. *Id*. at 49: 10 – 50: 6. This rebuts McKinnon's vague and conclusory report.

Reilly's report provides further insight on the defense that ProBuilders provided:

> There is also ample evidence in the record that Probuilders managed the litigation by requiring litigation plans and budgets from their chosen counsel.

2 Reilly's report states, on this subject, that

> The timing of the initial reservation on this issue (over 18 months late) and the filing of the rescission action (filed after judgment in the underlying case in 2011, four years after its insured was first sued and three years after Probuilders accepted the defense under reservation of rights), is also highly unusual and suggests that perhaps Probuilders did not believe in the legitimacy of its own endorsement.

> This activity is standard industry practice where there is no Cumis conflict. However, when there is requirement to appoint Cumis counsel, the insurer cannot dictate a litigation plan and budget to the Cumis lawyer, as this would defeat the entire purpose of independent counsel, which is to maintain autonomy from the insurer and take its direction from the insured only. The fact that Probuilders not only failed to appoint Cumis counsel but also actively managed the activities of its appointed counsel is inappropriate and deprived its insured of the benefits of an independent defense its insured was entitled to under the law. Docket 218-1 page 8 of 61.

A witness with Reilly's claims handling experience is well-situated to identify ProBuilders' conduct as exercising control over the defense, and as inconsistent with its obligation to allow *Haas* and *Haas Corp* to control their own defense.[3]

---

3 Reilly did opine that ProBuilders' reservation of rights required ProBuilders to allow Haas and Haas Corp to control their own defense through *Cumis* counsel. ProBuilders contends that whether *Cumis* counsel was required is an issue of law for the Court. It is true that, ultimately, it is an issue of law. However, McKinnon testified that the claims handling was up to par. McKinnon acknowledges that ProBuilders selected defense counsel, Seeds dec. exh. 1 at 7, and he also acknowledges that ProBuilders instructed defense counsel filed cross-complaints against subcontractors over Haas' objection, but appears to believe that this conduct was within industry standards. If *Cumis* counsel was required, then this did not satisfy industry standard.

This is important because ProBuilders did have an obligation to provide *Cumis* counsel. An insurer's obligation to retain independent counsel arises from the rule of professional conduct stating that an attorney can represent parties with conflicting interests only with the informed consent of both parties. *San Diego Navy Federal Credit Union v. Cumis Ins. Soc., Inc*., 162 Cal.App.3d 358, 375 (1984). A conflict of interest arises if the outcome of the coverage issue can be controlled by counsel retained by the insurer to defend the underlying claim. *Blanchard v. State Farm Fire and Cas. Co*., 2 Cal.App.4th 345, 350 (1991).

There are at least two separate reasons that ProBuilders' reservation of rights letter created just such a conflict. First, ProBuilders explicitly reserved rights under the exclusion for "expected or intended" injury. Seeds dec. exh. 3. at Pages 5 (exclusion) and 1 (ProBuilders was investigating "subject to a reservation of its right to assert the following coverage defenses"). An independent counsel obligation arises where the suit "against the insured contained allegations in part that the conduct of the insured was intentional, conduct which would not be covered under the insurance policy." *Blanchard , supra*, 2 Cal.App.4th at 349. "If the reservation of rights arises because of coverage questions which depend on the insured's own conduct, a conflict arises." *Foremost Ins. Co. v. Wilks,* 206 Cal.App.3d 251, 261 (1988). The Levines' complaint alleged intentional conduct, Seeds dec. exh 4, PRO0260 *et. seq*, so there was a *Cumis* conflict.

Second, ProBuilders' reservation of rights under the Contractor's Special Endorsement created an independent counsel obligation. *Schaefer v. Elder*, 217 Cal. App. 4th 1, 7 - 8 (2013) (now depublished, see response to motion in limine no. 8, below) holds that when an insurer's reservation of rights under a Contractor's Special Condition provision like the one in the ProBuilders' policy created a conflict requiring independent counsel.

If the Court grants this motion, then McKinnon will be allowed to testify to his opinions, without expert rebuttal, even though his report contains lengthy announcements of what the facts are, and his own opinions on coverage. If the Court has concerns about any specific aspects of Reilly's testimony, we are prepared to discuss those with the Court. However, so long as ProBuilders is allowed to call McKinnon, the insureds should be allowed to offer Reilly to rebut McKinnon.

**RESPONSE TO MOTION IN LIMINE NO. 2**

The insureds oppose motion in limine no. 2. *Brandt* fees are the attorneys' fees and costs that the insureds have incurred in order to recover policy benefits, and can be awarded as damages if the insureds prove that ProBuilders violated the implied covenant of good faith and fair dealing in withholding policy benefits. They are rather unique because these damages are ongoing, and will continue through trial. (This is why they are, ideally, addressed in a second jury phase, after the jury finds bad faith). As a result, some of these records of these damages do not exist yet, because the damages have not yet occurred.

These damages are identified in the Levines initial disclosure. Seeds dec. exh. 5 at p. 3. They are also identified in Haas's initial disclosure. Seeds dec. exh. 6 at p. 7. They could not be produced at that time because most of the damages had not even happened yet, and therefore the records did not exist. The insureds are in the process of preparing these records as trial exhibits and will produce them shortly.

**RESPONSE TO MOTION IN LIMINE NO. 3**

ProBuilders moves to exclude evidence of Haas's unpaid defense costs on the ground that he has not produced supporting records. The Court should deny this motion because those records are in ProBuilders' claim file. Those records show that ProBuilders refused to pay defense costs that were incurred before Lloyds announced it would cease

---

The Court should find that, as a matter of law, a *Cumis* obligation existed. An insurance claims handler like Reilly regularly makes a decision whether an insurer should recognize a *Cumis* obligation, Seeds dec. exh. 2 at 44: 14 – 25, so Reilly should be allowed to testify that an obligation was owed, as the background for his insight that ProBuilders controlled the defense, and that this control and failure to provide *Cumis* counsel violated industry standard.

defending, and that it refused to pay the full rates that counsel charged. Declaration of Robert Seeds. This evidence should not be excluded.

**RESPONSE TO MOTION IN LIMINE NO. 4**

The insureds oppose motion in limine no. 4. The insureds oppose motion in limine no. 3. Haas's only general damages are emotional distress. His counter-claim gives sufficient notice that he is seeking general damages, alleging "Ron Haas was damaged in an amount to be proven at trial because of PROBUILDERS' breach of its duty of good faith and fair dealing." Docket 39 at p. 10 para. 67. ProBuilders has cited no authority for the proposition that general damages must be specifically pled.

Emotional distress damages are, by their nature, hard to quantify. Any amount that Haas might state in an initial disclosure would be a number he created based on his own judgment, rather than something that could be verified or investigated. Failure to include a number for this category of damages in an initial disclosure should not bar Haas from recovering emotional distress damages, because it is harmless. FRCP 37(c)(1).

**RESPONSE TO MOTION IN LIMINE NO. 5**

The insureds oppose motion in limine no. 5. ProBuilders seeks to exclude all evidence of the Levines' emotional distress damages, even though ProBuilders' motion shows that ProBuilders deposed them on their emotional distress damages. This motion has the same basis as motion no. 4 above, and our response is similar: the lack of a disclosed number for emotional distress damages is harmless.

ProBuilders also seeks to exclude evidence of their lost earnings, although its motion shows that ProBuilders deposed them on their lost earnings. See, for instance, docket 222-2 exhibit A. ProBuilders complains about the lack of a number in the initial disclosure, and a lack of production of documents. ProBuilders' own motion, however, shows that these losses – basically, not getting jobs because of the effects of stress – are difficult to quantify. For instance, the motion includes this question and answer:

Q. And what do you estimate your income would be if you got that job?

A. I have no idea. *Id* at 58: 1 – 3.

Ty Levine would have no documents showing the money he did not make because of a job he did not get. ProBuilders was able to depose the Levines on this issue, so they should be allowed to testify about it.

**RESPONSE TO MOTION IN LIMINE NO. 6**

The insureds oppose motion in limine no. 6. FRE 701 allows a witness to testify about how the witness's own behavior might have changed under differing circumstances. Testimony about how the witness's own behavior might have been affected by learning additional or contradictory facts would be rationally based on that witness's perception. In a case where detrimental reliance or some similar concept was at issue, such testimony would be helpful to determine whether there was detrimental reliance. Such testimony would not be based on scientific, technical or other specialized knowledge.

Questions of this sort are often allowed in order to prove the elements of fraud. *United States v. Cuti*, 720 F.3d 453, 459 (2d Cir. 2013). For instance, the Court in *Cuti* allowed questions about the effect truthful information would have had on the accounting treatment of transactions. The Court stated:

> a witness may testify to the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior. As this case illustrates, "what-if-you-had-known" questions that present withheld facts to a witness are especially useful to elicit testimony about the impact of fraud. *Cuti, supra*, 720 F.3d at 459.

That Court quoted from the advisory committee's note about rule 701 that "Lay opinion under Rule 701 must be limited to opinions that 'result[] from a process of reasoning familiar in everyday life.'". *Id.* It held that

> When the issue for the fact-finder's determination is reduced to impact -- whether a witness would have acted differently if he had been aware of additional information -- the witness so testifying is engaged in "a process of reasoning familiar in everyday life."

The Ninth Circuit allows hypothetical questions to witnesses to prove materiality. *United States v. Laurienti*, 611 F.3d 530, 549 (9th Cir. 2010). In *United States v. Ranney*, 719 F.2d 1183 (1st Cir. 1983) the First Circuit held that the trial court did not abuse its discretion when it allowed a witness to answer the question "Would you have purchased

this if you were told the company never paid any money for the purchase, delivery and storage of this oil?" *Id*. at 1187 n. 8, see 1187 – 1188.

The insureds' witnesses should be allowed to answer similar questions, just as ProBuilders' underwriting witness can be expected to testify that if Haas's insurance application had contained different information, ProBuilders would have acted differently.

**RESPONSE TO MOTION IN LIMINE NO. 7**

The insureds oppose motion in limine no. 7 because it is overbroad. The insureds do not intend to contend that the defense attorneys ProBuilders retained failed to satisfy the standard of care. However, we we will contend that ProBuilders had an obligation to provide independent counsel (an issue of law) and did not do so, and controlled the defense it provided (a question of fact). We will also contend that ProBuilders' exercise of control over the defense and settlement preferred its interests to those of Haas and Haas Corp, injuring them. We also will contend that ProBuilders, for no good reason, went months without paying defense counsel it retained, and when counsel moved to be relieved on that ground, ProBuilders opposed, once again preferring its interests to its insureds' interests. Finally, we will show that ProBuilders rejected its retained attorneys' advice to settle the case. All of this testimony should be allowed because it supports the insureds' bad faith claims by showing that it acted unreasonably, preferring its interests over those of Haas and Haas Corp.

**RESPONSE TO MOTION IN LIMINE NO. 8**

The insureds respond to motion in limine no. 8 as follows: The insureds do not intend to offer evidence regarding *Schaeffer v. Elder* to the jury in order to prove that there was a *Cumis* obligation. That is because the insureds do not believe that the jury should decide whether Haas or the Levines were entitled to independent counsel. Instead, that is an issue of law for the Court to decide.[4]

---

4. ProBuilders' motion no. 1 agrees. It contends that whether it had an independent counsel obligation is an issue of law, and therefore an inappropriate subject for the insureds' claims handling expert. In responding to this motion, the insureds contend that ProBuilders did indeed have an obligation to provide independent counsel.

However, if the Court believes this issue is for the jury to decide, we would argue that opinion to the jury. The Court can consider that opinion, even though it has been de-published. *Employers Ins. of Wausau v. Granite State Ins. Co*., 330 F.3d 1214, 1220 (9th Cir. 2003) (Federal Courts "may consider unpublished state decisions"). Moreover, a "Supreme Court order to depublish is not an expression of the court's opinion of the correctness of the result of the decision or of any law stated in the opinion." Cal Rules of Court, Rule 8.1125 (d). There might be other circumstances under which the *Schaeffer* opinion could be relevant. Therefore the Court should deny this motion.

## RESPONSE TO MOTION IN LIMINE NO. 9

The insureds oppose motion in limine no. 9. This motion is the mirror image of our motion in limine no. 4, to exclude evidence of alleged misrepresentations or concealments, and of their materiality.

At the outset, it is time to recognize the elephant in the room: ProBuilders wants to combine the misrepresentation and coverage trials so that it can turn the coverage trial into a trial about Ron Haas being a liar. It hopes that the jury will dislike Haas and find there is no coverage. Therefore, the purpose of ProBuilders' motion is to prejudice the insureds' insurance coverage case. This result should be avoided if at all possible: the trial ProBuilders wants will injure the Levines, who are innocent of the alleged dishonesty that ProBuilders hopes the jury will hear about if the Court grants this motion.

### A. Pleading Rescission as an Affirmative Defense Does not Make it a Jury Issue

The first thesis of this motion is that rescission is pled as an affirmative defense, so ProBuilders has a right to a jury trial on it. However, ProBuilders has cited no authority for the proposition that it has a right to a jury trial on this affirmative defense.[5] ProBuilders does not have a right to a jury trial on this issue. "[T]he right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity as well as other

---

5. ProBuilders does include a quote from *Atmel Corp. v. St. Paul Fire & Marine Ins. Co.*, 416 F.Supp. 2d 802 (N.D. Cal. 2006) concerning a jury deciding rescission. That opinion does not hold that there is a *right* to a jury trial for rescission.

actions." *Simler v. Conner*, 372 U.S. 221, 222 (U.S. 1963). "The federal rule has historically been that rescission is equitable in nature and no right to a jury attaches to such actions." *Kline Hotel Partners v. Aircoa Equity Interests, Inc.*, 729 F. Supp. 740, 744 (D. Colo. 1990). As this Court has recently recognized, a "litigant is not entitled to have a jury resolve a disputed affirmative defense if the defense is equitable in nature." *Freescale Semiconductor, Inc. v. ChipMOS Techs.*, 2013 U.S. Dist. LEXIS 10517, 13-14 (N.D. Cal. Jan. 24, 2013). This is true even though ProBuilders has a right to a jury trial on the Haas and Levine contract claims. *Cal-Agrex v. Van Tassell*, 258 F.R.D. 340 (N. D. Cal. 2009) holds that when unclean hands is pled as a defense to breach of contract, "unclean hands was not an 'an issue properly before the jury'". *Id*. at 348, *aff'd* 408 Fed. Appx. 58, 61 (9th Cir. 2011) ("the district judge did not err in making a determination himself as to the viability of that defense.") *Accord*: *Jain v. Wipro, Inc*., 2011 U.S. Dist. LEXIS 148030 * 11 (N. D. Cal. 2011) ("the merits of the equitable defense [unclean hands] are for the Court, rather than the jury".) Therefore, even though rescission can be, and is, pled as an affirmative defense, ProBuilders has no right to a jury trial on rescission.

### B. The Prejudice Element of the Delay Defense does not Require Trying the Entire Case at Once

ProBuilders has contended that if none of the judgment is covered, then delay in rescinding could not prejudice Haas or the Levines. The insureds do not concede that. However, even if that is true, it does not justify trying all of rescission in front of the jury. Instead, the jury could decide the jury issues regarding coverage, and the Court, informed of those decisions, could then decide whether delay prejudiced Haas or the Levines.

### C. Overlapping Evidence does not Justify Trying Misrepresentation and Materiality in this Trial Phase

ProBuilders contends that there should be just one trial because evidence on the alleged misrepresentations is also relevant to determining compliance with the Contractor's Special Condition endorsement. The overlapping evidence – concerning the certificates and agreements Haas Corp obtained – is neither controversial nor time consuming. However, the issues are different: the endorsement concerns only the certificates and

subcontracts for this one project. For the representations, the question is their truth, for the entirety of Haas Corp's business operations, as of the application date, so it includes other projects as well. Therefore while there are insignificant evidentiary overlaps, these issues need not all be tried at once.

**D. Condition 11 is not, and should not be, an Issue in this Case**

On November 1, 2013, this Court is scheduled to hear ProBuilders' motion for leave to file amended answers, to plead, specifically, condition 11 as a defense to the insureds' claims.[6] When this motion is heard, the Court should deny it. The following responds to the arguments made in ProBuilders' reply, docket 217.

**1. ProBuilders' lengthy delay justifies denying the motion**

ProBuilders did not mention condition 11 until two and a half years after filing this suit. This condition is not mentioned in its pre-suit correspondence, in its pleadings, in its interrogatory response explaining its coverage position, or in its motion for summary judgment. The insureds' opposition to this motion cited cases pointing to much shorter delays as reasons to deny leave to amend.

To evaluate delay, courts inquire "whether the moving party knew or should have known the facts and theories raised by the amendment". *Amerisource Bergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 953 (9th Cir. 2006). ProBuilders should have known about this defense no later than 2009, when it began asserting that the Contractors Special Condition eliminated coverage. Four years passed from the time ProBuilders began contesting coverage until it first mentioned this condition.

ProBuilders has had two opportunities to explain this delay, but it has not explained why it did not ever mention this condition before this summer. ProBuilders' reply contends that "the reason for ProBuilders' delay in asserting Condition Precedent No. 11 is because ProBuilders thought Condition Precedent No. 11 was sufficiently pled when it

---

6. The motion is docket 207. The insureds' opposition is docket 213. The insureds have noted that some text was inadvertently omitted from page 3 of that document. A corrected opposition, with the omitted text inserted in bold, 16 point capital letters, has been filed. It is docket no. 240. ProBuilders' reply is docket 217.

originally filed its Answers." Reply at 10: 2 – 3. For this proposition, ProBuilders cites the following sentence from George Yaron's declaration: "I believed that the Thirteenth and Fourteenth Affirmative Defenses regarding conditions precedent was sufficiently plead, and that the satisfaction of conditions precedent has always been at issue by both parties' pleadings." Docket 207-1 p. 2: 10 – 12. However, ProBuilders and Yaron have not stated *when they formed this belief*. ProBuilders also has not stated when it first decided to invoke condition 11.

ProBuilders' reply ignores the insureds' assertion that ProBuilders seized on condition 11 only after it lost its motion for summary judgment. Docket 213 at p. 6. This explains ProBuilders' complete failure to mention the condition during the first four years it was denying coverage for the insureds' claims. It also is consistent with ProBuilders' statements that it thought it had pled condition 11 adequately: when ProBuilders finally noticed condition 11, sometime in the middle of this year, ProBuilders then decided that the affirmative defenses in its answers adequately pled the condition. This belief that it was adequately pled explains only the July to September part of the delay. However, the best explanation for the much longer period of delay, leading up to July of this year, is that *ProBuilders did not consider condition 11 to be a defense to coverage, separate from rescission, until after it had lost its rule 56 motion*. ProBuilders now wants to rely on condition 11 to avoid the problems with rescission identified in the Court's order denying that motion. ProBuilders' eleventh-hour decision to rely on this condition does not justify relief.

ProBuilders contends there is no delay because the pleadings have put at issue whether conditions precedent were satisfied, and condition 11 is a condition precedent. This argument ignores the fact that ProBuilders was obligated to plead with particularity failure to satisfy conditions precedent, and did not because it did not mention this condition.

The insureds contend that condition 11 is not a condition precedent, because the law disfavors conditions precedent, and unlike the Contractor's Special Condition, condition 11

does not state that it is a condition precedent. ProBuilders contends that the policy does state that condition 11 is a condition precedent, relying on this language, which immediately follows the heading SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS:

> We have no duty to provide coverage or defense under this insurance unless you and any other involved insured have, as conditions precedent to our duty to defend or indemnify, fully complied with the conditions contained in this policy.

ProBuilders appears to be arguing that all 17 of the provisions following this – more than four pages of 7.5 point type – are conditions precedent, merely because of that heading. However, there are a number of problems with this argument. The first is the very last provision, condition 17, which states:

> As a condition precedent to coverage under this policy you or any other involved insured must fully comply with all of the obligations imposed by a homeowner's warranty or applicable "right to cure" law.

If each of the 17 provisions preceding this one is indeed a condition precedent, merely because it follows the heading ProBuilders quoted, then this language is surplusage. The mere fact that condition 11 does not contain the same language as condition 17, and the Contractor's Special Condition, shows that it is not a condition precedent.

That language is not surplusage, because the remaining 16 conditions are not all conditions precedent. Most of them are just general terms. The first one provides: "Bankruptcy or insolvency of the Insured or of the Insured's estate will not relieve us of our obligations under this policy." That is not a condition precedent to coverage. The second one contains various provisions regarding cancellation. None of them is a condition precedent to coverage. The third one is an incorporation clause, and also addresses how changes can be made to the policy. Neither of them is a condition precedent to coverage. The fourth and fifth both describe rights that the insurer can exercise, in its discretion. Neither of them is a condition precedent to coverage. The sixth describes a number of obligations placed on the insured, including the notice and voluntary payments provisions, which ProBuilders concedes "an insurer has the burden of proving." Docket

217 p. 9: 3 – 4. They are not conditions precedent to coverage.

The point of this exercise is that even though the section titled SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS begins with language about conditions precedent, that does not make the provisions listed after it conditions precedent. Instead, the only one that is a condition precedent is the one that specifically says it is. *Pacific Dental Servs., LLC v. Homeland Ins. Co.*, 2013 U.S. Dist. LEXIS 100056, *13 (C.D. Cal. 2013). Having failed to plead this condition with specificity, and having failed to mention it for four years, ProBuilders did not give adequate notice of this issue. ProBuilders, having litigated this case for two and a half years on other grounds, has not explained why it is, at this late date, seeking to introduce this issue to this litigation. This long delay counsels in favor of denying this motion.

ProBuilders also argues that it is a condition precedent because it is a warranty. However, condition 11 does not satisfy the definition of warranty on which ProBuilders relies, found in Insurance Code Section 445:

> A statement in a policy, which imports that there is an intention to do or not to do a thing which materially affects the risk, is a warranty that such act or omission will take place.

Condition 11 states that statements that Haas had *previously made* did not misrepresent or conceal material facts. That does not satisfy Section 445.

**2. The Amendment is Prejudicial**

The insureds have demonstrated that this amendment would be prejudicial because it injects new legal theories, requires the insureds to consider new lines of argument, and would require significant new preparation. This very motion in limine proves that point. ProBuilders contends that condition 11 is a legal defense, entitling it to trial by jury on the issues that were previously raised only by the rescission claim, for which it was not entitled to a jury trial. The insureds' opposition to the motion for leave to amend noted some of the trial strategy problems with the jury hearing all of the rescission issues. ProBuilders' reply has two responses. First, ProBuilders notes that the insureds have not stated how their trial strategy would change if condition 11 were injected into the case. That is true, but the

insureds should not have to disclose their trial strategy in order to oppose the motion. However, the insureds have pointed out specific reasons why introducing condition 11 would affect trial strategy. This should be sufficient to demonstrate prejudice.

ProBuilders also contends that the insureds can solve problems raised by injecting condition 11 by "draft[ing] appropriate jury instructions". Docket 217 at p. 5: 9 – 10. That makes our point: injecting condition 11 changes the insureds' trial preparation. It is too late to inject new issues that have strategic implications – especially when ProBuilders has belatedly seized on this issue as an end-run on defenses to rescission that, so far, have been successful in defeating rescission.

**3. The Amendment is Futile**

The insureds argued that this amendment is futile because condition 11 provides only two remedies, increasing the premium or rescission. ProBuilders has separately pled rescission, and condition 11 is subject to the same defenses as rescission, so specifically pleading condition 11 adds nothing. ProBuilders has not responded to this argument.

The Court should not allow ProBuilders to invoke condition 11 at this late date. The Court should deny leave to amend. If condition 11 is not in this case, then the truth, or falsity, or materiality, of the application responses is an issue for the Court, and the jury trial will not be about Ron Haas's truthfulness. The Court should deny this motion.

**RESPONSE TO MOTION IN LIMINE NO. 10**

The insureds oppose motion in limine no. 10. The Levines now hold a judgment that they can directly enforce against ProBuilders. Insurance Code Section 11580. Because of this, the implied covenant of good faith and fair dealing governs ProBuilders conduct toward them. *Hand v. Farmers' Ins. Exchange*, 23 Cal. App. 4th 1847 (1994). Given this, evidence concerning ProBuilders' treatment of the Levines, at any time (including before the judgment was entered) is relevant for a number of reasons. First, it is admissible to prove ProBuilders' motives, in a case where punitive damages are pled.

Second, their status as beneficiaries of the policy was clear long before the judgment was entered, because ProBuilders knew long before then that if there was no settlement,

they would inevitably obtain a judgment against ProBuilders' insureds. On June 2, 2009, the defense counsel it retained advised ProBuilders that the defense "experts have thoroughly evaluated the plaintiffs' claims and, for the most part, agree with the plaintiffs' expert's evaluations." Seeds dec. exh. 7. A later defense counsel's September 16, 2010 pretrial evaluation report to ProBuilders states "There will not be a defense verdict", and that probable damages would be approximately $1 million or more. Seeds dec. exh. 8, see p. PRO03517. Defense counsel reported the case should not be tried, that instead ProBuilders should settle with the Levines because the case "is a liability case", and that "it seems clear that plaintiffs will prevail but that insurance coverage issues may prevent settlement". *Id*. at PRO03518. Knowing that the Levines would inevitably be found liable if ProBuilders did not settle, ProBuilders conduct toward them is relevant.

**RESPONSE TO MOTION IN LIMINE NO. 11**

The insureds oppose motion in limine no. 11. Even though ProBuilders has listed two of the insureds' counsel in its witness list contained in the Final Joint Pretrial Conference Statement, ProBuilders asks the Court to bar the insureds from calling their counsel George Yaron.

George Yaron was disclosed as a witness in the Rule 26 disclosures served by the Haas. Declaration of Robert Seeds exhibit 6 p. 6. That is because he was quite involved in the events that are at issue in this case. First, he sent and received a number of letters that will be offered in evidence. Second, he filed a pleading in that case, supported by his own declaration. These matters can be handled by an appropriate stipulation concerning those documents.

However, there are other matters that cannot be resolved so neatly. For instance, Yaron represented ProBuilders at settlement conferences conducted in the suit between the Levines and Haas. His conduct and statements in those settlement conferences are relevant to this case. For instance, he stated that ProBuilders was so confident of its no coverage position, including its position that it would not settle the claims, that ProBuilders was willing to litigate coverage, and if it lost in the trial court, it would win in the Court of

Appeal and receive favorable precedent on application of its Contractor's Special Condition endorsement. Although there are other witnesses to his conduct, including these statements, it would not be fair for ProBuilders to question the testimony of those other witnesses, by cross-examination or otherwise, and at the same time for Yaron to avoid testifying.

ProBuilders knows that George Yaron was quite involved in the underlying case. He is listed as a witness in Haas's Rule 26 disclosures. We assume that ProBuilders has provided the waiver of California Rules of Professional Conduct Rule 5-210 that is required in this circumstance. ProBuilders cannot now immunize him from testifying about his own statements and conduct by making him its trial attorney.

Respectfully submitted,

Dated: October 19, 2013 Greenan, Peffer, Sallander & Lally, LLP

______________________________

Robert L. Sallander, Jr., attorneys for Defendants/Counterclaimants

**DECLARATION OF ROBERT SEEDS**

I, Robert Seeds, declare:

1. I am an attorney admitted to practice law in this Court, and am employed by Greenan, Peffer, Sallander & Lally LLP, attorneys for the Levines and Haas in this matter. Based on my personal participation in the events described in this declaration I can truthfully testify, from my own knowledge, as follows.

2. Attached hereto as exhibit 1 is a true and correct copy of the letter report of Edward McKinnon, ProBuilders' designated expert witness on claims handling.

3. Attached hereto as exhibit 2 is a true and correct copy of the pages from the transcript of the deposition of David Reilly that are cited in this memorandum.

4. Attached hereto as exhibit 3 is a true and correct copy of ProBuilders' March 7, 2008 reservation of rights letter.

5. Attached hereto as exhibit 4is a true and correct copy the Levines' original complaint against Haas, as found in ProBuilders' claims file.

6. Attached hereto as exhibit 5 is a true and correct copy the Levines' Rule 26 disclosure in this case.

7. Attached hereto as exhibit 6 is a true and correct copy Haas's Rule 26 disclosure in this case.

8. Attached hereto as exhibit 7 is a true and correct copy of an email string appearing in ProBuilders' claim file, including a June 2, 2009 email status report.

9. Attached hereto as exhibit 8 is a true and correct copy of the pretrial report of Paul Minoletti, the attorney hired by ProBuilders who actually tried the underlying case. This report is extracted from ProBuilders' claim file.

10. Probuilders' claim file, exhibit 33, contains records of the Haas defense costs that were not paid. Those records include a letter from counsel to ProBuilders recapping ProBuilders' position on what it would pay, and showing that Haas would not be compensated for more than $19,000 in legal bills, found in exhibit 33 at PRO01871 *et seq*.

I declare under penalty of perjury under California and Federal law that the foregoing is true and correct. Executed in San Ramon, Contra Costa County, California, on October 11, 2013.

______________________________
Robert Seeds, declarant

**claims resource management, inc.**

California License No. 2B35861
Nevada License No. 10860

P.O. Box 250
33345 Santiago Rd.
Acton, California 93510
Telephone: (661) 265-6400
Fax: (661) 265-6450
www.crmi.com

Edward J. McKinnon
President
Direct Line: (661) 265-6401
E-mail: ed@crmi.com

July 25, 2012

To Whom It May Concern:

Re: Probuilders Specialty v. Valley Corp B., et al
Our File: 34,047

Ladies and Gentlemen:

I have been asked to prepare a report pursuant to Federal Rule of Civil Procedure §26(a)2(B). That report follows:

I was furnished, reviewed and relied upon the following:

1) Probuilders' First Amended Complaint, November 30, 2011;

2) Probuilders' Second Amended Complaint, July 12, 2011;

3) Probuilders' Answer to Counterclaim of Defendant and Counterclaimants Ty Levine and Karen Levine, August 22, 2011;

4) Defendants Ty Levine's and Karen Levine's Answer to Second Amended Complaint and Counterclaim of Defendants Ty Levine and Karen Levine Against Probuilders Specialty Insurance Company, RRG ("Probuilders"), August 1, 2011;

5) Ty Levine's Responses to Probuilders' Request for Admissions, Set One, July 15, 2011;

6) Ty Levine's Responses to Probuilders' Interrogatories, Set One, July 15, 2011;

7) Karen Levine's Responses to Probuilders' Interrogatories, Set One, July 15, 2011;

8) Karen Levine's Responses to Probuilders' Request for Admissions, Set One, July 15, 2011;

9) Defendant and Counterclaimant Ronald J. Haas' Responses to Probuilders' Request for Admissions, Set Two, July 14, 2011;



EXHIBIT
3
Reilly

claims resource management, inc.



10) Defendant and Counterclaimant Ronald Haas' Responses to Probuilders' Request for Production of Documents, July 5, 2011;

11) Defendant and Counterclaimant Ronald Haas' Responses to Probuilders' Request for Admissions, July 5, 2011;

12) Defendant and Counterclaimant Ronald Haas' Responses to Probuilders' Interrogatories, July 5, 2011;

13) Amended Initial Disclosures of Defendant and Counterclaimant Ronald J. Haas, April 7, 2011;

14) Second Amended Initial Disclosures of Defendant and Counterclaimant Ronald J. Haas, April 15, 2011;

15) Initial Disclosures of Plaintiff Probuilders to F.R.C.P. Rule 26(a)(1), April 7, 2011;

16) Defendants Ty Levine's and Karen Levine's Initial Disclosure Pursuant to F.R.C.P. Rule 26(a)(1)(D), April 7, 2011;

17) Initial Disclosures of Defendant and Counterclaimant Ronald J. Haas, April 7, 2011;

18) Probuilders' Answer to Counterclaim of Defendant and Counterclaimant Ronald J. Haas, Demand for Jury Trial, March 31, 2011;

19) Answer to First Amended Complaint and Counterclaim of Defendant Ronald J. Haas, March 8, 2011;

20) Defendants Ty Levine's and Karen Levine's Answer to Unverified First Amended Complaint, February 7, 2011;

21) Claim and Underwriting Files, Bates Documents: PRO00001-PRO04163 and PRO04680-PRO04704;

22) R.J. Haas Deposition, Volume II and Exhibits, June 19, 2012;

23) Probuilders' Responses to Interrogatories, Set One, February 16, 2012;

24) Probuilders' Supplemental Disclosure, December 2, 2011, Bates Documents: PRO04042 - PRO04050, PRO4063 - PRO069 and PRO04075 - PRO04114;

claims resource management, inc.



25) Probuilders' Supplemental Disclosure, November 29, 2011, Bates Documents: PRO02417-PRO02418, PRO03165-PRO03167, PRO03173-PRO03174, PRO03259-PRO03260, PRO03417-PRO03418, PRO03449, PRO03452, PRO03602, PRO03610, PRO03617, PRO03619, PRO03762, PRO03620, PRO03624-PRO03625, PRO03674, PRO03676-PRO03678, PRO03699, PRO03721-PRO03723, PRO03863, PRO03897-PRO03899, PRO04034, PRO04175, PRO03674, PRO03676-PRO03678, PRO03699, PRO04114, PRO04363, PRO04397, PRO04449, PRO04606, PRO04619;

26) Probuilders' Supplemental Disclosure Documents, on or about November 14, 2011, Bates Numbered: PRO03821, PRO03826, PRO03832, PRO03837, PRO03910, PRO04016-PRO04017, PRO04026, PRO04164,-PRO04174, PRO04176-PRO04362, PRO064-PRO04396, PRO04398-PRO04475, PRO04481-PRO04605, PRO04607-PRO04618 and PRO04621-PRO04644;

27) Karen Levine's Responses to Probuilders' Request for Production of Documents, Set Two, September 30, 2011;

28) Karen Levine's Responses to Probuilders' Interrogatories, Set Two, September 30, 2011;

29) Ty Levine's Responses to Probuilders' Request for Production of Documents, Set Two, September 30, 2011;

30) Ty Levine's Responses to Probuilders' Interrogatories, Set Two, September 30, 2011;

31) Karen Levine's Supplemental Responses to Probuilders Interrogatories, Set One, Nos. 1 and 3, September 7, 2011;

32) Ty Levine's Supplemental Responses to Probuilders Interrogatories, Set One, Nos. 1 and 3, September 7, 2011;

33) Ronald Haas' Answer to Second Amended Complaint, August 23, 2011;

34) Ronald Haas' Responses to Probuilders' Request for Admissions Supplemental, Set Three;

35) Ronald Haas' Responses to Probuilders' Request for Production of Documents Supplemental, Set One;

36) Ronald Haas' Responses to Probuilders' Request for Production of Documents Supplemental, Set Two;

claims resource management, inc.



37) Ronald Haas' Responses to Probuilders Request for Interrogatories, Supplemental, Set One and Two, July 7, 2012;

38) Ronald Haas' Responses to Probuilders' Request for Production of Documents, Supplemental, Set Three;

39) Plaintiff's Responses to The Levines' Request for Admissions, April 27, 2012;

40) Plaintiff's Written Responses to The Levines' Request for Production of Documents, Set One, April 26, 2012;

41) Plaintiff's Documents Produced in Response to The Levines' Request for Production of Documents, Set One, April 26, 2012, Bates Numbered: PRO04703, PRO00341-PRO00345, PRO04680-PRO04682, PRO00320-PRO00322, PRO04683-PRO04691, PRO00334-PRO00336, PRO00349-PRO00353, PRO04696-PRO04702, PRO04692-PRO04695, PRO00323-PRO00326, PRO00337-PRO00340, PRO00346-PRO00348, PRO00312-PRO00314, PRO04705-PRO04719, PRO04101-PRO04114, PRO04087-PRO04100, PRO03859-PRO03863, PRO03990-PRO03992, PRO03935-PRO03937, PRO03951-PRO03952, PRO04030-PRO031, PRO04035-PRO04036, PRO04039;

42) Supplemental Disclosure of Plaintiff Probuilders Pursuant to F.R.C.P. Rule 26(e), December 9, 2011;

43) Second Supplemental Disclosure of Plaintiff and Counter-Defendant Probuilders Pursuant to F.R.C.P. Rule 26(e), December 21, 2011;

44) Third Supplemental Disclosure of Plaintiff and Counter-Defendant Probuilders Pursuant to F.R.C.P. Rule 26(e), February 17, 2012;

45) Fourth Supplemental Disclosure of Plaintiff Probuilders Pursuant to F.R.C.P. Rule 26(e), March 16, 2012;

46) Probuilders Checks, Bates Numbered: PRO04645 through PRO04679;

47) Ronald Haas' Responses to Probuilders' Request for Production of Documents, Set Two;

48) Probuilders' Interrogatories, Set One, May 4, 2011;

49) Probuilders' Request for Production of Documents, Set One, May 4, 2011;

50) Ronald Haas' Responses to Probuilders' Request for Admissions Supplemental, Set One;

51) Probuilders' Request for Admissions, Set Three, November 11, 2011;

52) Probuilders' Request for Production of Documents, Set Three, November 11, 2011;

53) Ronald Haas' Responses to Probuilders' Request for Production of Documents, Set One;

54) Probuilders' Request for Production of Documents, Set Two, October 28, 2011;

55) Probuilders' Interrogatories, Set Two, December 13, 2011;

56) Ronald Haas' Responses to Probuilders' Request for Interrogatories, Set One and Two;

57) Probuilders' Request for Admissions, Set Two, June 10, 2011;

58) Ronald Haas' Responses to Probuilders' Request for Production of Documents, Set Three;

59) Ronald Haas' Responses to Probuilders' Request for Admissions, Set Three;

60) Probuilders' Request for Admissions, Set One, May 4, 2011;

61) R.J. Haas Deposition, Volume I and Exhibits, May 22, 2012;

62) Ronald Haas' Responses to Probuilders, Supplemental RFA Request for Admissions, Set One.

My report follows:

Pursuant to a contract effective October 28, 2005, the R.J. Haas Corp ("RJHC") agreed with Karen and Ty Levine ("Levine") to construct a new home using an existing foundation on Levine's property in Los Altos, California. Prior to the date of that contract and continuing until August 29, 2006, certain Underwriters at Lloyds through Catlin ("Catlin") provided Commercial General Liability insurance coverage for RJHC. On August 20, 2006, RJHC's president, Ronald J Haas ("Haas"), signed an application to obtain Commercial General Liability coverage from Probuilders Specialty Insurance Company, RRG ("Probuilders"). Thereafter, Probuilders wrote a policy for RJHC which was effective August 29, 2006 to August 29, 2007.

In its application for the Probuilders' policy, RJHC represented that it had written contracts with its subcontractors; that in those contracts, the subcontractors agreed to hold RJHC harmless with respect to the subcontractors' work and that RJHC is named as an additional insured on its subcontractors' insurance policies. Insurance professionals experienced with liability insurance for the construction industry recognize the value of a contractor obtaining express indemnity from its subcontractors and the value of a contractor being named an additional insured on its subcontractors' insurance policies. Additionally, requiring confirmation that a contractor is named an additional insured on its subcontractors' policies, also serves to confirm that those subcontractors are, in fact, insured. Insurance professionals recognize that a contractor is responsible for damage and injuries arising out of the work of its subcontractors. Express indemnity and additional insured coverage from subcontractors usually result in the transfer of much of the cost of defending construction related lawsuits and the costs to pay damages awarded in lawsuits, to the responsible subcontractors and their insurers. It is common for a contractor that has obtained express indemnity and additional insured coverage from its subcontractors, to be able to transfer 90% or more of the costs of construction related litigation and settlements to subcontractors and their insurers. The Probuilders' policy included Endorsement 5, which excluded coverage if RJHC did not obtain express indemnity and certificates of insurance evidencing additional insured coverage from its subcontractors ("CSC Endorsement").

Beginning in the second half of 2006, the relationship between RJHC/Haas and Levine deteriorated. Levine expressed concern over the timing and quality of work performed and material utilized by RJHC and its subcontractors. Haas expressed complaints about Levine's alleged failure to timely make decisions relating to material and work specifications. Levine cancelled the contract in February 2007 and sued RJHC, its surety and Haas on March 1, 2007 ("the Suit"). In the Suit, Levine alleged defects, damages and deficiencies to the work and materials provided by RJHC and its subcontractors. Levine did not allege damage to any other property.

The Suit was apparently tendered to Catlin, as Catlin accepted the defense of the defendants in the suit. Shortly after the Suit was filed, RJHC changed its name (I will continue to refer to the corporation as RJHC in this report) and filed for bankruptcy protection. Haas contended that a conflict existed between himself and RJHC in light of the bankruptcy filing. Catlin agreed to appoint Haas' chosen counsel, Branson, Brinkop, Griffith & Strong ("BBG&S") to defend Haas and Paul Minoletti, Esq., to defend RJHC and its surety. On March 28, 2007 BBG&S tendered the lawsuit to Probuilders and the claim was assigned to NBIS, Probuilders' third party claims administrator. The claim was initially assigned to NBIS adjuster, Chris Woodward. The file reflects that BBG&S had worked as coverage counsel for NBIS and Probuilders in the past. Woodward documented several phone conversations with a lawyer from BBG&S during the months that followed. The file further reflects that at one point Woodward and later, a second adjuster, Joe Warren, were confused over BBG&S' role. That role was clarified in a January 15, 2008 conversation between Woodward and a BBG&S lawyer.

**claims resource management, inc.**



On February 25, 2008, Catlin through its coverage counsel, Musick, Peeler & Garrett ("MP&G"), advised BBG&S that it had determined that its policy did not apply and that Catlin would be withdrawing from the defense. On March 7, 2008, NBIS for Probuilders issued a comprehensive letter or reservation of rights to RJHC/Haas, detailing the provisions of its policy that raised questions as to whether there was any coverage for the damages Levine sought in the Suit ("the ROR"). The ROR included references to the CSC Endorsement and a number of exclusions for damage to the work and/or product of RJHC and its subcontractors.

Catlin did withdraw from the defense of the Suit, effective 3/31/2008. BBG&S recognized that an agreement by Probuilders to defend the Suit would raise a conflict, because it provided other legal services to Probuilders. BBG&S recommended that Probuilders agree that the law firm of Robinson & Wood ("R&W") substitute for it. Probuilders agreed; however, shortly thereafter, R&W discovered a conflict because one of its lawyers knew Karen Levine. Levine refused to waive the conflict and R&W was forced to decline the engagement. BBG&S recommended other law firms and on July 22, 2008, Probuilders appointed the firm of Boornazian, Jensen & Garthe ("BJ&G") to substitute for BBG&S in the defense of Haas. Minoletti continued to represent RJHC and its surety.

Shortly after its involvement, BJ&G filed a cross claim against some of RJHC's subcontractors. Haas objected to these cross complaints, claiming that they would interfere with on-going business relationships. On January 23, 2009 Probuilders, through NBIS, instructed BJ&G to pursue indemnity from RJHC's subcontractors and additional insured coverage from the subcontractors' insurers. On January 26th, NBIS also reaffirmed a December 30, 2008 request that BJ&G provide a matrix identifying all RJHC's subcontractors and the subcontractors' insurers providing additional insured coverage to RJHC. Through the continuing efforts of NBIS to identify subcontractors providing express indemnity and additional insured coverage, Probuilders learned that the representations regarding express indemnity and additional insured coverage made by RJHC's president, Haas, when he signed the Probuilders' application, were not accurate. RJHC was performing its contract with Levine when Haas made those representations. The absence of express indemnity and AI certificates from subcontractors also came within the plain terms of the exclusions expressed in the CSC Endorsement.

On October 5, 2009, Probuilders supplemented the ROR with a letter to RJHC/Haas describing what it had learned and its position that the CSC Endorsement eliminated any potential for coverage under its policy. Unlike what Catlin did when it determined that its policy did not apply and unlike what many similarly situated insurers would do, Probuilders advised that it would continue to defend the Suit, despite that fact that it had concluded that it had no obligation to pay damages on behalf of RJHC or Haas.

In January 2010, RJHC's bankruptcy was dismissed. Probuilders concluded that this dismissal eliminated any potential conflict between Haas and RJHC and thereby permitting one law firm to defend both. BJ&G substituted for Minoletti. Shortly thereafter, BJ&G asked to be relieved as Haas' counsel and the decision was made that Minoletti would substitute for BJ&G to defend Haas.

On February 2, 2010, Levine demanded $985,000 to settle the Suit. On February 19, 2010, Probuilders responded to RJHC/Haas, reaffirming its conclusion that its policy did not apply and, although it would continue to defend the Suit, it would not pay a settlement or damages. In June 2010, Probuilders, through NBIS, issued two more letters reaffirming its position.

The Suit proceeded to trial on or about November 1, 2010. On November 2, 2010 NBIS, for Probuilders, again confirmed its coverage position and that it would continue to defend the Suit. The trial resulted in a verdict in favor of Levine. On November 30, 2010, a judgment in the amount of $1,470,858.78 was entered in favor of Levine. It is reasonable for an insurance professional to conclude that, to the extent that judgment includes damages that are on account of Property Damage as defined in the Probuilders policy, that damage was to work performed and material provided by RJHC and its subcontractors. On December 29, 2010 Probuilders again confirmed that it would not pay any portion of the judgment, but that it would continue to defend until all post trial motions were resolved. Probuilders did so.

In all material aspects, the claims handling by Probuilders and NBIS met the standard of care for similarly situated insurers. Probuilders' decision not to pay money to settle Levine's claim and not to pay any portion of Levine's judgment were reasonable and consistent with the standard of care and the decisions I would expect similarly situated insurers to make. The decision to continue to defend, despite a conclusion that there was no coverage, is not the decision that many reasonable insurers would make in similar circumstances. Many, like Catlin did here, would have withdrawn from the defense.

These opinions are based on my forty plus years in the insurance industry and my careful review of the documents listed above.

Attached is a copy of my Curriculum Vitae, which sets forth my background and expertise.

An article of mine was published in a 1994 edition of For The Defense, the magazine of the DRI. The article dealt with "claim files." In July 2006, I published an article for Daubert Online, which is a newsletter of the DRI. That article dealt with claims experts. I was published twice in Declarations, the magazine of the Excess/Surplus Lines Claim Association. The 2005 article dealt with my, then, 37 year perspective of the insurance industry. The 2008 article dealt with "minimum limit policies and catastrophic injuries."

For this assignment I am billing my time for all activity related to this matter at $300 per hour, plus out-of-pocket expenses.

**claims resource management, inc.**



Attached is a list of cases in which I have testified. This list is probably not complete. It is the best reconstruction I could form based on a review of my records.

Very truly yours,

CLAIMS RESOURCE MANAGEMENT, INC.

Edward J. McKinnon, RPA
President

Final-P:\wpjul\34047ejm9-11r.wpd

claims resource management, inc.

July 25, 2012
Our File: 34,047
Page 9

Attached is a list of cases in which I have testified. This list is probably not complete. It is the best reconstruction I could form based on a review of my records.

Very truly yours,

CLAIMS RESOURCE MANAGEMENT, INC.

Edward J. McKinnon, RPA
President

Final-P:\wpju\34047ejm9-11r.wpd

indemnify its insureds for at least part of the judgment. That's part of your opinion; correct?

A. Correct.

Q. Have you ever heard it said that whether a duty to defend exists in a given case is a legal issue?

Have you ever heard that before?

A. Well, it's a contract interpretation issue to a certain extent. So I understand that the courts interpret contracts and make decisions on those.

Q. Whether or not a duty to defend exists, that's a question of law for the court, is it not?

MR. SALLANDER: Objection; calls for a legal conclusion.

THE WITNESS: I think it would be.

BY MR. YARON:

Q. And also with regard to whether a duty to indemnify exists, that's also a question of law for the court, is it not?

MR. SALLANDER: Same objection.

THE WITNESS: I think it would be.

BY MR. YARON:

Q. And then in your next sentence, you indicate that covered damages clearly form the basis for at least part of the Levines' claim. Whether or not certain damages are covered or not, isn't that also a

legal issue for the court?

A. You know, I make that decision every day in my job so, ultimately, I guess, if a court disagreed with me or a claims handler, that would ultimately be the court's decision. But I think claims handlers have to make those calls every day in their job whether they're going to defend or not, whether damage is covered or not. This is just part and parcel of the job of claims adjusting. And you make those decisions all the time.

So to say that it's -- it's a legal issue and, therefore, an adjuster can't make that decision, well, adjusters make that decision all the time. It's a part of their job.

Q. I'm not suggesting that you can't make that decision, but I simply want to make it clear, though, that at least by way of my questioning to establish that what you're really opining on are things that are not really a proper subject of expert opinion testimony. That's what I'm driving at, and I don't mean to be argumentative about it.

But I'm simply trying to solicit from you -- or elicit from you that a recognition that certain things that you've opined upon are really legal issues?

A. Well, I mean, I think your expert did it,

Probuilders' actions are not immediately rescinding the premium in filing a rescission action at the time it discovered the alleged basis for the rescission are contradictory and belie its own lack of belief and the merits of such a legal recourse." This is part of your expert opinion?

A. Yes.

Q. So it's your opinion that Probuilders should have immediately rescinded the policy once it discovered the alleged basis for the rescission?

A. It's -- my opinion is even more than that. It's my opinion that if you're going to rescind the policy, you need to do your investigation and do it right away. So in other words, when they got this claim, which was tendered to some person named McGovern in March 2007 and they -- Probuilders sent an acknowledgement letter in May 2007.

Knowing they had that CSC endorsement, if they believed in it, the first thing you would do is you would go out and investigate whether they got all their indemnity agreements and their AI certificates. That information is all just lying there already. I mean --

Q. Where does it lie?

A. It's lying in files at your insured's. So

the minute you get that claim, if you believe in that endorsement, you send them a letter and say send me all the AI certificates, send me all the indemnity agreements, I need them within 30 days. If you cannot send them to me, I'll come out and I'll look for them. And within 30 days, you could make a decision on whether you're going to rescind that policy. They didn't even flag the issue until September of 2009, which is almost two and a half years later.

Q. Well, isn't it true, though, that before the insured in this case, Mr. Haas, had explicitly indicated that he always got hold harmless agreements and that he always got additional insured agreements.

Didn't he say that in the application?

A. Well, you're saying did he lie on the application. Okay, now you have to go out and verify whether or not he told the truth, if that's what -- if you really believe in that, if you really believe that was material, then you need to verify, after you get the claim, whether he lied or not or whether he misrepresented or didn't know -- I mean, there could be any other reason why that question might have been answered differently. So that needs to be done from the get-go.

Believe me, I've rescinded policies before,

differently than what Mr. Minoletti did in that hypothetical?

A. They would have probably made arguments about what damages were actually covered under the policy and that Probuilders had a duty to step up and settle the claim; and if they didn't and it went over the policy limits, they would be liable for that.

I don't think he went beyond that if -- and I'd like to see the correspondence because it doesn't -- I don't immediately remember it. And I'm assuming it was during her first tour of duty on this case, because I don't remember it -- in late 2010 there being a demand within limits.

Q. Whether or not Cumis counsel should have been appointed, that is a legal question, is it not?

A. To me, that's an adjuster decision. I mean --

Q. Let me ask you this.

A. -- you know, adjusters have to make that decision based on their reservation of rights that they're issuing, that the company is issuing. Whether there are -- obviously, you're looking at case law and you're making kind of an interpretation and ultimately that might be a court decision, but you have to make those decisions in your adjustment of claims.

I mean, they didn't come out and say we're extending a courtesy defense at the get-go. They said that in late 2009 for the first time.

Q. Isn't -- whether an estoppel should operate, isn't that an equitable remedy?

A. I believe that would be.

Q. Isn't that the exclusive province of a judge?

A. That would be a decision for the judge.

Q. So your opinion as to whether or not someone should be estopped from asserting the coverage defense, you're opining upon something that ultimately a judge would decide; correct?

A. Well, I am, but I'm also opining about the standard practice of claims handling and how you issue reservation of rights, whether you act upon them; if there's an exclusion that would take the claim entirely out of coverage, you'd deny coverage. You don't defend for a couple of years and then say, hey, this exclusion -- I've been sitting on it, but now I'm going to deny coverage.

The reason you withdraw from a claim -- you might defend a claim early on and then withdraw later based on new information. Sometimes new information comes out that impacts that decision to defend. But

that's usually the only reason. There's nothing here that came out -- that they couldn't have had or didn't have right at the beginning. So there wasn't any new information learned as a result of discovery to change their position on defense or indemnity. They had everything at the get-go.

Q. Returning to the statement of decision and the item of damage that you have alluded to, does that statement of decision indicate whose work was damaged by the defective work?

A. No.

Q. Would it be important in your opinion to perhaps look at the evidence that was presented at trial to see what this judge may have been referring to in this statement of decision?

A. I think that ship has sailed. I mean -- I think that statement alone says there's covered damages, and you can't re-litigate the case now that the case is over.

Q. Really? Probuilders isn't allowed to look at the trial transcript and present evidence as to what damage there is represented. We're not allowed to do that in this case?

A. The judge is saying damage to work caused by the defective work. I mean, that's a judge's decision.

BY MR. YARON:

Q. Is there specific portions of that report that you rebut?

A. Well, most of Mr. McKinnon's report isn't even opinion. It's simply a rehash of the underlying claim file. I think you get to page 8. "On February 2nd, 2010, Levine demanded 985,000 to settle the suit.

"On February 19th, 2010, Probuilders responded to RJHC/Haas reaffirming its conclusion that if the policy did not apply and although it would continue to defend the suit, it would not pay a settlement or damages." So he's talking about their failure to settle within limits and apparently putting a seal of approval on it.

In the third paragraph on page 8, I disagree with his conclusion that Probuilders and NBIS met the standard of care for similarly situated insurers; that they were somehow magnanimous for continuing a defense; that they characterize late in the game as a courtesy defense, which they had never mentioned at the outset. I don't think that that comports with the standard of care.

Q. Okay.

A. And that's one of his few actual opinions.

NBIS
Claims & Risk
Management, Inc.

MAILED

**CERTIFICATE OF MAILING**

March 7, 2008

Robert Jay Haas, President
RJ Haas Corp.
12226 Saratoga-Sunnyvale Road
Saratoga, CA 95070

RE: **Ty and Karen Levine v. RJ Haas Corp., et al**
**Santa Clara County Superior Court Case #107CV-081016**

| | |
|---|---|
| General Contractor: | RJ Haas |
| Project: | 700 Benvenue Avenue, Los Altos, California |
| PBSIC Policy: | COM 5010992; Effective 08/29/06 to 08/29/07 |
| Deductible: | $3,500.00, Per Claim |
| NBIS File #: | 1011393 |

Dear Mr. Haas:

NBIS Claims & Risk Management, Inc. (hereinafter "NBIS") is the independent third-party claims administrator for ProBuilders Specialty Insurance Company, RRG (hereinafter "PBSIC"). PBSIC issued a Commercial General Liability insurance policy to RJ Haas Corp. (hereinafter "RJ Haas") under the policy number and effective dates referenced above.

We previously acknowledged receipt of the tender letter of this claim from your office in which RJ Haas requests that PBSIC accept the defense and indemnification for RJ Haas under RJ Haas' policy with PBSIC.

This letter serves, in part, to advise you that PBSIC is in receipt of the tender of this claim from your attorney, in which your attorney notifies PBSIC of this potential claim under your policy with PBSIC and requests that PBSIC accept the defense and indemnification for RJ Haas under RJ Haas' policy with PBSIC.

RJ Haas is respectfully informed that NBIS, on behalf of PBSIC, will continue to conduct a full investigation into this matter under policy #COM 5010992, subject to a reservation of its right to assert the following coverage defenses.

**FACTS:**

This is a construction defect lawsuit arising from the construction of one (1) single-family home located at 700 Benvenue Avenue in Los Altos, CA.
RJ Haas contracted on October 27, 2005 to act as the general contractor. You have stated that, during January of 2007, RJ Haas was terminated and did not complete the work called for under the contract..

We have no reason to doubt the validity of the facts cited herein but if you have any substantive information to the contrary you are requested to notify us immediately.

NBIS will continue to conduct an investigation to determine the scope of work completed by RJ Haas, to determine when all of the work called for in RJ Haas' contract was completed and to determine what insurance coverage exists for this claim under the PBSIC policies, if any, and to determine if any defense fees and costs are owed by PBSIC for this case.

**POLICY:**

We take this opportunity to remind you that PBSIC issued a Commercial General Liability Coverage Form, under policy #COM 5010992, subject to form PBG0001 (01/01/06), for the policy period of August 29, 2006 to August 29, 2007.

The policy limits are $1 Million Each Occurrence Limit and $2 Million Aggregate Limit.

Policy ##COM 5010992 is subject to a Per Claim Deductible at $3,500.00, per form R0401 (Ed. 01/01/05).

The deductible form states the agreed amount, $3,500.00, shall be deducted from each and every claim under the respective policy, irrespective of the number of claims which may be joined in any one suit, arbitration, mediation, or any other form of legal proceeding. The deductible applies equally to loss and adjustment expense payments.

**COVERAGE ISSUES:**

Before proceeding, you are cautioned that some of the quoted policy language that appears in the body of this letter contains bolded words/terms that are defined in Section V of each policy. The pertinent definitions in this instance can be found under the Section V – Definitions located later in this letter.

In addition to Section V – Definitions, throughout this policy the words **you** and **your** refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words **we**, **us** and **our** refer to the company providing this insurance.

Policy #COM 5010992 is guided by Commercial General Liability Coverage Form, form PBG0001 (01/06), which reads, in pertinent part, as follows:

Your attention is drawn to form PBG0001 (01/01/06) that establishes the nature of the coverage grant. It is located in **SECTION I – COVERAGES** and is titled, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY.

**SECTION I – COVERAGES**, states in part, as follows:

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. INSURING AGREEMENT – INDEMNITY

a. We will pay those sums that an insured becomes legally obligated to pay as **damages** because of **bodily injury** or **property damage** to which this insurance applies. **We** may at **our** discretion investigate any **occurrence** and settle any **claim** or **suit** that may result. **Our** obligation to pay damages is further limited as provided in SECTION III – LIMITS OF INSURANCE or in SECTION I of the policy titled EXCLUSIONS: COVERAGES A AND B.

However, coverage only attaches under certain types of circumstances. This is made clear in subsection "b" of the Insuring Agreement that reads as follows:

b. This insurance applies to **bodily injury** and **property damage** only if:

(1) The **bodily injury** or **property damage** is caused by an **occurrence** that takes place in the **coverage territory**; and

(2) The **bodily injury** or **property damage** resulting from such **occurrence** first begins during the policy period.

All **bodily injury** or **property damage** arising from an **occurrence** shall be deemed to first begin at the time of the first such **bodily injury** or **property damage**, even though the occurrence giving rise to such **bodily injury** or **property damage** may be continuous or involve repeated exposure to the same generally harmful conditions, and even though the nature, type or extent of such **bodily injury** or **property damage** may be continuous, progressive, cumulative, changing or evolving, and regardless of whether such **bodily injury** or **property damage** is known or apparent to any person or **insured.**

If the date when the **bodily injury** or **property damage** first begins cannot be determined, then the date the **property damage** or **bodily injury** first begins shall be deemed to be the earliest date on which the process, condition or circumstance which led to the **bodily injury** or **property damage** began or was created.

c. **We** shall have no obligation to indemnify any insured in connection with any suit filed before the policy period, even though the **insured** was not a party to such **suit** at the time it was filed. For purposes of this provision, **suit** includes any actions which are consolidated, or actions which are re-filed between some or all of the same parties, and the initial filing date of the first **suit** shall be used in determining whether the **suit** was filed before the policy period.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

Pursuant to SECTION I - COVERAGES of the Insuring Agreement, there will be no duty to defend your company if another carrier is so obligated, as the Insuring Agreement in subsection 2 a. reads, in pertinent part, as follows:

2. INSURING AGREEMENT – DEFENSE

a. **We** will have the right and duty to defend **insureds** as defined in Paragraphs 1. and 2. of SECTION II – WHO IS AN INSURED against any **suit** seeking damages to which this insurance applies. However, we shall have no duty or obligation to defend an **insured** as defined in Paragraphs 1. and 2. of SECTION II – WHO IS AN INSURED against any **suit** where any other insurer is obligated to defend the **insured**, and we shall have no duty to contribute or participate in the defense provided by any other such carrier. **Our** duty to defend is further limited as provided below or in SECTION I of the policy entitled EXCLUSIONS: COVERAGES A AND B.

b. **We** have no duty or obligation to defend any **insured** other than **insureds** as defined in Paragraphs 1. and 2. of SECTION II – WHO IS AN INSURED, and in particular no duty to defend **insureds** as defined in Paragraph 3. of SECTION II – WHO IS AN INSURED.

c. We will have no duty to defend an **insured** against any **suit** seeking damages for **bodily injury** or **property damage** to which this insurance does not apply.

e. **We** shall have no duty to defend any **suit** filed before the policy period, even though the **insured** was not a party to such **suit** at the time if was filed. For purposes of this provision, **suit** includes any actions which are consolidated, or actions which are re-filed between some or all of the same parties, and the initial filing date of the first **suit** shall be used in determining whether the suit was filed before the policy period.

f. **We** shall have no duty to defend any **suit** in which it is alleged or claim, in whole or in part, that any **bodily injury** or **property damage** began before the policy term.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

The following exclusions are brought to your attention as they may have a bearing on coverage. Your attention is again drawn to form PBG0001 (01/06) that establishes the exclusions that are a part of the policy. They are located in **SECTION I – COVERAGES**, titled, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY.

3. EXCLUSIONS: COVERAGES A AND B

This insurance does not apply to:

A. EXPECTED OR INTENDED INJURY OR CRIMINAL ACT:

**Bodily** injury or **property damage** that is:

(1) Expected or intended from the standpoint of any **insured**; or

(2) The result of a criminal act committed by any **insured**.

B. CONTRACTUAL LIABILITY:

**Bodily injury, property damage, personal injury** or **advertising injury** for which an **insured** is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for **bodily injury** or **property damage**:

(1) That **you** would have in the absence of a contract or agreement; or

(2) **You** assumed in a contract or agreement that is an **insured contract,** provided the **bodily injury** or **property damage** occurs subsequent to the execution of the **insured contract** and the **bodily injury** or **property damage** arises from **your** work performed during the policy period.

Coverage for liability for **bodily injury** or **property damage** assumed in an **insured contract** is limited to **your** percentage of negligence or fault in causing the **bodily injury** or **property damage** according to applicable principles of comparative fault, and to the amount of damages that results from **your** percentage of fault, but not for the amount of any damages resulting from the fault or negligence of others.

Coverage is limited to **your** percentage of negligence or fault regardless of whether or not your liability under the **insured contract** is so limited, and regardless of what additional liability you may have agreed to assume.

Coverage for liability **you** assume in an **insured contract** is subject to all of the other terms, conditions and exclusions of this policy. Where pursuant to an **insured contract you** have assumed liability to another party for the cost of that party's defense, reasonable attorneys' fees and litigation expenses for which **you** are liable to that party are deemed damages because of **bodily injury** or **property damage** so long as those attorneys' feels and litigation expenses are for the defense of that party in a **suit** which seeks damages for **bodily injury** or **property damage** covered by this policy and such costs, fees and expenses would otherwise be covered by this policy. Payments made to **you** or on **your** behalf for such liability shall reduce the applicable limits of insurance as set forth in Section III. Except as set forth in this exclusion, the costs incurred by **you** for the defense of another are not covered.

J. DAMAGE TO PROPERTY

**Property damage** to:

(1) Property owned, rented, or occupied by an **insured**, including any costs or expenses incurred by an **insured**, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises an **insured** sells, gives away or abandons, if the **property damage** arises out of any part of those premises;

(3) Property, real or personal, loaned to any **insured**;

(4) Personal property in the care, custody or control of any **insured**, whether or not such care, custody or control was exclusive at the time of such **property damage**;

(5) Any real property on which **you** of any contractors or subcontractors working directly or indirectly on **your** behalf are performing operations, if the **property damage** arises out of those operations except that, if **you** are not a general contractor or developer of real property, then this exclusion applies only to the particular part of the real property on which **you** or others working directly or indirectly on **your** behalf are performing the operations; or

(6) Any property that must be restored, repaired or replaced because **your** work was incorrectly performed on it.

Paragraph (2) of this exclusion does not apply if the premises are **your work** and were never occupied, rented or held for rental by **you.**

Paragraph (6) of this exclusion does not apply to **property damage** included in the **products-completed operations hazard.**

For purposes of paragraph (5), **you** or any contractors or subcontractors working directly or indirectly on **your** behalf shall be deemed to be "performing operations" from the time when **you** or the contractors or subcontractors begin work until such operations are complete as set forth in paragraph 14.b. of SECTION V – DEFINITIONS – (**Products-Completed Operations Hazard**).

K. DAMAGE TO **YOUR PRODUCT**

**Property damage** to **your product.**

L. DAMAGE TO **YOUR WORK**

**Property damage** to **your work** or any part of it and included in the **products-completed operations hazard.**

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on **your** behalf by a subcontractor.

M. DAMAGE TO **IMPAIRED PROPERTY** OR PROPERTY NOT PHYSICALLY INJURED

**Property damage** to **impaired property** or property which has not been physically injured arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in **your product** or **your work;** or

(2) A delay or failure by **you** or anyone acting on **your** behalf to perform a contract or agreement in accordance with its terms.

This exclusion applies to property which is otherwise not physically injured or damaged but which must be demolished, removed, repaired, replaced, altered or damaged in order to remove, repair or replace **your work** or **your product.**"

P. PUNITIVE DAMAGES, FINES OR PENALTIES

**Claims** for exemplary or punitive damages, fines or penalties based upon, arising out of, or imposed by or under any law, statute, or ordinance of any federal, state or municipal government agency or any other types of fines, penalties, punitive damages, exemplary damages, treble damages or the multiplication of compensatory damages of any nature.

Q. EARTH MOVEMENT EXCLUSION

**Bodily injury** or **property damage** arising from, aggravated by, or as a consequence of earth movement, whether the earth movement is combined with any other cause. As used in this exclusion, the term earth movement includes, but is not limited to, earthquake, landslide, subsidence, mudflow, sinkhole, erosion, or the sinking, rising, shifting, expanding or contracting of earth or soil.

This Exclusion applies regardless of the cause or causes of the earth movement and includes defects or negligence in design, construction or materials, or any other event, conduct or misconduct which may have or is claimed to have precipitated, caused or acted jointly, concurrently, or in any sequence with earth movement in causing the **bodily injury** or **property damage**. This exclusion further applies to **bodily injury** and **property damage** arising from the mitigation, repair or avoidance of earth movement.

Notwithstanding **our** duty to defend an insured under SECTION I – COVERAGES, Paragraph 2. INSURING AGREEMENT – DEFENSE of this policy, where a **suit** is based in part upon **bodily injury** or **property damage** which is excluded by this exclusion, and even though damages potentially covered by this policy are also sought, **we** shall have the right, but not the obligation, to defend the **suit**. When **we** elect not to defend an **insured** under SECTION I – COVERAGES, Paragraph 2. INSURING AGREEMENT – DEFENSE in such **suit**, **we** shall reimburse such an **insured** for the **insured's** reasonable attorneys' fees and litigation expenses in accordance with paragraph 15, of SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS.

T. FUNGI, MOLD, ORGANIC PATHOGENS OR BACTERIA

**Bodily injury**, **property damage**, or **personal injury** arising, directly or indirectly, out of:

PRO00361

(1) Any actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any **fungi, mold, organic pathogens or bacteria** on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such **bodily injury** or **property damage.**

(2) Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, preventing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, **fungi, mold, organic pathogens or bacteria**, by any insured or by any other person or entity.

This exclusion applies regardless of the origin or cause of the **fungi, mold, organic pathogens or bacteria**, and whether any other cause of said **bodily injury** or **property damage** acted jointly, concurrently or in any sequence with said **fungi, molds organic pathogen or bacteria**.

Notwithstanding **our** duty to defend an insured under SECTION I – COVERAGES, Paragraph 2. INSURING AGREEMENT – DEFENSE of this policy, where a **suit** is based in part upon **bodily injury** or **property damage** which is excluded by this exclusion, and even though damages potentially covered by this policy are also sought, **we** shall have the right, but not the obligation, to defend the **suit**. When **we** elect not to defend an **insured** under SECTION I – COVERAGES, Paragraph 2. INSURING AGREEMENT – DEFENSE in such **suit**, **we** shall reimburse such an **insured** for the **insured's** reasonable attorneys' fees and litigation expenses in accordance with paragraph 15, of SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS.

U. CERTAIN CONSTRUCTION PROJECTS NOT COVERED

**Property damage** arising from **your work** that is performed on or in connection with, or **your product** that is incorporated into or upon, any **construction project** where any claim of **property damage** caused, or alleged to have been caused, by **your work** or **your product**, or of any defect, inadequacy or deficiency in **your work** or **your product**, was made prior to the policy period. This exclusion applies regardless of whether different **property damage** caused, or alleged to have been caused by **your work** or **your product**, or different allegations of defects, inadequacies or deficiencies in **your work** or **your product** are made during or after the policy period.

V. PAST WORK OR CONSTRUCTION PROJECTS

**Property damage** included within the **products-complete operations hazard** which arises out of **your work** or **your product** that was performed on or in connection with, or was incorporated into or upon, any improvement to real property or any **construction project**, together with any associated common areas, before the inception date of this policy or, if this policy is a renewal policy, the inception date of the first policy of continuous coverage provided by **us**. This exclusion does not apply if the **construction project** is specifically endorsed on this Policy and a premium is charged for it.

X. CONDOMINIUM OR TOWNHOUSE LIABILITY

**Property damage** or **bodily injury** within the **products-completed operations hazard** arising from, related to or in any way connected with a condominium or townhouse project including both the habitational structures and units together with any associated common areas.

This exclusion applies to **property damage** or **bodily injury** arising out of, related to or connected with any apartment project or structure that is converted into a condominium or townhouse regardless of whether the conversion or the apartment project occurred before, during of after the period of this policy.

This exclusion applies to a project or development of condominiums or townhouses, or an apartment project or structure converted into condominiums or townhouses, even if some or all of the units are held for rental or lease.

BB.EXTERIOR INSULATION AND FINISH SYSTEMS

**Bodily injury** or **property damage** arising directly or indirectly, out of:

(1) The design, manufacture, construction, fabrication, preparation, installation, application, maintenance or repair, including remodeling, service, correction, or replacement, of an **exterior insulation and finish system** (EIFS) commonly referred to as synthetic stucco or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such system; or

(2) Any work or operations with respect to any exterior component, fixture or feature of any structure if an **exterior insulation and finish system** is used in ay part of that structure.

CC. CONCRETE SULFATES

**Property damage** arising, directly or indirectly, out of:

(1) The actual, alleged or threatened exposure of concrete to, or the absorption by concrete products of sulfates whether such sulfates are in pure form or are or were combined with any other chemical or material;

(2) Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, remediating or disposing of concrete that is exposed to or has absorbed sulfates.

(3) Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing treating, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of sulfates on concrete;

(4) Any supervision, instructions, warnings, recommendations, or advice given or which should have been given in connection with (1), (2) or (3), above; or

(5) Any obligation to share damages with or repay someone else who must pay damages because of sulfates or products or materials containing sulfates.

This exclusion shall apply without regard to the source or sources of the sulfates, or the basis of the **insured's** liability. This exclusion includes defects or negligence in design, construction or materials, or any other event, conduct or misconduct, which may have or is claimed to have precipitated, caused or acted jointly, concurrently, or in any sequence with sulfates in causing the **property damage.**

Notwithstanding **our** duty to defend an insured under SECTION I – COVERAGES, Paragraph 2. INSURING AGREEMENT – DEFENSE of this policy, where a **suit** is based in part upon **bodily injury** or **property damage** which is excluded by this exclusion, and even though **property damage** potentially covered by this policy are also sought, we shall have the right, but not the obligation, to defend the **suit.** When **we** elect not to defend an **insured** under SECTION I – COVERAGES, Paragraph 2. INSURING AGREEMENT – DEFENSE in such **suit, we** shall reimburse such an **insured** for the **insured's** reasonable attorneys' fees and litigation expenses in accordance with paragraph 15, of SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS.

GG. COURSE OF ROOFING OPERATIONS

Property damage not included within the products-completed operations hazard to any building or structure and/or the contents, furniture and fixtures, improvements and betterments of any building or structure, directly or indirectly arising out of or caused, or alleged to have been caused by, in whole or in party, wind, hail, snow, rain, ice or any combination of these or any other form of precipitation occurring while the roof or other covering of the building or other structure is being constructed, repaired or replaced.

Notwithstanding SECTIN V – DEFINITIONS, Paragraph 19. Products-Completed Operations Hazard, work on a roof or other covering of a building or structure shall be deemed complete only when all work or operations upon it has been finished, regardless of whether the scope of an insured's work or operations includes less than the full completion of the roof or other covering and only when the roof or other structure is completely finished from the standpoint of all persons or entities involved.

HH. CONSOLIDATED (WRAP-UP OR OWNER CONTROLLED) INSURANCE PROGRAM

**Bodily injury** or **property damage** arising out of or connected with **your work**, including **bodily injury** or **property damage** within the **products-completed operations hazard**, on a **construction project** or at a location where a consolidated (Wrap-Up or Owner Controlled) insurance program has been provided by the prime contractor/project manager or owner of the **construction project** in which **you** are involved.

This exclusion applies whether or not the consolidated (Wrap-Up or Owner Controlled) insurance program:

(1) Provides coverage identical to that provided by this Coverage Part;

(2) Has limits adequate to cover all claims;

(3) Remains in effect;

(4) Applies to the **bodily injury** or **property damage**; or

(5) Has **you** as its prime contractor, project manager, owner or principal **insured**.

PRO00365

II. BREACH OF CONTRACT

**Bodily injury, property damage, personal injury** or **advertising injury** arising, directly or indirectly, out of the actual or alleged breach of any contract or agreement.

OO. CROSS LIABILITY

**Bodily injury, property damage, personal injury** or **advertising injury** for any **claims** made or **suits** brought by any **insured** against any other **insured**, except this exclusion does not apply to claims or suits brought against **you** by an **insured** as defined in paragraph 3. of Section II – Who Is An Insured.

SUPPLEMENTARY PAYMENTS – COVERAGES A AND B, reads, in part:

**We** will pay, with respect to any **claim**, or any **suit we** defend:

1. All expenses **we** incur.

5. Costs awarded against **you** in a suit for damages but only if awarded on a cause or causes of action covered by this insurance. However, **we** will not pay costs which are awarded for attorney fees by reason of statute, court rule, regulation or a contractual obligation (except as set forth in paragraph B of EXCLUSIONS: COVERAGES A AND B.

**SECTION II – WHO IS AN INSURED** states in pertinent part, as follows:

1. If **you** are designated in the declaration as:

   d. An organization other than a partnership, joint venture, or Limited Liability Company, **you** are an **insured. Your executive officers** and directors are **insureds,** but only with respect to their duties as **your executive officers** or directors. **Your** stockholders are also **insureds,** but only with respect to their liability as stockholders.

2. Each of the following is also an **insured:**

   a. **Your** direct employees are insureds, but only for acts within the scope of their employment by **you**. Your direct employees do not include loaned, rented, leased or temporary employees, persons who qualify as borrowed servants or employees, **your executive officers** (if **you** are an organization other than a partnership or joint venture), or **your** managers (if **you** are a limited liability company). However, no direct employee is an **insured** for:

PRO00366

(2) **Property damage** to property;

(a) Owned, occupied or used by; or

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose, and even if the control is no-exclusive, by;

**You**, any of **your** employees, any partner or member (if **you** are a partnership or joint venture), or any manager or member (if **you** are a limited liability company).

3. Any other person or entity qualifying as an additional insured under a Blanket Additional Insured Endorsement or added by an endorsement issued by **us** to this policy as an additional insured is an **insured** hereunder, but only to the extent and with the limitations set forth in the endorsement.

No person or entity is an **insured** by virtue of the acquisition of all or any part of the assets of an **insured** and no person or organization is an **insured** with respect to the conduct of any current or past partnership, joint venture, limited liability company or any other entity that is not shown as a Named Insured in the declarations.

As previously stated, NBIS is investigating this claim under a reservation of rights for policy #COM 5010992. There are endorsements attached to each policy that might apply to this matter. Those endorsements read, as follow:

Policy #COM 5010992 is amended by Endorsement #2, Subcontractor Operations Exclusion, form R0056 (Ed. 08/01/05), that reads as follows:

Is agreed that no coverage is provided by this policy for **property damage** or **bodily injury** arising out of, related to or connected with **your work** or **your product** that was performed or supplied while acting in the capacity of a subcontractor.

If this policy is endorsed to provide Coverage C then where the terms **property damage**, or **bodily injury** appear above shall be amended to read "**property damage, bodily injury, personal injury** or **advertising injury**."

Policy #COM 5010992 is amended by Endorsement #4, Per Claim Deductible, form R0401 (Ed. 01/01/05), that reads as follows:

It is agreed that <u>**$1,500.00**</u> shall be deducted from each and every **claim** under this policy, irrespective of the number of **claims** which may be joined in any one **suit**, arbitration, mediation, or any other form of legal proceeding. Such coverage as is afforded under this policy applies subject to the following conditions:

1. The deductible(s) shall apply to the **named insured** for all costs incurred by **us** on behalf of any **insured** for adjusting, legal and related expenses as well as any payments made by **us** toward the settlement of each and every **claim.**

2. All of the other terms and provisions of this policy, including those with respect to an **insured's** obligations upon an **occurrence** or **claim** and **our** right to investigate, defend, negotiate and/or settle any **claim** or **suit**, apply irrespective of the application of the deductible(s).

3. The **named insured** shall contribute the amount of the deductible(s) within ten (10) days from the date of request by **us** or **our** representative. The request for payment of the deductible(s) herein set forth shall be sent to the **named insured** by ordinary mail addressed to the first **named insured** at the address listed in the policy. The ten (10) days shall begin to apply from the postmark of the letter bearing such request. Failure of the **named insured** to pay the amount of the deductible(s) within ten (10) days as herein set forth shall void the policy with respect to the **claim(s)** involved.

4. **We** shall have the right to make partial deductible recoveries from the **named insured** when partial settlements and/or expense below the full amount of the deductible(s) are incurred by **us.**

5. As respects Coverages A, B and C of this policy, the deductible applies equally to all damages sustained by any one person or organization as a result of any one **claim.**

6. Failure or delay by **us** in seeking reimbursement of the deductible(s) shall not be considered a waiver by us. **We** may deduct from any payment on judgment or settlement the amount of any deductible(s) not reimbursed as of the date such payment is due.

7. If this policy is endorsed to provide Coverage C then anywhere the term **occurrence** appears in the body of this endorsement shall be amended to read "**occurrence** or offense." Furthermore, Item 5 above shall be amended to include Coverage C.

**All Other Terms And Conditions Of This Policy Remain Unchanged**

Policy #COM 5010992 is amended by Endorsement #5, Contractors Special Conditions, form R0500 (Ed. 01/01/05), that reads as follows:

As a condition precedent to this policy applying to any **claim** in whole or in part based upon work performed by independent contractors, the **insured** must have prior to the date of the loss giving rise to the **claim**:

PRO00368

(1) Received a written indemnity agreement from the independent contractor holding the **insured** harmless for all liabilities, including costs of defense, arising from the work of the independent contractor; and

(2) Obtained certificates of insurance from the independent contractor indicating that the **insured** is named as an additional insured and that coverage is maintained equal to or greater than provided by this policy with limits of at least $1,000,000 per **occurrence**.

(3) The **insured** has maintained the records evidencing compliance with subsections 1 and 2.

The insurance provided by this policy shall be excess over and above any other valid and collectible insurance available to the **insured** under subsection (2).

The following definitions in policy #COM 5010992 are found in the Commercial General Liability Coverage Form, PBG0001 (01/01/06), and can be found in the policy form under Section V – Definitions. Each definition is pertinent to the language quoted from the PBSIC policy form and endorsements and read, as follows:

**SECTION V – DEFINITIONS**

4. BODILY INURY

**Bodily injury** means **bodily injury**, sickness or disease sustained by a person, including death resulting from any of these at any time. **Bodily injury** does not include shock or emotional, mental or psychological distress, injury, trauma or anguish, or other similar condition, unless such condition results solely and directly from prior physical injury, physical sickness or physical disease otherwise covered under this policy.

5. CLAIM

**Claim** means a request or demand for money or services because of **bodily injury** or **property damage** received by **us** or an **insured** including the service of **suit** or institution or arbitration proceedings against an **insured. Claim** does not include reports of accidents, acts, errors, occurrences, offenses or omissions with may give rise to a **claim** under this policy.

6. CONSTRUCTION PROJECT

**Construction project** means all of **your work** that is performed on or in connection with, or **your product** that is incorporated into, any work of real property improvement, construction, repair or alteration under a single agreement, contract or purchase order.

PRO00369

Where **your work** is performed under, or where **your product** is supplied in connection with, more than one agreement, contract or purchase order but is part of a work of real property improvement or construction that is being done in phases, **your work** or **your product** under all the agreements, contracts or purchase orders will be deemed to be part of the same **construction project**. Where the **construction project** involves work on more than one structure or improvement, all of the structures and ancillary construction shall be deemed part of the same **construction project**.

8. EXECUTIVE OFFICER

**Executive officer** means a person holding any of the officer positions created by **your** charter, constitution, by-laws or any other similar governing document.

9. EXTERIOR INSULATION AND FINISH SYSTEM

**Exterior Insulation and Finish System** means an exterior cladding or finish system used on any part of any structure, and consisting of any of the following:

(1) A rigid or semi-rigid insulation board made of expanded polystyrene or other materials;

(2) The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

(3) A reinforced base coat;

(4) A finish coat providing surface texture and color.

10. FUNGI, MOLD, ORGANIC PATHOGENS OR BACTERIA

**Fungi, mold, organic pathogens** or **bacteria** means any type or form of fungus including mold or mildew, bacteria, virus, allergen or pollen, or other organism or organic matter and any myotoxins, spores, scents or by-products or substances released by **fungi, mold, organic pathogens** or **bacteria**.

12. IMPAIRED PROPERTY

**Impaired property** means tangible property, other than **your product** or **your work**, that cannot be used or is less useful because:

a. It incorporates **your product** or **your work** that is known or thought to be defective, deficient, inadequate or dangerous; or

b. **You** have failed to fulfill the terms of a contract or agreement;

13. INSURED CONTRACT

**Insured contract** means that the part of any written contract or written agreement pertaining to **your** business (including an indemnification of a municipality in connection with work performed for a municipality) under which **you** assume the tort liability of another party to pay for **bodily injury** or **property damage** to a third person or organization, but only if such **bodily injury** or **property damage** is not otherwise excluded by this insurance. Tort liability means liability that **you** would have in the absence of any contract or agreement.

An **insured contract** does not include that part of any contract or agreement:

a. That indemnifies any person or organization for **bodily injury** or **property damage** arising out of construction or demolition operations, within fifty (50) feet of any railroad property;

b. That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(1) Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, field orders, change orders, or drawings, designs or specifications; or

(2) Giving directions or instructions, or failing to give them;

c. Under which **you**, if an architect, engineer or surveyor, assume liability for an injury or damage arising out of **your** rendering or failure to render **professional services;**

d. That indemnifies any person or organization for damage by fire to premises rented or loaned to **you**;

16. OCCURENCE

**Occurrence** means an accident, including a continuous or repeated exposure to substantially the same generally harmful condition.

19. PRODUCTS-COMPLETED OPERATIONS HAZARD

**Products-completed operations hazard:**

a. includes all **bodily injury** and **property damage** occurring away from premises **you** own or rent and arising out of **your product** or **your work** except:

(1) Products that are still in **your** physical possession; or

(2) Work that has not yet been completed or abandoned.

b. **Your work** will be deemed completed or abandoned at the earliest of the following times:

(1) When all of the work called for in **your** contract has been completed.

(2) When all of the work to be done at the job site has been completed if **your** contract calls for work at more than job site.

(3) When that part of the work done at a job site has been put to its intended use by any person or organization.

(4) When **you** refuse to continue performance of **your work** under any contract or when your continued work at the job site or **your** contract has been terminated by anyone for any reason.

(5) When all of **your work** in connection with the construction of a residential or commercial building has been completed even though **your** contract may call for further work on additional buildings, but in any event not later than the issuance of the Notice of Completion or similar document for the building.

Work that may need service, maintenance, correction, repair or replacement, after it is complete as set forth in paragraph b. above, will be treated as completed even though a contract requires such service, maintenance, correction, repair or replacement.

c. This hazard does not include **bodily injury** or **property damage** arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the **loading** or **unloading** of that vehicle; or

(2) The existence of tools, uninstalled equipment or abandoned or unused materials.

20. PROPERTY DAMAGE

**Property damage** means physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it. Loss of use of tangible property unaccompanied by physical injury to that property is not **property damage.**

21. SUIT

**Suit** means a civil proceeding in which damage because of **bodily injury** or **property damage** to which this insurance applies are alleged. **Suit** includes:

a. An arbitration proceeding in which such damages are claimed and to which an **insured** must submit or does submit with **our** consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which an **insured** submits with **our** consent.

22. YOUR PRODUCT

**Your product** means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(1) **You;**

(2) Others trading under **your** name; or

(3) A person or organization whose business or assets **you** have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**Your product** includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your product**; and

b. The providing of or failure to provide warnings or instructions.

**Your product** does not include vending machines or other property rented to or located for the use of others but not sold.

23. YOUR WORK

**Your work** means:

a. Work or operations performed by **you** or on **your** behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

**Your work** includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your work**; and

b. The providing of or failure to provide warnings or instructions.

**SUMMARY:**

Based on the above, PBSIC will continue to conduct an investigation of this matter subject to a reservation of rights under policy #COM 5010992. In doing so, PBSIC is not waiving, but is preserving, all of its rights to contend it is not obligated to defend RJ Haas, to contend that it is not obligated to indemnify RJ Haas, to recover any monies spent in settlement or satisfaction of judgments, and to file a declaratory relief action to secure a resolution of any coverage issues.

By allowing PBSIC to continue to conduct an investigation under a reservation of rights RJ Haas is not waiving, but will be deemed to have preserved, all of its rights to contend that PBSIC is obligated to fully defend and indemnify RJ Haas.

Furthermore, if future investigation and/or discovery disclose additional reasons why coverage may not apply, PBSIC reserves the right to amend this reservation to include them.

Given PBSIC's assertion of coverage defenses, RJ Haas should consider seeking the guidance and advice of an attorney. However, the services provided by counsel are not a cost that will be honored by the policy.

Since there are actual and potential limitations to the amount of coverage that will be afforded, it is PBSIC's duty to inform you when a claim is denied, in whole or in part, that you may have this matter reviewed by the California Department of Insurance which is located at:

California Department of Insurance
Claims Service Bureau, 11th Floor
300 South Spring Street
Los Angeles, California 90013
(800) 927-4357 or (213) 897-8921

If you take exception to, or wish to discuss, PBSIC's investigating this matter subject to a reservation of rights, either you or your representative is requested to contact the undersigned.

You are also requested to notify us if you come into possession of information that would substantively alter the basis of PBSIC's coverage position.

Thank you for your time, courtesy and continued cooperation.

Yours truly,
NBIS Claims & Risk Management, Inc.

Joe Warren

Joe Warren
Sr. Claims Litigation Specialist
Direct #: 760-834-6719
E-Mail: jwarren@nbis.com

cc:

Tina Baird, Esq.
Branson, Brinkop, Griffith & Strong, LLP
643 Bair Island Road, #400
Redwood City, CA 94063
tbaird@BBGSLAW.com

LouCinda Laughlin, Esq.
Musick, Peeler & Garrett, LLP
One Wilshire Blvd., #2000
Los Angeles, CA 90017-3383
E-Mail: l.laughlin@mpglaw.com

Commodore Insurance Services
Via E-Mail: jmoncada@commodoreins.com

PRO00375

Jay M. Ross (State Bar No. 151750)
Matthew P. James (State Bar No. 211860)
HOPKINS & CARLEY
A Law Corporation
The Letitia Building
70 S First Street
San Jose, CA 95113-2406

*mailing address:*
P.O. Box 1469
San Jose, CA 95109-1469
Telephone: (408) 286-9800
Facsimile: (408) 998-4790

Attorneys for Plaintiffs
TY LEVINE and KAREN LEVINE

ENDORSED
2007 MAR -1 P 3:52
CLERK OF THE SUPERIOR COURT
COUNTY OF SANTA CLARA, CALIFORNIA
BY ___ DEPUTY CLERK
Dendel

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

TY LEVINE and KAREN LEVINE,

Plaintiffs,

v.

R.J. HAAS CORP., a California corporation; RONALD J. HAAS, an individual; INTERNATIONAL BUSINESS AND MERCANTILE REASSURANCE COMPANY, an Illinois corporation; and DOES 1 - 50, inclusive,

Defendants.

CASE NO. 107CV-081016

COMPLAINT FOR

(1) BREACH OF CONTRACT;
(2) BREACH OF EXPRESS WARRANTY;
(3) NEGLIGENCE;
(4) NEGLIGENCE PER SE;
(5) PROMISSORY FRAUD;
(6) FRAUD;
(7) ACCOUNTING;
(8) REVOCATION OF CONTRACTOR'S LICENSE; AND
(9) RECOVERY AGAINST CONTRACTOR'S LICENSE BOND

## GENERAL ALLEGATIONS

1. Plaintiffs, Ty Levine and Karen Levine (collectively the "Levines") are, and at all times mentioned herein were, the owners of that certain residential real property located at 700 Benvenue Avenue, Los Altos, County of Santa Clara, California ("Property").

2. The Levines are informed and believe, and on that basis allege, that Defendant R.J. Haas Corp. ("Haas" or the "Company"), Contractor's License Number 826084, is a corporation organized and existing under the laws of the State of California, with its principal place of

business located in Saratoga, County of Santa Clara, California.

3. The Levines are informed and believe, and on that basis allege, that Defendant Ronald J. Haas ("Mr. Haas") is an individual, residing in Santa Clara County, who, at all times relevant, was Haas' Responsible Managing Officer, President, and Chief Executive Officer.

4. The Levines are informed and believe, and on that basis allege, that at all times mentioned herein, defendant International Business and Mercantile Reassurance Company ("IBMRC") was, and now is, an Illinois corporation duly organized and existing, and doing business under and by virtue of California law, in the making, guaranteeing, and becoming a surety on bonds required or authorized by law.

5. The true names and capacities of defendants sued herein as Does 1 through 50 are unknown to the Levines, who therefore sue these defendants by such fictitious names. The Levines will amend this complaint to show their true names and capacities when the same have been ascertained. The Levines are informed and believe, and on that basis allege, that each of the fictitiously named defendants are responsible in some manner for the occurrences herein alleged and that the Levines' injuries as herein alleged were proximately caused thereby.

6. The Levines are informed and believe, and on that basis allege, that defendants, and each of them, are, and at all times herein mentioned were, the agents, servants, employees, and representatives of their co-defendants, and were at all times herein mentioned acting within the scope, purpose, and authority of such agency, service, employment, and representation, and with the permission, knowledge, and the consent of their codefendants; any reference hereinafter to "defendants" is intended by the Levines to refer to "defendants, and each of them."

7. In mid-2005, the Levines decided to do a major remodel of their existing home on the Property, and build their dream home in its place. The Levines wanted their home built with quality, excellent workmanship, and by someone who took pride in their work. To find the right contractor, the Levines interviewed prospective candidates. Eventually, the Levines met Mr. Haas. The Levines described their vision, and Mr. Haas provided the Levines with his Company's background information and assurances that Haas was more than capable of building the Levines' home in conformance with their needs and expectations.

8. Specifically, Mr. Haas communicated, the Company's web site to which the Levines were pointed described, and Haas' written proposal to the Levines noted that the Company specialized in "quality custom home construction in the desirable Los Altos area." Haas also represented that its projects were "characterized by a unique combination of customer service, quality craftsmanship and unexcelled value," and that Haas was a "well-established firm with over 20 years of experience in custom home construction." Based on these assurances, among others, the Levines were sold and entrusted the construction of their dream home to Mr. Haas and his Company.

9. Unfortunately, Mr. Haas and his Company failed to live up to the promises. Instead of having a completed, quality-built home, the Levines ended up with an incomplete home built with low quality materials and a serious lack of attention to detail that also is riddled with defects. They also ended up with a construction project months behind the promised schedule which has caused them to move three (3) times and incur substantial extra construction financing expenses. Almost worse, the Levines did not get the care, attention and responsiveness that Mr. Haas promised and that sold them on doing business with the Company. The Levines brought concerns about the construction to Mr. Haas' attention many times, only to be ignored. Neither the Company nor Mr. Haas took the initiative or responsibility to identify and correct problems. Because of the lack of attention and response, the Levines had their own investigation of the construction performed, which resulted in the identification of substantial construction errors, omissions and defects. The Levines provided Mr. Haas and the Company with the details of what was found, and made numerous requests that Haas address these deficiencies and provide a schedule of completion of both the repair work and the entire project. Haas was, and remains, totally unresponsive to the point of abandoning the Project, leaving the Levines to hire a new contractor to repair the defects and finish the job. Specific details regarding these issues are set forth below. What started out as a dream for the Levines has turned into a nightmare because of Mr. Haas and his Company.

///

///

**FIRST CAUSE OF ACTION**
**(Breach of Contract, Against Haas and DOES 1-50)**

10. The Levines reallege and incorporate by reference into this cause of action each and every foregoing paragraph as though stated in full herein.

11. On or about October 28, 2005, in Los Altos, California, the Levines and Haas entered into a written construction contract (hereinafter called "Contract"), whereby Haas agreed to perform demolition and construction to build a custom home for the Levines on the Property in conformance with the plans and specifications (hereinafter the "construction plans") the Levines obtained through their Architect, the Bob Flury Design Group (hereinafter referred to as the "Project"). A true and correct copy of the Contract is attached hereto as **Exhibit 1**, and incorporated herein by reference.

12. In addition to many other duties, the Contract required Haas to:

(a) Provide all labor, materials, tools, machinery, equipment, temporary utilities, transportation, etc., to construct and complete the work on the Project in a good, workmanlike and substantial manner, pursuant to Paragraph 1 of the Contract;

(b) Construct and complete the work on the Project in strict conformance with the plans and specifications, pursuant to Paragraph 2 of the Contract;

(c) Construct and complete the work on the Project in strict compliance with all laws, ordinances, rules and regulations of applicable governmental authorities, pursuant to Paragraph 2 of the Contract;

(d) Perform all work necessary to complete its work on the Project for a firm fixed price of $821,078, pursuant to Paragraph 3 of the Contract;

(e) Commence work within 10 days after written notice to proceed from the Levines, pursuant to Paragraph 4 of the Contract;

(f) Prosecute the work diligently and continuously until completion, pursuant to Paragraph 4 of the Contract;

(g) Complete its work on the project within 330 days from commencement of



PRO00250

EXHIBIT 4

work, pursuant to Paragraph 4 of the Contract;

(h) Adjust the total Contract price, based on the actual costs of allowance items, pursuant to Paragraph 9 of the Contract;

(i) Remedy any failure to perform pursuant to the terms of the Contract after the mailing of a written three-day notice to correct, pursuant to Paragraph 10 of the Contract; and

(j) Maintain workers' compensation insurance at its own expense for all employees working on the Project, pursuant to Paragraph 16 of the Contract.

13. The Levines are informed and believe, and on that basis allege, that Haas breached the Contract by, among other things, failing to perform and complete its work in accordance with the Contract and the construction plans, including:

(a) Failing to install foundation footings, and failing to properly install foundation footings, piers and posts, resulting in, among other things, the sub-floor being severely uneven in numerous areas and damage to the drywall where Haas attempted to temporarily support the roof above a missing foundation footing;

(b) Installing the wrong and improper roofing material, failing to properly frame the roof per the construction plans and applicable building codes, and causing the roof to sag and bow in numerous areas;

(c) Haas also cut numerous structural rafters in the roof contrary to, among other things, the construction plans in a failed attempt to repair the situation;

(d) Failing to install numerous shear walls and foundation elements per the construction plans and applicable building codes before covering the same with drywall on the interior and stucco on the exterior;

(e) Failing to properly calculate the HVAC requirements of the Project per applicable standards and requirements;

(f) Failing to install properly sized ducts and returns in the HVAC system per applicable standards and requirements;

(g) Cutting a shear wall to accommodate HVAC ducts contrary to, among

other things, the construction plans;

(h) Failing to properly install the concrete tile roofing system;

(i) Failing to properly install the exterior stucco underlayment resulting in excessive cracking, and failing to properly install the exterior stucco resulting in excessive cracking;

(j) Failing to correctly install windows, including, among other things leaving gaps between the windows and the framing and damaging the windows;

(k) Failing to adequately protect the Project from inclement weather, resulting in water damage to the Project;

(l) Failing to commence work within 10 days after the Levines' written notice to proceed and causing substantial delays in construction by failing to call for and schedule capping of the gas line;

(m) Failing to complete the project within 330 days, as required by the Contract;

(n) Providing inflated bid amounts from various subcontractors and/or material suppliers in order to obtain secret profits;

(o) Failing to bid the work on the Project from the construction plans;

(p) Failing to complete the work for the agreed fixed-price sum;

(q) Failing to correctly adjust the Contract price for various allowance items;

(r) Hiring unlicensed project managers and subcontractors to work on the Project;

(s) Failing to properly supervise the Project, thereby resulting in the Levines hiring a professional project manager at their own expense;

(t) Directing Haas' employees to work on the Project without having workers' compensation insurance coverage;

(u) Failing to furnish materials and equipment of good quality;

(v) Failing to adequately supervise the work of its agents, employees, subcontractors, and other persons performing work under contract with Haas;

(w) Failing to correct scores of construction defects, after the Levines provided in excess of 24 separate written notices of the defects to Haas;

(x) Failing to provide a detailed schedule, plans, and specifications for the repair work and to perform repair work after receipt of at least five (5) written three-day notices from the Levines, pursuant to the terms of the Contract;

(y) In response to the Levines' multiple written requests to perform pursuant to the terms of the Contract, refusing to perform and turning the entire project over to its "coverage counsel," thereby effectively abandoning the Project; and,

(z) Failing to perform construction required in engineering construction plans necessary to address the installation of regular-weight roof tiles as opposed to the light-weight roof tiles originally contemplated in the construction plans.

14. The Levines have performed all conditions, covenants, and promises required to be performed on their part pursuant to the Contract, except as to those obligations that were excused and/or discharged by Haas' prior breaches and conduct.

15. As a direct and proximate result of Haas' breaches of the Contract, the Levines have incurred damages, including, but not limited to: property damage; investigation and repair costs; loss and disruption of the beneficial use and occupancy of their residence; extra costs as a result of the delay in construction including, but not limited to, rents for temporary replacement housing and construction loan extension fees; and loss of property value and equity. The delay and disruption also has resulted in damages of, without limitation, additional direct and indirect costs to complete the Project, including increased costs for administration and supervision. The Levines' damages have not been ascertained at this time, but will be proven at trial in an amount in excess of this court's minimum jurisdiction.

16. In addition, the Levines are informed and believe, and on that basis allege that they have incurred damages related to diminution of value of the Property as a result of the Levines' inability to ascertain and therefore repair numerous undiscoverable defects, and the impact that will have on the re-sale of the Property. The Levines' damages have not been ascertained at this time, but will be proven at trial in an amount in excess of this court's minimum jurisdiction.

17. The Contract, at paragraph 19, contains a provision for the recovery of attorney fees and expert witness fees for the party who prevails in litigation to enforce the Contract. As a result of Haas' breaches of the Contract, the Levines have been required to retain Hopkins & Carley as their attorneys and also will have expert witnesses in this matter, and have and will continue to incur such fees in connection with this litigation.

WHEREFORE, the Levines pray for relief as hereinafter set forth.

**SECOND CAUSE OF ACTION**
**(Breach of Express Warranty, Against Haas and DOES 1-50)**

18. The Levines reallege and incorporate by reference into this cause of action each and every foregoing paragraph as though stated in full herein.

19. On or about October 25, 2005, Haas expressly promised, in writing, that the labor and materials furnished under the Contract would be of good, workmanlike quality, that the work would be performed in accordance with applicable building codes, laws and regulations, that the work would be free from defects, that the work would be completed within 330 days for a fixed price, and that the work would conform to the requirements of the Contract, plans and specifications.

20. Haas' express promises as alleged herein became a part of the basis of the bargain between the Levines and Haas, and thus constituted express warranties.

21. The Levines are informed and believe, and on that basis allege, that Haas breached the express warranties by, among other things, the acts, omissions and items described in paragraph 13, above.

22. The Levines made numerous demands for Haas to perform under its warranty, but Haas refused. At one point, Haas refused to perform any work and, instead, abandoned the Project, leaving the matter to his insurance "coverage counsel."

23. As a direct and proximate result of Haas' breach of express warranty, the Levines have incurred damages, including, but not limited to: property damage; investigation and repair costs; loss and disruption of the beneficial use and occupancy of their residence; rents for temporary replacement housing; construction loan extension fees; additional direct and indirect

costs, including administration and supervision, to complete the Project; and loss of property value and equity. The Levines' damages have not been ascertained at this time, but will be proven at trial in an amount in excess of this court's minimum jurisdiction.

24. In addition, the Levines have incurred damages related to diminution of value of the Property, as a result of the Levines' inability to ascertain and therefore repair numerous, undiscoverable defects, and their corresponding duty to disclose such undiscoverable defects to potential purchasers. The Levines' damages have not been ascertained at this time, but will be proven at trial in an amount in excess of this court's minimum jurisdiction.

WHEREFORE, the Levines pray for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION
**(Negligence, Against Haas and DOES 1-50)**

25. The Levines reallege and incorporate by reference into this cause of action each and every foregoing paragraph as though stated in full herein.

26. Haas owed the Levines duties, including, but not limited to: (1) the duty to comply with all applicable laws, ordinances, rules and regulations; (2) the duty to furnish materials and equipment of good quality and appropriate for their intended purposes and applications; (3) the duty to supervise the work its agents, employees, and subcontractors on the project; (4) the duty to perform the construction work consistent with the Contract, construction plans, and applicable building codes and industry standards; (5) the duty to complete work free from defects, (6) the duty to complete its work within the time period in the Contract; and (7) the duty to complete the work under the Contract for the agreed fixed-price sum.

27. The Levines are informed and believe, and on that basis allege, that Haas breached its duty of care when it negligently and carelessly performed its obligations under the Contract by, among other things:

(a) Failing to install and failing to properly install foundation footings, piers and posts, resulting in, among other things, the sub-floor being out of level;

(b) Failing to properly frame the roof per the construction plans and applicable building codes, and causing the roof to sag and bow in numerous areas;

(c) Cutting numerous structural rafters in the roof contrary to, among other things, the construction plans and applicable building codes and industry standards in a failed attempt to repair the situation, thereby creating the need, on information and belief, for removal of the roof to repair the cut rafters;

(d) Failing to correctly install windows, including, among other things leaving gaps between the windows and the framing and damaging the windows;

(e) Failing to install numerous shear walls and foundation elements per, among other things, the construction plans and applicable building codes, which will require, among other things and on information and belief, demolition of interior drywall and exterior stucco to repair;

(f) Failing to properly calculate the HVAC requirements of the Project in compliance with, among other things, applicable standards;

(g) Failing to correctly install ducts and returns in the HVAC system in compliance with, among other things, applicable standards;

(h) Cutting a shear wall to accommodate HVAC ducts contrary to, among other things, the construction plans;

(i) Failing to advise the Levines regarding the appropriate type of roofing material resulting in the installation of roofing tile heavier than was contemplated in the original construction plans and the need for re-engineering of the house, failing to construct according to revisions of the construction plans to accommodate the installation of the heavier roof tiles, and failing to properly install the concrete tile roofing system;

(j) Failing to properly install the exterior stucco underlayment resulting in excessive cracking of the stucco, which will result in the need, on information and belief, to remove the stucco in order to correct;

(k) Failing to correctly install windows and causing damage to windows during the course of performing other work;

(l) Failing to provide work that was free from defects, for example, and without limitation, failing to properly install the exterior stucco resulting in excessive

cracking;

(m) Failing to commence work within 10 days after the Levines' written notice to proceed and causing substantial delays in construction by failing to recognize the need to call for and schedule capping of the gas line;

(n) Failing to complete the project within 330 days, as required by the Contract;

(o) Failing to properly supervise the Project, thereby forcing the Levines to hire a professional project manager at their own expense;

(p) Directing Haas' employees to work on the Project without having workers' compensation insurance coverage;

(q) Failing to furnish materials and equipment of proper quality;

(r) Failing to adequately supervise the work of its agents, employees, subcontractors, and any other persons performing work under contract with Haas;

(s) Failing to correct scores of construction defects, after the Levines provided in excess of 24 separate written notices of the defects to Haas;

(t) Failing to provide a detailed schedule, plans, and specifications for the repair work and to perform repair work after receipt of at least five (5) written three-day notices from the Levines, pursuant to the terms of the Contract;

(u) In response to the Levines' written requests to perform pursuant to the terms of the Contract, Haas refused to perform and turned the project over to its "coverage counsel," thereby effectively abandoning the Project;

(v) Failing to adequately protect the Project from inclement weather, resulting in water damage to the Project, including, but not limited to the OSB sub-floor Haas installed at the Project;

(w) Failing to maintain the original plans and permits on site during construction, taking possession of those items and failing and refusing to return them to the Levines after Haas left the Project despite several requests for their return; and

(x) After leaving the Project, demanding a $500 payment and an agreement not

to mention the payment as a condition of transferring the temporary power pole to the Levines' new contractor when the true cost of that power pole was $200 or less.

28. As a direct and proximate result of Haas' breach of express warranty, the Levines have incurred damages, including, but not limited to: property damage; investigation and repair costs; loss and disruption of the beneficial use and occupancy of their residence; rents for temporary replacement housing; construction loan extension fees; additional direct and indirect costs, including administration and supervision, to complete the Project; and loss of property value and equity. The Levines' damages have not been ascertained at this time, but will be proven at trial in an amount in excess of this court's minimum jurisdiction.

29. In addition, the Levines have incurred damages related to diminution of value of the Property, as a result of the Levines' inability to ascertain and therefore repair numerous, undiscoverable defects, and their corresponding duty to disclose such undiscoverable defects to potential purchasers. The Levines' damages have not been ascertained at this time, but will be proven at trial in an amount in excess of this court's minimum jurisdiction.

WHEREFORE, The Levines pray for relief as hereinafter set forth.

**FOURTH CAUSE OF ACTION**

**(Negligence Per Se– Statutory Violations of the Business and Professions Code, Against Haas and DOES 1-50)**

30. The Levines reallege and incorporate by reference into this cause of action each and every foregoing paragraph as though stated in full herein.

31. California Business and Professions Code section 7159 ("Section 7159") contains mandatory requirements for the form and content of contracts relating to the remodeling of residential property. The labor, services and materials, which Haas agreed to provide under the Contract constituted home improvement work under Section 7159. The Contract was subject to the requirements of Section 7159. Haas violated Section 7159 and other provisions of the Business and Professions Code and California Contractors license laws, including, without limitation, the following:

(a) Section 7159 Failure to provide the Levines with a form of agreement that complies with Business and Professions Code section 7159 for form and content. Haas violated

several subsections, including, but not limited to:

(i) The Contract failed to state a commencement date for the work, in violation of subsection (b);

(ii) The Contract failed to provide a schedule of payments, in violation of subsection (e);

(iii) The Contract failed to provide a statement to the effect that lien releases would be provided upon satisfactory payment being made, in violation of subsection (f);

(iv) The Contract failed to provide the "Notice to Owner," in violation of subsection (j);

(v) The Contract failed to state what constitutes substantial commencement of the work, in violation of subsection (k); and

(vi) The Contract failed to provide the notice regarding the contractor's failure to substantially commence work, in violation of subsection (l).

(b) Section 7107 Haas abandoned its work on the Project, without legal excuse, in violation of § 7107 of the Business and Professions Code. Further, after Haas' work on the Project ceased, Haas refused to return and provide the Levines with the original building permit and the original construction plans approved by the Town of Los Altos.

(c) Section 7109 As is demonstrated by the acts alleged in paragraph 13, above, Haas willfully departed from accepted trade standards for good and workmanlike construction on the Project and willfully departed from the construction plans for the Project, without legal excuse.

(d) Section 7160 The Levines were induced to enter into contract for work of improvement through false and fraudulent statements knowingly made by Haas.

(e) Section 7161 Haas used false, misleading and deceptive misrepresentations in the procurement of the Contract.

32. The Levines are informed and believe, and on that basis allege, that the adoption of said statutes, ordinances and/or regulations was for the purpose of protecting the Levines and others similarly situated from the type of damage and injury alleged herein.

33. Haas' statutory violations constitute negligence per se.

34. As a direct and proximate result of Haas' negligence per se, the Levines have suffered damages, as alleged in paragraphs 28 and 29, above.

WHEREFORE, the Levines pray for relief as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
**(Promissory Fraud, Against Haas, Ronald J. Haas and DOES 1-50)**

35. The Levines reallege and incorporate by reference into this cause of action each and every foregoing paragraph, except paragraphs 25 thru 34, inclusive, as though stated in full herein.

36. On or about October 28, 2005, and in Los Altos, California, Ronald J. Haas, individually and as corporate representative of Haas, made the following written representations to the Levines:

(a) That Haas' residential construction projects "are characterized by a unique combination of customer service, quality craftsmanship and unexcelled value."

(b) That Haas' bid for the Project was based on the construction plans and specifications for the Project;

(c) That Haas would perform work on the Project in a good, workmanlike, and quality manner, and that the work would be performed in accordance with applicable building codes, laws and regulations;

(d) That Haas' work on the Project would be free from defects and would conform to the requirements of the Contract, plans and specifications;

(e) That Haas' work on the Project would be "substantially complete" within 330 days from commencement of the work;

(f) That Haas would complete the Project for a "firm fixed price" of $821,078;

(g) That Haas would adjust the total Contract price, based on the actual costs of allowance items; and

(h) That Haas would carry workers' compensation insurance for all of Haas'

employees working on the Project.

37. The representations contained in Paragraph 36 were false. The Levines are informed and believe, and thereon allege, that the true facts were that:

(a) Numerous homeowners had either litigated or arbitrated their claims against Haas for poor construction quality on similar residential projects;

(b) Ronald J. Haas created no fewer than seven related construction entities and obtained multiple California State Contractors licenses to avoid liability for work on past construction projects;

(c) Haas had no intention of constructing a home for the Levines that would be of quality craftsmanship and unexcelled value, as evidenced by the numerous, substantial defects on the Project, and Haas' utter failure to respond the Levines' demands to repair and complete the work;

(d) Haas had no intention of completing the project per the construction schedule, nor did it intend to complete the Project for the firm fixed price;

(e) Haas refused to install allowance items the Levines chose, because the chosen items did not have inflated profits built in the prices; and

(f) Haas routinely directed employees to work on the Project without having workers' compensation insurance coverage.

38. Ronald J. Haas made the material statements in Paragraph 36 for the purpose of inducing the Levines to sign the construction Contract.

39. At the time Ronald J. Haas made the material representations in Paragraph 36, Ronald J. Haas and Haas did not intend to fulfill the representations.

40. The Levines relied on the material misrepresentations contained in Paragraph 36, and they would not have entered into the Contract had they known the truth of the matters asserted.

41. The Levines have been significantly damaged by the misrepresentations contained in Paragraph 36. Specifically, the Levines have incurred damages, including but not limited to, property damage; investigation and repair costs; loss and disruption of the beneficial use and

occupancy of their residence; rents for temporary replacement housing; construction loan extension fees; additional direct and indirect costs, including administration and supervision, to complete the Project; and loss of property value and equity. The Levines' damages have not been ascertained at this time, but will be proven at trial in an amount in excess of this court's minimum jurisdiction.

42. The statements of Ronald J. Haas and Haas were willful, fraudulent, malicious, and oppressive. As a result, the Levines are entitled to punitive damages.

WHEREFORE, the Levines pray for relief as hereinafter set forth.

**SIXTH CAUSE OF ACTION**
**(Fraud, Against Ronald J. Haas, Haas and DOES 1-50, Inclusive)**

43. The Levines reallege and incorporate by reference into this cause of action each and every foregoing paragraph, except paragraphs 25 thru 42, inclusive, as though stated in full herein.

44. The Levines are informed and believe, and on that basis allege that following completion of the roof installation work on the Property, Ronald J. Haas, acting as agent for Haas, caused a written progress payment request be submitted to the Levines for the roof work, thereby representing to the Levines that the roof work had been performed pursuant to the Contract and in conformance with the construction plans, and applicable building codes.

45. The Levines are informed and believe, and on that basis allege that the representation referenced in Paragraph 44 was, and is, false. The Levines are informed and believe, and on that basis allege that Haas intentionally failed to execute the construction plans revised to accommodate the heavier roof tile and/or knew that the construction had not been executed as required by the construction plans but concealed that material fact from the Levines.

46. In addition, the Levines are informed and believe, and on that basis allege, that Haas failed to correctly frame the roof of the Project, and caused sagging and bowing of the roof. After the Levines notified Haas of this issue, Ronald J. Haas and/or other employees of Haas, on behalf of Haas, inspected the roof from inside the attic, directed a purported repair of the sagging and bowing condition, and, upon completion of such work, represented to the Levines that Haas

had repaired the roof without disclosing that such repair resulted in a material deviation from the construction plans and applicable building codes and industry standards, and, on information and belief, created a potentially dangerous condition.

47. The Levines are informed and believe, and on that basis allege, that the representation referenced in Paragraph 46 was, and is, false. The Levines are informed and believe, and on that basis allege, that Ronald J. Haas and/or other employees of Haas, on behalf of Haas, intentionally failed to repair the roof in accordance with the construction plans and applicable building codes and industry standards. Specifically, Haas intentionally cut several structural rafters in the attic, resulting in the roof being weakened and dangerous to occupants of the house.

48. In addition, the Levines are informed and believe, and on that basis allege, that Ronald J. Haas, and Haas, by requesting, and receiving, inspections for the roof work from building officials, impliedly represented to the Levines that the construction plans submitted to building officials accurately represented the structural design for the roof and roof tile, and also represented that the construction had been executed in compliance with the plans submitted to the building department.

49. The Levines are informed and believe, and on that basis allege, that the representation referenced in Paragraph 48 was, and is, false. The Levines are informed and believe, and on that basis allege, that Ronald J. Haas, on behalf of Haas, intentionally installed regular weight roof tiles with full prior knowledge that the house had not been constructed for the heavier tiles. In addition, the Levines are informed and believe, and on that basis allege, that Ronald J. Haas, on behalf of Haas, failed to execute design revisions requested by the structural engineer, to allow for the use of regular weight tiles, after Haas was notified that the roof was designed for light weight roof tiles.

50. When Ronald J. Haas and Haas made the representations and/or concealed the facts referenced in Paragraph 44, 46, and 48, they knew them to be false and made these representations and/or concealed material facts with the intention to deceive and defraud the

Levines and to induce the Levines to act in reliance in the manner hereinafter alleged, or with the expectation that the Levines would so act.

51. The Levines, at the time these representations were made by Ronald J. Haas and Haas, and at the time Ronald J. Haas and Haas took the actions herein alleged, were ignorant of the falsity of Ronald J. Haas and Haas' representations and believed them to be true and/or that material facts had been concealed. In reliance on these representations, the Levines were induced to, and did, make progress payments to Haas, and continued to allow Haas to perform work on the Property. Had the Levines known the actual facts, they would not have taken such action.

52. The Levines' reliance on Ronald J. Haas and Haas' representations was justified because Ronald J. Haas and Haas represented themselves to be competent contractors, fully able to build a high quality custom residence.

53. As a proximate result of the fraudulent conduct of Ronald J. Haas and Haas, as herein alleged, the Levines were induced to pay Haas for negligent work and work not performed in conformance with the construction plans. In addition, the Levines have, or will be, forced to hire alternate contractors to properly perform the work referenced above. This work includes, but is not limited to, excavation of the foundation in order to correctly tie in the new foundation, re-installation of all of the exterior stucco, and reframing the roof rafters, which, on information and belief, requires removal of the existing roof. The Levines have been damaged in an amount to be proven at trial.

54. The aforementioned conduct of Ronald J. Haas and Haas were intentional misrepresentations, deceits, or concealments of material facts known to Ronald J. Haas and Haas, with the intention on the part of the Ronald J. Haas and Haas of depriving the Levines of property or legal rights or otherwise causing injury, and was despicable conduct that subjected the Levines to a cruel and unjust hardship in conscious disregard of the Levines' rights, so as to justify an award of exemplary and punitive damages.

///

///

///

WHEREFORE, the Levines pray for relief as hereinafter set forth.

**SEVENTH CAUSE OF ACTION**
**(Accounting, Against Haas and DOES 1-50, Inclusive)**

55. The Levines reallege and incorporate by reference into this cause of action each and every foregoing paragraph as though stated in full herein.

56. Pursuant to the Contract, Haas agreed to complete all construction work on the Project for a fixed price of $821,078.

57. Haas represented to the Levines that it obtained bids from various subcontractors and material suppliers for the work on the Project and based the fixed Contract price on these bids.

58. The Levines are informed and believe, and on that basis allege, that, among other things:

(a) Haas inflated the subcontractor and supplier bids on the Project, in an effort to inflate the Contract price and obtain secret profits;

(b) Haas intentionally improperly charged the Levines for "change orders" to inflate the Contract price and obtain secret profits; and, .

(c) Haas failed to give the Levines proper credits for work performed that was less than the scope described in the contract, and for items of work removed entirely from the contract when, for example, Haas refused to perform that work.

59. The amount of money due from Haas to the Levines is unknown to the Levines and cannot be ascertained without an accounting of the receipts and disbursements made pursuant to the Contract.

WHEREFORE, the Levines pray for relief as hereinafter set forth.

**EIGHTH CAUSE OF ACTION**
**(Revocation of Contractor's License, Against Haas and DOES 1-50, Inclusive)**

60. The Levines reallege and incorporate by reference into this cause of action each and every foregoing paragraph as though stated in full herein.

61. The Levines are informed and believe, and on that basis allege, that Haas abandoned its work on the Project, without legal excuse, in violation of § 7107 of the Business and Professions Code. Further, after Haas' work on the Project ceased, Haas refused to return and provide the Levines with the original building permit and the original construction plans approved by the Town of Los Altos.

62. The Levines are further informed and believe, and on that basis allege, that, as alleged in more detail above, Defendant Haas willfully departed from accepted trade standards for good and workmanlike construction on the Project and willfully departed from the construction plans, without legal excuse, in violation of § 7109 of the Business and Professions Code.

63. The Levines are further informed and believe, and on that basis allege, that Defendant Haas materially failed to complete its work on the Project for the price stated in the Contract, in violation of § 7113 of the Business and Professions Code.

64. The Levines are further informed and believe, and on that basis allege, that Defendant Haas aided and abetted unlicensed contractors to evade the provisions of the Business and Professions Code, in violation of § 7114 of the Business and Professions Code.

65. Said violations, among others and without limitation, constitute grounds for revocation of Haas' contractor's license and are included in this action pursuant to § 7106 of the California Business and Professions Code. In addition, the Levines request that all contractor's license(s) for which Ronald J. Haas is a qualifier, be likewise revoked.

WHEREFORE, the Levines pray for relief as hereinafter set forth.

**NINTH CAUSE OF ACTION**
**(Recovery Against Contractor's License Bond, Against IBMRC and DOES 1-50)**

66. The Levines reallege and incorporate by reference into this cause of action each and every foregoing paragraph as though stated in full herein.

67. The Levines are informed and believes and thereon allege, that Haas, as principal, and IBMRC, as surety, executed a statutory contractor's bond, as required by Business and Professions Code §7071.5. Under Business and Professions Code §7071.5, such bonds are for the benefit of any person damaged as a result of violation of Chapter 9, Division 3, of the Business

and Professions Code (Business and Professions Code §§ 7000 through 7173).

68. For the reasons previously alleged, IBMRC is indebted to the Levines in the full amount of the penal sum of said contractor's license bond, in the amount of $12,500.00.

WHEREFORE, the Levines pray for relief as hereinafter set forth.

PRAYER

WHEREFORE, the Levines pray for judgment against defendants, and each of them, as follows:

**ON THE FIRST, SECOND, THIRD, and FOURTH CAUSES OF ACTION:**

1. For damages according to proof at the time of trial in an amount in excess of the minimum jurisdiction of this court; and

2. For the costs of suit herein incurred, including reasonable attorney fees and expert fees, as may be allowed by California law; and

3. For interest thereon at the maximum legal rate.

**ON THE FIFTH and SIXTH CAUSES OF ACTION:**

1. For damages according to proof at the time of trial in an amount in excess of the minimum jurisdiction of this court; and

2. For punitive damages, to punish Defendants for their fraudulent conduct.

**ON THE SEVENTH CAUSE OF ACTION:**

1. For an accounting between the Levines, on one hand, and Haas on the other hand.

**ON THE EIGHTH CAUSE OF ACTION:**

1. For revocation of Haas' contractor's license and all contractor's licenses for which Ronald J. Haas is a qualifier in accordance with §7106 of the California Business and Professions Code.

**ON THE NINTH CAUSE OF ACTION:**

1. For the penal sum of $12,500.00 for each bond issued with Haas as principal under Business and Professions Code §7000 through 7173; and

2. For costs of suit herein.

///

ON ALL CAUSES OF ACTION:

1. For the costs of suit herein incurred, including reasonable attorney fees and expert witness fees, as may be allowed by California law; and

2. For such other and further relief as the court may deem proper.

Dated: March 1, 2007

Hopkins & Carley
A Law Corporation

By: [signature]
Jay M. Ross
Attorneys for Plaintiffs
TY LEVINE and KAREN LEVINE

### *Progress Payment Schedule*
### *Building Construction Contract*
### *Paragraph #3*

1. Work has progressed through basement, foundation and rough grading..................10%
2. Framing lumber is onsite.........................................................................................10%
3. Work has progressed through the first floor rough framing stage.............................10%
4. Work has progressed through rough framing and roof sheathing is complete............10%
5. Work has progressed through plumbing top out, roofing and rough heating............10%
6. Work has progressed through stucco wire, with rough wiring and drywall hung.......10%
7. Work has progressed thru brown (2nd) coat of stucco and drywall is taped............10%
8. Drywall is textured and interior jambs and doors are in place..................................10%
9. Cabinets, counter tops and shower surround are installed.........................................10%
10. Final Building Inspection Approved by Building Department, Public Authority....... ..5%
11. Holdback: Funds may be held for 30 days after recording of Notice of Completion and expiration of lien period...........................................................................................5%

# *R.J. Haas Corp*

## Building Construction Contract

THIS AGREEMENT is made this 27 day October 2005, by and between Mr. and Mrs. Levine, hereinafter Called "Owner", whose address is: 700 Benvenue Avenue, Los Altos, CA 94024 and R.J. Haas Corp, hereinafter Called "Contractor", License No. 826084, whose address is 12225 Saratoga-Sunnyvale Road, Saratoga, California, 95070.

The Construction Lender is:
The Architect is:

In consideration of the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1. Contractor agrees to construct and complete in a good, workmanlike and substantial manner, upon the real property hereinafter described, furnishing all labor, materials, tools, machinery, equipment, temporary utilities, transportation and any other facilities needed therefore, A NEW CONSTRUCTION RESIDENCE IN ACCORDANCE WITH PLANS, SPECIFICATIONS AND COST BREAKDOWN SIGNED BY OWNER AND CONTRACTOR. (Hereinafter called the "Project," whether one or more building or improvements), upon the following real property 700 Benvenue Avenue, Los Altos, CA 94024, hereinafter called the "Property). The Owner will locate and point out the property lines to Contractor, and will provide boundary stakes by a licensed surveyor if there is any doubt as to boundaries.

Notes:
1. Offsite improvements are excluded.
2. Onsite improvements are excluded unless specified.
3. Permit, fees, plans and engineering are provided by Owner.

2. The project is to be constructed and completed in strict conformance with the plans and specifications for the same signed by the parties hereto and incorporated herein by reference, a copy of which plans and specifications have been filed with the Construction Lender named above (If there is no Construction Lender, all references to same in this contract are to be disregarded.)

The structure is also to be constructed and completed in strict compliance with all laws, ordinances, rules and regulations of the applicable governmental authorities, and Contractor is to apply for and obtain all required permits and licenses, paying all fees therefore, and all other fees required by such governmental authorities. Unless otherwise specifically provided in the plans and specifications, the Owner will pay all assessments and charges of any kind required by governmental authorities and public utilities for financing or repaying the costs of sewers, storm drains, water service and other utilities, including tap-in or hookup charges and the like.

3. In consideration of the covenants and agreements herein contained being performed and kept by Contractor, including the supplying of all labor, materials and services required by this contract, and the construction and completion of the Project, Owner agrees to pay to Contractor the sum of $821,078, in installments as follows: PAYMENT SCHEDULE PER ATTACHED PROGRESS PAYMENT SCHEDULE AND COST BREAKDOWN FORM.

If progress payments are to be made through the Owner, Owner represents that the construction funds are sufficient to pay the contract price and all extra work that may be ordered by Owner. Owner will do everything possible to expedite payments. The Owner hereby irrevocably authorizes the Approved Trustee to make payments, 10 and 11, 5% and 5% respectively, directly to the Contractor when due. Funds are to be deposited with the Trustee at the time of contract signing.

If progress payments are to be made through the Construction Lender, Owner represents that the construction loan fund is sufficient to pay the contract price and all extra work that may be ordered by Owner. Owner will do everything possible to expedite payments. The Owner hereby irrevocably authorizes the Construction Lender to make all payments directly to the Contractor when due.

EXHIBIT 1

RH

4. The Contractor agrees to commence work hereunder within 10 days after receipt of written notice from the Owner to do so, and after permit issue, to prosecute said work thereafter diligently and continuously to completion, and in any and all events to substantially complete the same within 330 days after commencement of work as aforesaid, subject to such delays as are permissible under paragraph 11, below. In no event shall the Contractor commence said work or place any materials on the Property prior to receipt of such notice from the Owner.

5. Contractor shall pay promptly all valid bills and charges for material, labor, machinery, equipment or any other service or facility used in connection with or arising out of the construction Project and will indemnify and hold the Owner of the property free and harmless against all liens and claims of lien for labor, services, and materials, or any of them, filed against the property or any part thereof, and from and against all expenses and liability in connection therewith, including, but not limited to, court costs and attorney's fees resulting or arising there from; provided that the Contractor shall be excused from this obligation to the extent that the Owner is in arrears in making progress payments to the Contractor. Should any liens or claims of lien be filed for record against the property, or should Owner receive notice of any unpaid bill or charge in connection with the construction, Contractor shall immediately either pay and discharge the same and cause the same to be released of record, or shall furnish the owner with the proper indemnity either by satisfactory corporate surety bond or title policy, which indemnity shall also be subject to approval of the Construction Lender.

6. Contractor shall, if requested by Owner, before being entitled to receive payment due for change orders, furnish to Owner estimates, quotations, and cost breakdown covering work to be done and the materials to be furnished to the Project. The owner shall provide payment for change orders in advance of work being performed by the contractor.

7. This contract package and the plans and specifications are intended to supplement one another. In case of conflict, however, the specifications shall control the plans, and the provisions of this contract package shall control both. In the event that work is displayed on the plans but not called for in the specifications or in the event that work is called for in the specifications but not displayed in the plans, Contractor shall be required to perform as though called for and displayed in both places.

8. Should the Owner or Architect, if any, at any time during the progress of the work request any modification, alterations, or deviations in, additions to, or omissions from this contract or the plans or specifications, he shall be at liberty to do so, and the same shall in no way affect or make void this contract; but the amount thereof shall be added to the amount of the contract price stated above, as the case may be, by a fair and reasonable valuation, based upon the actual cost of labor, materials, and other costs, plus fifteen (15) percent profit to the Contractor. This contract shall be deemed to be completed when the work is finished in accordance with the original plans as amended or modified by such changes, whatever may be the nature or extent thereof. The rule of practice to be observed in fulfillment of this paragraph shall be that, upon the demand of either the owner or the Contractor, the character and valuation of any or all changes, omissions or extra work shall be agreed upon and fixed in writing, signed by the owner and the Contractor, prior to performance. Where the alterations, deviations, additions, or omissions from said plans or specifications require the written approval of the Construction Lender, the Owner will secure said written approval; provided, however, that the Contractor shall not be deemed to have waived his right to compensation for any extra work even though the same is not provided for in writing. Payments for extra work will be made pursuant to Paragraph 6, above.

9. If the contract price above includes allowances and the cost of performing the work covered by the allowance is either greater or less than the allowance, the contract price shall be increased or decreased accordingly. Unless otherwise specified by the owner in writing, the Contractor shall use its own judgment in accomplishing the work covered by an allowance. If the Owner requests that the work covered by an allowance be accomplished in a way that the cost will exceed the allowance, the Contractor shall comply with the Owner's request provided that the Owner pays the additional costs in advance.

10. Should Contractor, at any time during the progress of the work, refuse or fail to supply sufficient workmen for the expeditious progress of said work or fail to perform any other provisions of this contract, Owner may, upon giving three (3) days' notice in writing to Contractor, by registered or certified mail, (a copy of which shall be furnished to the Construction Lender) and Contractor's failure to remedy any such failure within said three (3) day period, terminate this contract and provide the necessary material and workmen to finish the work and may enter upon the Property for such purpose and complete said work. The expense thereof shall be deducted from the contract price, or if the total cost of the work to Owner exceeds the contract price, Contractor shall pay to Owner upon demand the amount of such excess in addition to any and all other damages to which Owner may be entitled. In the even of such termination, Owner may not take possession of all materials, equipment and appliances belonging to Contractor upon the Property upon which said work is being performed and may not use the same in the completion of said work. Such termination shall not prejudice any other legal rights that the Owner may have against the Contractor.

BV JLL RH

11. Time is of the essence of this contract and Contractor shall substantially complete the work during the time provided for in Paragraph 4 above. However, the time during which Contractor is delayed in said work by (a) the acts of Owner or his agents or employees or those claiming under agreement with or permission from Owner, or by (b) the Acts of God which Contractor could not have reasonably foreseen and provided against, or by (c) unanticipated stormy or inclement weather which necessarily delays the work, or by (d) any strikes, boycotts or like obstructive actions by employees or labor organizations and which are beyond the control of Contractor and which he cannot reasonably overcome, or by (e) the failure of Owner to make progress payments promptly, shall be added to the time for completion of the work by a fair and reasonable allowance. Furthermore, the Contractor shall have the right to stop work if any payment, including payment for extra work, is not made to Contractor as provided in this Contract. In the event of such nonpayment, Contractor may keep the job idle until all payments then due are received.

12. It is understood and agreed that Contractor, before incurring any other expenses or purchasing any other materials for the Project, shall proceed with the foundation work and that if, at the time of excavation therefore, the Contractor finds that the work below the surface of the ground is at variance with the conditions indicated by the plans and specifications or information supplied by the Owner, or should unknown physical conditions below the surface of the ground be of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this contract be encountered, he shall so notify the Owner, and Owner shall at that time have the right and option to immediately cancel and terminate the within contract or to deposit the estimated cost of the required extra foundation work with the Construction Lender, if there be one named herein, or add such amount to the contract funds wherever same are at that time deposited and the contract sum shall be increased accordingly. Such costs shall be paid for by Owner as extra work. It is agreed that in the event of a cancellation, the Contractor shall be paid his actual costs of the work done prior to the time of cancellation. In computing such costs, building permit fees, insurance and such financing and title charges as are not refundable shall be included, and that supervision time, office overhead and profit are to be included in such costs to be refunded to Contractor by reason of such cancellation.

13. Occupancy of said improvements or any part thereof shall be construed as an acceptance of any work done up to the time of final payment prior to occupancy, except such items as are plainly evident to anyone not experienced in construction work, the entire work is to be subject to the inspection and approval of Owner or Architect at the time when it shall be claimed by Contractor that the Project has been completed prior to occupancy. It is understood and agreed that the acceptance of any work by the Owner or Architect shall not be an acceptance by the Construction Lender who is not a party hereto.

14. Owner agrees to sign and file for record within five (5) days after the substantial completion of the Project Notice of Completion (a copy thereof to be deposited with the Construction Lender at least forty-eight hours prior to such recording). If the Owner fails to so record the Notice of Completion within said five (5) day period, the Owner hereby appoints the Contractor as the Owner's agent to sign and record such Notice of Completion on the Owner's behalf. This agency is irrevocable and is an agency coupled with an interest. Contractor agrees that upon receipt of final payment, to release the Project and property from any and all claims that may have accrued against same by reason of said construction. If the Contractor faithfully performs the obligations of this contract on his part to be performed, he shall have the right to refuse to permit occupancy of the structure by the Owner or Owner's agents until the Notice of Completion has been recorded and Contractor has received the payment, if, any, due hereunder at completion of construction, less such amounts as may be retained pursuant to mutual agreement of the Owner and Contractor under the provisions of Paragraph 3, above. The Construction Lender has the right to make its own decisions as to the completion of any work, independent of the parties hereto.

15. Owner agrees to procure at its own expenses and prior to the commencement of any work hereunder, fire insurance with course of construction, vandalism, extended coverage and malicious mischief clauses attached in a sum equal to the cost of said improvements as set forth in Paragraph 3 hereof, with loss, if any, payable to any mortgagee or beneficiary under any deed of trust covering the Project. Such insurance shall be written to protect the Owner and shall name the Contractor and his Subcontractors as additional insured's, and shall protect Owner, Contractor and his Subcontractors and the Construction Lenders as their interests may appear. Should Owner fail so to do, Contractor may procure such insurance, but is not required to do so, and owner agrees on demand to reimburse Contractor in cash for the cost hereof.

If the project is destroyed or damaged by any accident or disaster, such as fire, storm, flood, landslide, earthquake or subsidence, or by theft or vandalism, any work done by Contractor in rebuilding or restoring the work shall be paid for by the owner as extra work under Paragraph 8, above. If, however, the estimated cost of replacement of the work already completed by Contractor exceeds twenty (20%) percent of the contract price, the Owner shall have the option to cancel this contract and, in such event, the Contractor shall be paid the reasonable cost, including net profit to Contractor in the amount of ten (10%) percent, of all work performed by Contractor before such cancellation.

05-17-2007 14:43 From-JAMES E M ERN INC +650-594-9130 T-199 P.029/035 F-850

16. Contractor shall, at his own expense carry all workmen's compensation insurance to protect Contractor's employees and public liability insurance necessary for the full protection of Contractor and Owner from injury to persons or property arising from the acts of Contractor or his Subcontractors during the progress of the work. Certificates of such insurance shall be filed with owner and with the Construction Lender if Owner so requires, and shall be subject to the approval of both of them as to adequacy of protection. Owner shall obtain and pay for insurance against injury to his own employees, if any, and persons on the site at Owner's direction. The Contractor shall not be responsible for any damage occasioned by the Owner or Owner's agents, Acts of God, earthquake, or other causes beyond the control of Contractor, unless otherwise herein provided.

17. Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration in accordance with Construction Industry Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any Court having jurisdiction thereof. Owner, Contractor, Architect and all Subcontractors, Sub-Subcontractors, material suppliers, and other parties concerned with the construction of the project are bound, each to the other, by this arbitration clause, provided each party has signed this contract or contract that incorporates this contract by reference, or signs any other agreement to be bound by this arbitration clause. On the demand of the arbitrator or any party to an arbitration initiated under the arbitration provisions of this contract, Owner, Contractor, and any Subcontractors, Sub-Subcontractors, or other party bound by this arbitration provision agrees to join, become a party to, and be bound by such arbitration proceedings. If any party refuse or neglects to appear at or participate in such arbitration proceedings, the arbitrators are empowered to decide the controversy in accordance with whatever evidence is presented by the party or parties who do participate. The arbitrators are authorized to award any party or parties such sums and they consider proper for the time, expense, and trouble of arbitration, including arbitrator fees and attorney's fees.

18. Contractor guarantees all equipment, material, supplies, and work furnished on the project against defective construction or workmanship for a period of one year following the completion of the project, except when a longer guaranty is provided by the supplier or manufacturer of the equipment or material. Contractor shall supply the Owner with all warranty and guaranty documents relevant to the equipment and materials incorporated into the job and guaranteed by its suppliers or manufacturers.

19. If either party hereto becomes involved in arbitration or litigation arising out of this contract or the performance of it, the court or tribunal in such arbitration or litigation may award reasonable costs and expenses of such arbitration and litigation, including expert witness fees and attorney's fees, to the successful party.

20. Upon the completion of the Project, the Contractor agrees to remove all debris and surplus materials from the Owner's property (including under area of structure) and leave said property in a neat and broom clean condition.

21. The owner may not assign this contract, or payments due hereunder, without the written consent of the contractor or construction lender, if any.

22. Construction Lender is not a party to this contract and is not bound or obligated by or under any of the terms hereof.

23. Any notice required or permitted under this contract may be given by certified or registered mail at the addresses contained in this contract, but such address may be changed by written notice by one party to the other from time to time. Notice shall be considered received three days after deposited in the mail, postage prepaid.

24. This contract constitutes the entire agreement of the parties. No other agreements, oral or written, pertaining to the work to be performed under this contract exists between the parties. This contract can be modified only by an agreement in writing signed by both parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first written above.

OWNER: [signature] 10/28/05
[signature] 10.28.05

CONTRACTOR: [signature] Bros. 10/28/05
R.J. HAAS Corp

Page 8

R. J. HAAS CORP

Residence: Levine Residence
700 Benvenue Ave
Los Altos, CA

UPDATED [illegible]

| | Basic | Allow. | Sitework | Total | Options | Remarks |
|---|---|---|---|---|---|---|
| 1410 Temporary Facilities Misc. | 2,000 | | | 4,954 | | |
| 1240 Finish Grading | | | 1,000 | 1,000 | | |
| 1230 Demolition | | | 11,000 | 11,900 | | |
| 2110 Structural Concrete | 39,800 | | | 79,780 | | |
| 3110 Lumber Rough | 64,700 | | | 129,367 | | |
| 6210 Lumber Finish | 7,200 | | | 14,397 | | |
| 3115 Carpenter Labor - Rough | 68,100 | | | 136,203 | | |
| 6215 Carpenter Labor - Finish | 9,100 | | | 18,180 | | |
| 4230 Doors & Frames, Entry, Garage | 13,300 | | | 25,565 | | |
| 4240 Entry Door | | 5,000 | | 5,000 | | |
| 4210 Windows, Skylights | | 59,295 | | 59,295 | | |
| 6410 Cabinets, Installed, Finished | | 42,410 | | 42,410 | | |
| 3120 Framing Hardware | 13,600 | | | 27,221 | | |
| 4270 Hardware Door | | 2,300 | | 2,300 | | |
| 3810 Rough Plumbing | 24,300 | | | 48,595 | | |
| 6810 Finish Plumbing | | 12,557 | | 12,657 | | |
| 3710 Rough Electric | 33,800 | | | 87,700 | | |
| 6710 Finish Electrical | | 9,030 | | 9,030 | | |
| 4010 Roof Cover | 20,400 | | | 40,770 | | |
| 4820 Stucco | 22,000 | 9,100 | | 53,065 | | Stucco Trim Allow. $4,700, Smooth Stucco Allow. $4,400 |
| 6810 Heating,Vent., AC | 20,800 | | | 41,842 | | |
| 4410 Sheetmetal, Flashing & Jacks | 10,600 | | | 20,971 | | |
| 6615 Glass/Bath Bars, M.C., Shower | | 3,600 | | 3,600 | | |
| 6010 Drywall | 24,300 | 3,000 | | 51,598 | | Level 5 Fin. Allow. $3,000 |
| 4310 Insulation | 7,500 | | | 14,985 | | |
| 6310 Tilework, Marble, Granite, Tops | | 36,100 | | 36,100 | | |
| 6120 Carpet | | 2,680 | | 2,680 | | |
| 6130 Finish Flooring, Hardwood | | 10,306 | | 10,306 | | |
| 6910 Painting & Decorating | 28,200 | | | 46,992 | | |
| 6510 Appliances | | 17,041 | | 17,041 | | |
| 4250 Garage Door & Hardware | | 8,000 | | 8,000 | | |
| 7010 Debris Boxes | | | 3,700 | 3,700 | | |
| 7020 Building Cleanup | | | 3,700 | 3,700 | | |
| 1250 Drain Tile | | | 700 | 700 | | |
| 7210 Driveway, Curb | | | 10,000 | 10,000 | | |
| 7215 Walks, Steps & Porches | | | 18,750 | 16,750 | | |
| 3740 Security | | 3,227 | | 3,227 | | |
| 7362 Waterproof Coating, Roof | | | 2,300 | 2,300 | | |
| 1216 Erosion Control, Temp Fence | | | 1,000 | 1,000 | | |
| 1440 Utility Connections, Water, Sewer | | | 2,500 | 2,500 | | |
| 6212 Mstr/Din Rm Cove | | 910 | | 910 | | |
| 6225 Shoji Doors | | 1,000 | | 1,000 | | |
| 3750 Lutrn/Leviton System | | 4,000 | | 4,000 | | |
| 3720 Structured Wiring | | 1,520 | | 1,520 | | |
| Solar System | | 18,000 | | 18,000 | | |
| Sub Total | 405,300 | 248,976 | 53,650 | 707,826 | | |
| Supervision | | | | 21,235 | | |
| O.H. & G.A. | | | | 14,157 | | |
| Profit | | | | 77,861 | | |
| Total Construction Cost | | | | $821,078 | | |



KL
RH

PRO00274

EXHIBIT 4

# R.J. Haas Corp
## Building Construction Contract

PROPERTY ADDRESS: 700 BENVENUE AVENUE, LOS ALTOS, CA

NAME AND ADDRESS OF CONTRACTOR OR BUILDER: R.J. Haas Corp
12226 Saratoga-Sunnyvale Road
Saratoga, California 95070

1. EXCAVATION
Bearing Soil, Type: Per Soils Report

2. FOUNDATIONS
Footings Concrete Mix: Pump Mix
Foundation Wall Material: Concrete
Interior Foundation Wall Material: Concrete
Columns Material and Sizes:
Girders Material and Sizes: Per Plan
Basement Entrance Areaway: Not Applicable
Waterproofing: Per Plan & Contract

Reinforcing: Per Plan/Strength psi: 2,500
Reinforcing: Per Plan
Party Foundation Wall: Not Applicable
Piers Material and Reinforcing: Per Plan
Sills Material: PT 2x, 3x
Window Areaways: Not Applicable
Footing Drains: Per Plan & Contract
Foundation Vents: Per Code

3. CHIMNEYS
Heater Flue Size: 8"
Fireplace Flue Size: 10"
Water Heater Flue Size: 4"

4. FIREPLACES
Gas Circulator: Owner Select Per Contract
Hearth: Owner Select per Contract
Mantel: Owner Select per Contract

Fireplace Face: Owner Select per Contract

5. EXTERIOR WALLS
Wood, Grade and Species: Standard/Better DF
Sheathing: OSB Thickness: 3/8" Width: 4 Ft.
Siding: Per Plan
Stucco: Textured Thickness: 1"
Masonry Veneer: Per Plan & Contract
Exterior Fascia Painting: Material-Kelly Moore

Shingles: Per Plan
Lath: Felt/Wire Weight: 5lb.
Door Sills: Oak, AL

6. FLOOR FRAMING
Joists: Wood, Grade and Species: Per Plan & Contract

7. SUBFLOORING
Material Grade and Species: OSB T/G ¾"

8. FINISH FLOORING
Material Grade and Species: Per Plan & Contract

Owner to Select per Contract

9. PARTITION FRAMING
Studs: Wood Grade and Species: #2/Better DF
Size and Spacing: 16" O.C.

10. CEILING FRAMING
Joists: Wood, Grade and Species: #2/Better DF
Size and Spacing: 24" O.C

11. ROOF FRAMING
Rafters: Wood, Grade and Species: #2/Better DF

KL TY RH

12. ROOFING
Sheathing: Wood, Grade and Species: ½" OSB - Solid
Roofing: Tile/Concrete
Type: Per Plan - Owner Select Per Contract
Number of Plies: Flashing Material: GI
Grade: 10.5 lb.-Per Sq. Ft.
Underlay: #30 Felt Fastening: GI
Gage or Weight: 26

13. GUTTERS AND DOWNSPOUTS
Gutter Material: GI- Shape: OG or Equal
Downspout Material: GI
Downspouts Connected to: Sub-Drain per Contract
Dry-Well /Splash Blocks
Gage or Weight: 26 - Size: 5"
Gage or Weight: 24 - Size: 3"
Storm Sewer /Sanitary Sewer

14. DRYWALL
Drywall Wall Surface: Gypsum Board
Drywall Ceilings: Gypsum Board
Joint Treatment: Mud/Tape 3 Coats
Finish: Textured - Thickness ½"
Finish: Textured - Thickness ½"

15. DECORATING (Paint, Wallpaper, etc.)
Kitchen Wall, Ceiling: Semi-Gloss, 1 Color
Bath Wall, Ceiling: Semi-Gloss, 1 Color
Other Wall, Ceiling: Flat
Trim: Semi-Gloss, 1 Color
Color: Owner to Select per Contract
Color: Owner to Select per Contract
Color: Owner to Select per Contract
Color: Owner to Select per Contract

16. INTERIOR DOORS AND TRIM
Doors Type: 6 Panel Hollow Core or Equal
Door Trim Type: Per Contract
Base Type: Per Contract
Finish Doors: Per Contract
Trim: Per Contract
Thickness: 1 3/8", Paint Grade
Material: Finger joint Pine, Paint Grade
Material: Pine, MDF, Paint Grade
Material: Paint
Material: Paint

17. WINDOWS
Window Type: Wood - Owner Select per Contract
Window Type: Vinyl - Owner Select per Contract
Finish Exterior: Clad
Finish Interior: Paint Grade
Finish Casing: Paint Grade

18. ENTRANCES AND EXTERIOR DETAIL
Entry Door System: Owner Select per Contract
Finish: Owner to Select per Contract

19. CABINETS AND INTERIOR DETAIL
Kitchen Cabinets: Per Plan and Contract
Bath Cabinets: Per Plan and Contract
Built-In Furniture - Per Plan and Contract
Owner Select per Contract
Owner Select per Contract
Owner Select per Contract

20. STAIRS
Main Stair: Treads - Rough
Main Stair: Risers - Rough
Main Stair: Stringer: - Rough
Basement: Handrail, Stair Apron, False End
Material: OSB - Thickness: 1 1/8"
Material: OSB - Thickness: ¾"
Material: DF - Size: 2 x 12
Material: Owner Select per Contract

21. SPECIAL FLOORS AND WAINSCOT
Floors: Per and Contract
Wainscot: Per Plan & Contract
Owner Select per Contract
Owner Select per Contract

22. PLUMBING - FIXTURES
Sink, Lavatory: Per Plan and Contract
Water Closet, Bathtub: Per Plan and Contract
Shower over Tub, Stall Shower: Per Plan and Contract
Owner Select per Contract
Owner Select per Contract
Owner Select per Contract

KL RH



HUD Form 92005 (10/84)

PRO00276

06-17-2007 14:44 From-JAMES E MCGOVERN INC +650-594-8130 T-189 P.032/035 F-860

EXHIBIT 4

22. PLUMBING – FIXTURES (CONTINUED)
Laundry Trays: Per Plan and Contract
Bathroom Accessories: Per Plan and Contract
Curtain Rod, Shower Enclosure: Per Plan and Contract
Shower Pan: Per Plan and Contract
Water Supply: Public – Per Plan and Contract
House Drain (Inside): Per Plan and Contract
House Sewer (Outside): Per Plan and Contract
Water Piping: Per Plan and Contract
Domestic Water Heater: One Unit
Heating Capacity: Manufacturer Specification
Gas Service: Utility Company
Footing Drains:
Sump Pump: Per Plan

Owner Select per Contract
Owner Select per Contract
Owner Select per Contract
Material: Waterproofing Membrane
Sewage Disposal: Public
Material: ABS
Material: ABS
Material: Copper Tubing
Type: Gas
Gallons: 75
Gas Piping: Black Iron
Connected to: Storm Sewer – Per Contract
Discharge: Storm Sewer – Per Contract

23. HEATING
Warm Air: Forced
Duct Supply: Per Design/Build
Return Supply: Per Design/Build
Insulation: Per Design/Build
Furnace (Make and Model): As Required
Controls (Make and Model): As Required
Kitchen Exhaust Fan – Per Plan and Contract

Type: FAU-Gas, A/C – 80%, 10 SEER
Material: Flex
Material: Flex
Material: Fiberglass
Outside Air Intake
Programmable Thermostat
Owner Select per Contract

24. ELECTRIC WIRING
Service: Underground
Special Outlets: Range, Doorbell, Chimes

Amps: 200 or Per Plan
Interior Wiring: Romex, Copper

25. LIGHTING FIXTURES
Total Number of Fixtures: Per Plan and Contract

Owner Select per Contract

26. INSULATION
Roof: Per Plan - Title 24
Ceiling: Per Plan - Title 24
Wall: Per Plan - Title 24
Floor: Per Plan - Title 24

Material: FG Batt-10"-R30, Typical
Material: FG Batt-10"-R30, Typical
Material: FG Batt-3"-R13, Typical
Material: FG Batt-5"-R19, Typical

27. HARDWARE (Make, Material, and Finish)
Owner to Select per Contract

Material: Door Hardware, Brass Finish

SPECIAL EQUIPMENT - Owner to Select – Options
Central Vacuum System
CAT 5, DSS, Computer Wiring
Recirculating Hot Water System
Fire Sprinkler/EWAS System

Security, Intercom System
Acoustic Sound System, Home Theatre
Steam Generator System (Shower)
Nu-Heat Flooring System

PORCHES – Per Plan and Contract
Material: Owner to Select per Contract

Terraces – Per Plan and Contract

GARAGES – Per Plan and Contract

WALKS AND DRIVEWAYS
Driveway Width: Per Plan and Contract
Surfacing Material: Per Plan and Contracts
Front Walk Width: Per Plan and Contract
Steps Material: Per Plan

Base Material: Rock -Thickness: 6"
Thickness: Per Plan
Base Material: Rock -Thickness: 4"

Additional Specification: All Hard Surfaces, Owner Select per Plan and Contract

Other Onsite Improvements
(All exterior onsite improvements not described elsewhere, including items such as unusual grading, drainage structures, retaining walls, fence, railings, and accessory structures.)

Additional Specification: Per Contract

LANDSCAPING, PLANTING, AND FINISH GRADING -- No Landscaping Included.

OWNER: 10/28/05
10.28.05

CONTRACTOR: Pres. 10/28/05
R.J. Haas Corp.



PRO00278

HUD Form 92005 (10/84)

05-17-2007 14:45 From-JAMES E MCGOVERN INC +650-684-9180 T-188 P.034/035 F-850

EXHIBIT 4

Kim O. Dincel (SBN 131563)
Julie Bonnel-Rogers (SBN 176200)
**HINES SMITH CARDER DINCEL BLAND**
25 Metro Drive, Suite 600
San Jose, CA 95010
Phone: (408) 573-5723
Fax: (408) 519-2906

Attorneys for Defendants
TY LEVINE and KAREN LEVINE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PROBUILDERS SPECIALTY INSURANCE COMPANY, RRG, a District of Columbia, Risk Retention Group,<br><br>Plaintiffs<br><br>vs.<br><br>VALLEY CORP. B., a California Corporation formerly known as R.J. HAAS CORP; RONALD J. HAAS, an individual; TY LEVINE, an individual; and KAREN LEVINE, an individual,<br><br>Defendants | **Case No. CV10-5533-JW**<br><br>**DEFENDANTS TY LEVINE'S AND KAREN LEVINE'S INITIAL DISCLOSURE PURSUANT TO FRCP 26(a)(1)(D)**<br><br>Judge: Magistrate Judge Howard R. Lloyd<br>Trial Date: Not Yet Set<br>First Amended Complaint Filed; December 17, 2010 |

DEFENDANT TY LEVINE, an individual, and DEFENDANT KAREN LEVINE, an individual, (hereinafter "DEFENDANTS") submit the following Initial Disclosures pursuant to Federal Rules of Civil Procedure, Rule 26(a)(1).

I. **WITNESSES WHO MAY HAVE DISCOVERABLE INFORMATION**

DEFENDANTS are aware of the following witnesses who were associated with the underlying case, *Levine v. R.J. Haas Corp*, Santa Clara Superior Court Case No. 107CV081016:

1. Karen Levine: May be contacted through counsel Julie Bonnel-Rogers at (408)573-5728.
2. Ty Levine: May be contacted through counsel Julie Bonnel-Rogers at (408)573-5728.



EXHIBIT 5

3. Ronald J. Haas Sr.: May be contacted through counsel Chip Cox at (925) 866-1000
4. Ronald J. Haas Jr.: Son of Ronald J. Haas Sr.; 3216 Oriole Drive, San Jose, CA 95117; (408) 625-3535
5. Jennifer Haas: Daughter-In –Law of Ronald J. Haas Sr.; 3216 Oriole Drive, San Jose, CA 95117; (408) 625-3535
6. Mike Good: Project Manager on Levine Project; Address and Phone Number Unavailable; Failed to Appear and Respond to Deposition Subpoena.
7. Tucker Langlois: Project Manager on Levine Project; Barry Swenson Builder 777 North First Street, 5th Floor, San Jose, CA 95112; (408) 287-0246;
8. Susan Lambre: Former Bookkeeper at R.J. Haas Corp; (650) 947-3105; Email: Sblackmore@lagcc.com
9. Felicia Delores: Investigator for the Department of Insurance; (408)201-8800
10. Pat Kelley: Construction Defect Expert for the Plaintiffs; (650) 591-2624
11. Joseph Hutka: Construction Defect Expert for the Defense; (707)766-7079; 17 Webster St. Petaluma Ca. 94952;
12. Paul Minoletti: Attorney for Ronald J. Haas Sr. in *Levine v. R.J. Haas Corp*, Santa Clara Superior Court Case No. 107CV081016; 1 Waters Park Drive, Suite 210, San Mateo, CA 94403; (650)638-9600;
13. Brian Hawes: Attorney for Ronald J. Haas Sr. in *Levine v. R.J. Haas Corp*, Santa Clara Superior Court Case No. 107CV081016; haweslawfirm@earthlink.net; 1900 South Norfolk Street, Suite 350; San Mateo, 94403; (650)320-1616;
14. David Garthe: Attorney for Ronald J. Haas Sr. in *Levine v. R.J. Haas Corp*, Santa Clara Superior Court Case No. 107CV081016; Boornzian Jensen & Garthe 555 12th Street, Suite 1800; Oakland, CA 94607; (510)834-4350;
15. Jonathan Heck: Attorney for Ronald J. Haas Sr. in *Levine v. R.J. Haas Corp*, Santa Clara Superior Court Case No. 107CV081016; Boornzian Jensen & Garthe 555 12th Street, Suite 1800; Oakland, CA 94607; (510)834-4350;

16. Jay Ross: Attorney for Ty Levine and Karen Levine in *Levine v. R.J. Haas Corp*, Santa Clara Superior Court Case No. 107CV081016; Hopkins & Carley, 70 South First Street, San Jose, CA 95113; (408)286-9800.

II. **DOCUMENTS THAT MAY CONTAIN DISCOVERABLE INFORMATION**

DEFENDANTS have already provided copies of the trial exhibit binder from the matter of *Levine v. R.J. Haas Corp*, Santa Clara Superior Court Case No. 107CV081016 to counsel for Plaintiff ProBuilders Specialty Insurance and counsel for Co-Defendant Ronald J. Haas . Other documents such as pleadings, discovery, depositions transcripts and correspondence from the matter of *Levine v. R.J. Haas Corp*, Santa Clara Superior Court Case No. 107CV081016 are also available upon request, but may have minimal relevance to the subject coverage action.

III. **DAMAGES**

DEFENDANTS contend that the judgment obtained by them against R.J. Haas Corp and Ronald J. Haas Sr. should be covered in full or in part by ProBuilders Specialty Insurance. That judgment includes damages, costs and fees as follows:

| | |
|---|---|
| Underlying Judgment | $1,470, 858.78 |
| Attorney Fees | $ 465,766.58 |
| Costs 2/25/2011 | $ 14,174.10 |
| Costs 12/3/2010 | $ 38,850.51 |
| | $1,989,649.97 |

DEFENDANTS further contend that additional fees and costs will be accrued in their efforts to defend against the appeals from the underlying case *Levine v. R.J. Haas Corp*, Santa Clara Superior Court Case No. 107CV081016 filed by Ronald J. Haas, Sr.

DEFENDANTS contend that additional fees and costs will be accrued in their efforts to defend against this action filed by ProBuilders.

///

///

///

///

IV. **LIABILITY INSURANCE**

The only insurance agreement DEFENDANTS believe may satisfy the judgment at issue is ProBuilders Specialty Insurance Policy Number COM 5010992.

Dated: April 6, 2011

HINES SMITH CARDER DINCEL BLAND

By: ______________________________
Kim O. Dincel
Julie Bonnel-Rogers
Attorneys for Defendants
TY LEVINE and KAREN LEVINE

# PROOF OF SERVICE

***Probuilders Specialty Insurance v. Valley Corp.***
**Northern District Case No.CV10-5533 JW**

I am employed in the County of Santa Clara, State of California. I am over the age of 18 years and not a party to the within action; my business address is: 25 Metro Drive, Suite 600, San Jose, CA 95110.

On April 7, 2011, I served the foregoing document(s) described as follows:

**DEFENDANTS TY LEVINE'S AND KAREN LEVINE'S INITIAL DISCLOSURE PURSUANT TO FRCP 26(a)(1)(D)**

on all interested parties in this action by placing a true copy thereof addressed as follows:

| | |
|---|---|
| George D. Yaron, Esq.<br>James I. Silverstein, Esq.<br>Aslan Bananzadeh, Esq.<br>YARON & ASSOCIATES<br>601 California Street, 21st Floor<br>San Francisco, CA 94108<br>Tel: (415) 658-2929<br>Fax: (415) 658-2930 | Attorneys for:<br>Plaintiff, PROBUILDERS SPECIALTY INSURANCE COMPANY, RRG |
| Chip Cox, Esq.<br>Greenan, Peffer, Sallander & Lally, LLP<br>6111 Bollinger Canyon Road, Suite 500<br>San Ramon, CA 94583<br>Tel: (925) 866-1000<br>Fax: (925) 830-8787 | Attorneys for:<br>Defendant, R.J. HAAS CORP. |

[X] **BY MAIL:** I deposited such envelope in the mail at San Jose, California. The envelope was mailed with postage thereon fully prepaid.

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, all mail is deposited with the U.S. Postal Service on the same day with postage thereon, fully prepaid at San Jose, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postage meter date is more than one day after date of deposit for mailing in the affidavit.

[ ] **BY PERSONAL SERVICE:** I caused a true and correct copy thereof enclosed in a sealed envelope to be delivered by hand to the above-named addressee(s).

[ ] **BY ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused said document(s) to be sent to the person(s) at the e-mail address(es) listed in the service list. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.



EXHIBIT 5

[ ] **BY OVERNIGHT COURIER:** I placed the UPS package for overnight delivery in a box or location regularly maintained by UPS at my office or I delivered the package to an authorized courier or driver authorized by UPS to receive documents. The package was placed in a sealed envelope or package designated by UPS with deliver fees paid or provided for, addressed as follows:

[ ] **BY FACSIMILE TRANSMISSION:** I caused the above-referenced document to be transmitted to the person(s) set forth in the attached service list, at the facsimile number(s) set forth thereto. The facsimile machine I used complied with rule 2003(3) and no error was reported by the machine. Pursuant to rule 2005(i), I caused the machine to print a transmission record of the transmission, a copy of which is attached to this declaration.

**[X]** **(State)** I declare under penalty of perjury, pursuant to the laws of the State of California, that the above is true and correct.

Executed on April 7, 2011, at San Jose California.

Kimberly Nimori
Type or Print Name

Signature

Chip Cox (SBN_159681)
GREENAN, PEFFER, SALLANDER & LALLY LLP
6111 Bollinger Canyon Road, Suite 500
San Ramon, California 94583
Telephone: (925) 866-1000
Facsimile: (925) 830-8787

Attorneys for Defendant
RONALD J. HAAS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT

PROBUILDERS SPECIALTY INSURANCE COMPANY, RRG, a District of Columbia, Risk Retention Group,

Plaintiff,

vs.

VALLEY CORP., B., a California Corporation formerly known as R.J. HAAS CORP.; RONALD J. HAAS, an individual; TY LEVINE, an individual; and KAREN LEVINE, an individual,

Defendants.

RONALD J. HAAS,

Counterclaimant,

vs.

PROBUILDERS SPECIALTY INSURANCE COMPANY, RRG, a District of Columbia, Risk Retention Group,

Counterclaim defendant.

**CASE NO.: CV 10-05533 JW**

**SECOND AMENDED INITIAL DISCLOSURES OF DEFENDANT AND COUNTERCLAIMANT RONALD J. HAAS**

Defendant and counterclaimant Ronald J. Haas makes the following Initial Disclosures under Rule 26 of the Federal Rules of Civil procedure:

## I. INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION

Haas identifies the following individuals likely to have discoverable information that Haas may use to support his claims or defenses, except those individuals used solely for

impeachment:

Kevin Auen
NBIS Claims & Risk Management, Inc.
1900 Overlook III
2859 Paces Ferry Road
Atlanta, GA 30339
760.834.6719

Haas is informed and believes that Kevin Auen has information regarding ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016.

David Garthe
Boornazian, Jensen & Garthe
555 12th Street, Suite 1800
Oakland, California 94607
510.834.4350

Haas is informed and believes that David Garthe has information regarding ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016.

David Gwin
NBIS Claims & Risk Management, Inc.
1900 Overlook III
2859 Paces Ferry Road
Atlanta, GA 30339
760.834.6719

Haas is informed and believes that David Gwin has information regarding ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016.

Ron Haas
Defendant and counterclaimant; Mr. Haas may be contacted through counsel

Ron Haas has information regarding ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016, plaintiffs' claims in *Levine*, and ProBuilders' allegations regarding the application for insurance.

Sherrianne Hanavan
NBIS Construction & Transport
1450 Frazee Road, Suite 414
San Diego, CA 92108
866.668.6247

Haas is informed and believes that Sherrianne Hanavan has information regarding ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016.

Jonathon Heck
Boornazian, Jensen & Garthe
555 12th Street, Suite 1800
Oakland, California 94607
510.834.4350

Haas is informed and believes that Jonathon Heck has information regarding ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016.

Ty Levine
Defendant; Mr. Levine may be contacted through counsel

Haas is informed and believes that Ty Levine has information regarding his claims in *Levine*, and ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016.

Karen Levine
Defendant; Ms. Levine may be contacted through counsel

Haas is informed and believes that Karen Levine has information regarding her claims in *Levine*, and ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016.

///

///

///

///

Paul Minoletti
Law Offices of Paul G. Minoletti
1 Waters Park Drive, Suite 210
San Mateo, CA 94403
650.638.9600

Haas is informed and believes that Paul Minoletti has information regarding ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016.

Jane Pineda
NBIS Claims & Risk Management, Inc.
1900 Overlook III
2859 Paces Ferry Road
Atlanta, GA 30339
760.834.6719

Haas is informed and believes that Jane Pineda has information regarding ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016.

John Podesta
Branson, Brinkop, Griffith & Strong, LLP
643 Bair Island Road, Suite 400
Redwood City, CA 94063
650.365.7710

Haas is informed and believes that John Podesta has information regarding ProBuilders' investigation of the tender of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016, and ProBuilders' defense of *Levine*.

Shannon Preuss
NBIS Construction & Transport
1450 Frazee Road, Suite 414
San Diego, CA 92108
866.668.6247

Haas is informed and believes that Shannon Preuss has information regarding ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016.

Jay Ross
Hopkins & Carley
The Letitia Building
70 South First Street
San Jose, CA 95113
408.286.9800

Haas is informed and believes that Jay Ross has information regarding ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016.

David Strong
Branson, Brinkop, Griffith & Strong, LLP
643 Bair Island Road, Suite 400
Redwood City, CA 94063
650.365.7710

Haas is informed and believes that David Strong has information regarding ProBuilders' investigation of the tender of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016, and ProBuilders' defense of *Levine*.

Joe Warren
NBIS Claims & Risk Management, Inc.
1900 Overlook III
2859 Paces Ferry Road
Atlanta, GA 30339
760.834.6719

Haas is informed and believes that Joe Warren has information regarding and ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016.

Chris Woodward
NBIS Construction & Transport
1450 Frazee Road, Suite 414
San Diego, CA 92108
866.668.6247

Haas is informed and believes that Chris Woodward has information regarding and ProBuilders' defense of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016.

George Yaron
Yaron & Associates
601 California, 21st Floor
San Francisco, CA 94108
415.658.2929

Haas is informed and believes that George Yaron has information regarding ProBuilders' investigation of the tender of *Levine v. R. J. Haas Corp.*, Santa Clara County Superior Court Case No. 1-07-CV081016, and ProBuilders' defense of *Levine*.

## II. INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION

Haas identifies the following categories of documents in Haas' possession, custody or control that Haas may use to support his claims or defenses, except documents used solely for impeachment:

- Litigation file in *Levine v. Haas*, including pleadings, written discovery, deposition transcripts, miscellaneous documents and correspondence;
- ProBuilders Insurance Policy No. COM 5010992;
- "Coverage correspondence" to and from NBIS and its representatives regarding *Levine*;
- Certificates of liability insurance, subcontracts, indemnity agreements, and related correspondence for construction projects

These documents are in the possession, custody or control of Hass' counsel.

## III. DAMAGES

Haas has or anticipates he will incur the following damages that he seeks from counterclaim defendants:

$1,989,649.97 Judgment in *Levine*

$30,000.00 estimated defense costs paid in *Levine*

$10,000.00 estimated expenses incurred to obtain coverage from ProBuilders

Haas will incur an unknown additional amount of defense costs incurred to appeal the judgment in *Levine*.

Haas will also incur an unknown additional amount of fees and expenses to obtain coverage from ProBuilders in this action.

Dated: April 15, 2011

GREENAN, PEFFER, SALLANDER & LALLY LLP

By: Chip Cox
CHIP COX
Attorneys for Defendant and Counterclaimant Ronald J. Haas

**PROOF OF SERVICE**

I, the undersigned, hereby declare:

I am employed in the County of Contra Costa, State of California in the office of a member of the bar of this court, at whose direction the following service was made. I am over the age of 18 and not a party to this legal action. My business address is: Greenan, Peffer, Sallander & Lally, 6111 Bollinger Canyon Road, Suite 500, San Ramon, California 94583.

On the date given below, from the business address indicated above, I served a true and correct copy of:

**SECOND AMENDED INITIAL DISCLOSURES OF DEFENDANT AND COUNTERCLAIMANT RONALD J. HAAS**

on the interested parties in this matter by enclosing said document(s) in a sealed envelope, addressed as follows:

**(SEE ATTACHED SERVICE LIST)**

**[X]** **[BY MAIL]** I am readily familiar with the business practice of Greenan, Peffer, Sallander & Lally for collection and processing of correspondence for mailing with the United States Postal Service, wherein the correspondence would be deposited with the United States Postal Service that same day, in the ordinary course of business. I served such envelope(s) in accordance with said business practice. [CCP §1013(a)]

[ ] **[BY FACSIMILE]** I placed said document(s) to be transmitted via facsimile to the party (ies) at the facsimile number(s) indicated. Said transmission was reported as complete and without error by the transmitting machine. A copy of the transmission report is attached hereto. [CRC 2.300 et seq., CCP §1013(e)(f)]

[ ] **[BY OVERNIGHT DELIVERY]** I caused such envelope(s) to be deposited with or in a box or other facility regularly maintained by the express service carrier, or delivered to an authorized courier of said carrier, delivery fees paid or provided for, to be delivered the next business day. [CCP §1013(c)]

[ ] **[BY ELECTRONIC SERVICE]** I caused such document(s) to be transmitted electronically to the party (ies), at the electronic mailing address(es) indicated. Said transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on **April 15, 2011** at San Ramon, California.

Diane M. Houghton



EXHIBIT 6

**SERVICE LIST**

***PROBUILDERS SPECIALTY INSURANCE COMPANY V. VALLEY CORP., B., ET AL.***
(U.S. District Court, Northern District CV 10-05533 JW)

**Attys for Plaintiff Probuilders Specialty Insurance Company**
George D. Yaron, Esq.
James I. Silverstein, Esq.
Hielam Chan, Esq.
YARON & ASSOCIATES
601 California Street, 21st Floor
San Francisco, CA 94108
Tel: 415-658-2929
Fax: 415-658-2930
gyaron@yaronlaw.com
jsilverstein@yaronlaw.com
hchan@yaronlaw.com

**Attys for Defendants Ty and Karen Levine**
Kim O. Dincel, Esq.
Julie Bonnel-Rogers, Esq.
HINES SMITH CARDER DINCEL BLAND
25 Metro Place, 6th Floor
San Jose, CA 95110
Tel: 408-573-5725
Fax: 408-519-2606
Kdincel@hinessmith.com
Jrogers@hinessmith.com

**Jonathan W. Heck**

**From:** Jonathan W. Heck
**Sent:** Tuesday, June 02, 2009 8:41 AM
**To:** 'Joe Warren'
**Cc:** 'rjhaas@pacbell.net'; David J. Garthe
**Subject:** RE: Levine v Haas Claim: 3568 Our File: 25530

Mr. Warren,

This email will bring you up to date on the status of this action.

Plaintiffs' counsel has informed us that the plaintiffs have suffered damages to date in the amount of $923,402.64. These damages are comprised of the following:

1. $537,034.71 for the cost to repair defects and damages at the plaintiffs' house and for the cost to complete the construction of the plaintiffs' house;

2. $61,065.87 for out of pocket loss of use damages because the plaintiffs were not able to use their home for 14 months while defective construction was repaired and construction of the home was completed (this amount is based upon the plaintiffs' purported expenses for extended rental of a townhouse and storage unit);

3. $67,834.03 for additional damages suffered by the plaintiffs such as loan penalties and interest and extended course of construction insurance as a result of the delayed completion of the house;

4. $59,969.66 for Stearman/expert costs; and

5. $197,498.37 for plaintiffs' attorneys' fees and costs pursuant to the attorneys' fees provision in the contract between R.J. Haas Corp. and the plaintiffs.

We also recently received a written settlement demand from the plaintiffs in the amount of $860,224.89 (a discount of approximately $63,000 from the plaintiffs' total alleged damages).

Based upon the plaintiffs' settlement demand and the plaintiffs' request to the special master, the special master has scheduled a settlement conference for 9:30 a.m. on June 9, 2009. I believe that the short notice of the settlement conference is an attempt by the special master to (1) appease the plaintiffs and (2) put pressure on us to evaluate this case and see if the parties can quickly determine whether this case can be settled.

From our discussions with the special master/mediator, the plaintiffs are anxious to resolve this case. If they are unable to settle the case in the very near future the plaintiffs intend to request a trial date when we appear before the court on June 16, 2009 for a case management conference.

In light of the June 9, 2009 settlement conference, the special master has asked that we prepare settlement demands to each of the subcontractors so that we can try to raise as much money as possible towards the plaintiffs' claims. Our experts have thoroughly evaluated the plaintiffs' claims and, for the most part, agree with the plaintiffs' expert's evaluations. Based upon their review of the plaintiffs' documents, our experts have developed allocations to the various responsible subcontractors for costs associated with repairing defects at the plaintiffs' home and costs associated with completing construction of the plaintiffs' house. Using our experts' allocations as a guide, we have prepared the following proposed settlement demands to the subcontractors:

1. West Coast Plastering - allocation of $124,003; demand of $150,000 (this demand includes allocations of the plaintiffs' alleged repairs costs, completion costs, loss of use damages, loan penalties and interest, and Stearman costs);

Exhibit K

2. United Plumbing Contractors allocation of $51,545; demand of $60,000 (this demand includes allocations of the plaintiffs' alleged repairs costs, completion costs, loss of use damages, loan penalties and interest, and Stearman costs);

3. Nelson Castrillo Heating & Air Conditioning - allocation of $26,432; demand of $35,000 (this demand includes allocations of the plaintiffs' alleged repairs costs, completion costs, loss of use damages, loan penalties and interest, and Stearman costs);

4. Marco Roofing allocation of $31,776; demand of $40,000 (this demand includes only an allocation of the plaintiffs' Stearman costs because it does not appear that repairs to roofing resulted in any delays in the completion of the construction of the house).

Our experts have allocated a significant percentage of the plaintiffs' claims to the framer, Fonseca Construction, for significant framing defects at the plaintiffs' house (both plaintiffs' and defense experts have opined that this was one of the worst framing jobs they have ever seen with many framing components missing, inadequate, or not installed/located as designed). As you know, we have not been able to identify or locate a contractor by the name of Fonseca Construction and thus have not been able to serve the framer with our cross-complaint. Without the framer in the case we will not be able to allocate a significant amount of the plaintiffs' alleged damages to any other party in this case (there are no other trades which were jointly or severally liable for the framing defects at the plaintiffs' house). We would estimate that the allocation to the framer would be well in excess of $200,000.

An impediment that we will likely face in our attempts to settle with the subcontractors is that the defects alleged in their work have not resulted in any damage to the plaintiffs' house. At least one subcontractor, United Plumbing Contractors, has informed us through their counsel that settlement of the claims in this case may be difficult for any significant amount of money because the claims relate to the subcontractors' work product and there is no allegation of resulting damage. Counsel for Nelson Castrillo and Marco Roofing have not stated that this will pose a problem for them but it is possible that these issues will come to light after we issue settlement demands.

As we reported previously, West Coast Plastering's personal counsel, Mark Freschi, has made a lot of noise in response to our cross-complaint. According to Mr. Freschi, there was a settlement between RJ Haas Corp. and West Coast Plastering relating to the stucco defects at the plaintiffs' house. Mr. Freschi contends that Mr. Haas withheld $24,500 in payment to West Coast Plastering as a settlement of the stucco issues. Mr. Haas recalls that he withheld payments to West Coast Plastering and that the amount may have been approximately $24,000. There is apparently no written settlement agreement or release of claims against West Coast Plastering.

Mr. Freschi has stated that if we pursue the cross-complaint against West Coast Plastering, he will likely file a motion for determination of good faith settlement pursuant to California Code of Civil Procedure section 877.6 and thereby attempt to bar Mr. Haas's current equitable indemnity claims against West Coast Plastering. There is certainly the risk that the court would agree with West Coast Plastering's contention regarding settlement. If the court granted such a motion in favor of West Coast Plastering it would preclude us from pursuing equitable indemnity claims against West Coast Plastering.

I do not believe that West Coast Plastering would succeed with such a motion, however. While the court may find that there was a "settlement" of the stucco defects, there was certainly no settlement of, and no intent to release West Coast Plastering from, the plaintiffs' other damage claims (loss of use, delay, etc.). In light of the plaintiffs' additional claims arising out of West Coast Plastering's defective work at the project, a purported settlement of $24,500 would not be in the ballpark of West Coast Plastering's estimated liability.

We believe that West Coast Plastering would most likely receive an offset or credit against its liability in this action in the amount of $24,500 (or whatever amount can proven to have been withheld in payment).

Mr. Freschi also contends that Mr. Haas fraudulently obtained a certificate of insurance from West Coast Plastering (after the Levine project) and attempted to use the certificate to obtain additional insurance under West Coast Plastering's insurance policy for the Levine project. Mr. Freschi has stated that if we continue with pursuit of the cross-complaint against West Coast Plastering it is probable that West Coast Plastering will pursue its own affirmative fraud claims against Mr. Haas. We do not have any information to support West Coast

- will these facts qualify Haas for coverage?

- Fonseca Construction → unable to find any evidence that this was a licensed entity → if not licensed would qualify as employees of RJ Haas Corp.
(Joe Warren has already acknowledged that he doubts Fonseca had a license)

- concrete issues → foundation probs. = missing + inadequate piers
- Leon Concrete? → lost license during project → so qualified as employees of RJ Haas Corp.

Plastering's contention. In any case, if we do not seek a defense on Mr. Haas's behalf from West Coast Plastering's insurance carrier then neither West Coast Plastering nor its carrier has suffered any damage.

To the extent that we may have difficulty pursuing cross-claims against West Coast Plastering due to the above-referenced allegations by Mr. Freschi, we have discussed with the mediator the possibility of convincing the plaintiffs to amend their complaint to pursue claims directly against West Coast Plastering. The mediator believes this may be an appropriate course under the circumstances because West Coast Plastering would have to focus on the potential liability for the plaintiffs' damages and not on any potential claims that West Coast Plastering may have against Mr. Haas. We will discuss this strategy further with the mediator and plaintiffs' counsel to see if the plaintiffs are amenable to pursuing direct claims against West Coast Plastering. We will report to you further on this at a later date.

Our experts have reviewed the plaintiffs' documents to determine whether the repair costs and completion costs appear reasonable. According to our experts, the repair and completion costs for the plaintiffs' house, though significantly higher than the original contract price with RJ Haas Corp., do not appear to be unreasonable for the work performed by the subsequent contractors. Much of the plaintiffs' alleged damages relate to expenses incurred repairing numerous and significant defects at the house including, framing, stucco, windows, roofing, HVAC, plumbing, and interior drywall. Considering the reasonableness of the plaintiffs' expenses and the fact that they have already incurred these expenses it is unlikely that we will be able to reduce the plaintiffs' recovery by contending that the expenses were unreasonable.

Please let us know your thoughts on the settlement allocations and demands to the subcontractors. If we have your authority we will issue written demands to the subcontractors based upon the demands referenced above.

Additionally, please let us know your thoughts on the June 9, 2009 settlement conference. Do you have sufficient information at this time to make a settlement offer to the plaintiffs? Will you be available to attend in person or by telephone? Considering the likelihood that the plaintiffs will recover most, if not all, of their alleged damages, we would recommend attempting to resolve the claims sooner rather than later. The plaintiffs' attorneys' fees will continue to increase the longer this case continues and without any express indemnity claims against the subcontractors we have no way of passing these expenses on to the subcontractors.

We would also recommend trying to settle with the subcontractors sooner rather than later because we will not be able to recover from the subcontractors any of the fees and costs incurred in Mr. Haas's defense in this action or any fees incurred in pursuit of the indemnity claims against the subcontractors (this will be a case of significantly diminishing returns the longer we litigate the equitable indemnity claims against the subcontractors).

Based upon our allocations and demands to the subcontractors referenced above, and considering the $24,5000 offset/credit which West Coast Plastering may receive, we do not believe it is very likely that we will be able to recover more than approximately $200,000 from the subcontractors in settlement of the plaintiffs' claims. That leaves approximately $660,000 of the plaintiffs' current settlement demand which would be allocated to the insured. Despite the fact that the plaintiffs' have already purportedly discounted their damages for the above-referenced settlement demand, we expect that the plaintiffs are still willing to accept some amount less than the demand to settle this case. We will speak with the mediator to see if we can get a better idea as to what the plaintiffs may be willing to accept to settle this case. Preliminarily, we believe that the plaintiffs may be willing to settle in the range of $700,000 which would require a contribution of approximately $500,000 on behalf of Mr. Haas. Please let us know your thoughts on this.

Please give me a call when you have a chance to discuss this further. Thank you.

Jon Heck

potential coverage counsel
1.) Craig Meredith
2.) Barry Weinstein
(*) email ProBuilders policy to Ron Haas

Jonathan W. Heck
**Boornazian, Jensen & Garthe**
555 12th Street, Suite 1800
P.O. Box 12925
Oakland, California 94604-2925
Telephone: (510) 834-4350
Facsimile: (510) 839-1897
jheck@bjg.com

6/25/2009

LAW AND MEDIATION OFFICES
OF
PAUL G. MINOLETTI

1 WATERS PARK DRIVE, SUITE 210
SAN MATEO, CALIFORNIA 94403
Telephone: (650) 638 -9600
Facsimile: (650) 638-9604
E-mail: pgmlaw@gmail.com

SEPTEMBER 16, 2010

**VIA E-MAIL:** JPineda@nbis.com

Jane Pineda
Senior Claims Examiner
NBIS Construction & Transport Insurance Services, Inc.
1900 Overlook III
2859 Paces Ferry Road
Atlanta, GA 30339

**PRE-TRIAL REPORT OF COUNSEL**

| **DATE: September 16, 2010** | **OUR FILE #: Levine v. R.J. Haas Corp.** |
|---|---|
| CLAIMANT: Ty and Karen Levine | CLAIM #: 03-02-1011393 |
| INSURED: R.J. Haas Corp. | VENUE: Santa Clara County Superior |
| (EXPECTED) TRIAL DATE: November 1, 2010 | DEFENSE FIRM: Paul G. Minoletti |

## I. INSURED

A. Effectiveness as a witness – rate (from excellent to poor) his/her demeanor, general credibility, memory and particular tendencies as a witness. **Ron Haas, as the person most knowledgeable for the R. J. Haas Corp., has a good demeanor in that he is calm and deliberate in responding to questions at deposition, his general credibility is good, his memory is fair as he does not recall a great deal of detail and relies on documents to refresh his memory, his tendencies are to respond to deposition questions in a very cautious and deliberate manner, which is understandable given the allegations of fraud and misrepresentation, but makes for a very slow and tedious process. All three sessions thus far have focused primarily upon the relationship between Ron Haas, as an individual, and the corporation, as well as a review of ads and website material, but it is not "alter ego" evidence nor does it rise to "misrepresentation" There has been some, but not a great deal of testimony regarding the project itself, of note is Mr. Haas testimony regarding the roof issues, which he explains was due to a change in material (heavier tiles) that were approved by the engineer. Mr. Haas was also questioned on the costs for each category of item in the contract, implying that the plaintiffs were somehow**

PRO03510

**overcharged for items; however, it is all laid out in the contract and there do not appear to be overcharges. Mr. Haas relates that delays asserted by the Levines were due mostly to the Levines inability to make timely decisions on allowances and because of change orders. The fourth session of his deposition is now set for October 6, 2010.**

B. Other Insurance Coverage – type of policy, policy number and/or claim number, carrier name, address and phone number, claims person's name, type of other insurance clause (excess, escape or pro-rata), limit, deductible, known coverage defenses and/or reservation of rights (attach copy if available). **Pending re-tender to Lloyds as of August 26, 2010, CGL policy, policy number WUG-000393-2, policy period 08/29/2005 - 08/29/2006, the TPA claims representative currently handling this is Jeff Belden of Blair and Co., phone 800-487-1263 ext. 216. Copy attached. Coverage counsel for Lloyds is LouCinda Laughlin, phone 213-629-7675. Ms. Laughlin denied coverage and withdrew the defense of the insured on February 25, 2008. Copy attached. Note that one of the reasons for the withdrawal was that the insured had filed for bankruptcy, which has been dismissed as of October 2009.**

## II. PLAINTIFFS

A. Name, address, age, marital status and occupation. If plaintiff is a business, provide a description. **Ty Levine and Karen Levine reside at the subject single family residence at issue: 700 Benvenue Avenue, Los Altos, CA, ages are estimated at mid-40's, married but rumor of divorce as of mediation on September 9, 2009 and continuing to this date (although still no filing in court as of this report); Ty Levine currently unemployed tech industry professional and Karen Levine was last known employed in lending with Washington Mutual (now Chase), in any event, it appears that the burden of this lawsuit and personal finances have strained the relationship. The Special Master reported at the September settlement conference that Karen Levine was ready to withdraw from the case stating "only the lawyers will get money out of this".**

B. Effectiveness as a witness – rate (from excellent to poor) his/her demeanor, general credibility, memory and particular tendencies as a witness. **Please note that neither plaintiff has been deposed, so observations are based on appearances at mediation, etc. Ty Levine will make a fair to good witness, his demeanor is sarcastic, flippant and vengeful thus far, and I do not have enough contact to opine on his credibility, memory or tendencies. Karen Levine has been less involved and more reserved and I do not have enough contact with her to opine further. Their depositions will be taken in the next few weeks by counsel for Marco Roofing.**

C. Name of plaintiff attorney and ability. **Kim Dincel is new plaintiffs' counsel and I have not met him yet or had any previous experience with him or his firm. I have been dealing with his associate Christopher Lai who has been cordial and cooperative. The data below is from his firm's website:**

**Kim O. Dincel (Partner)**

Kim Dincel received his law degree in 1987 from Loyola Law School in Southern California. He is licensed to practice in all federal and state courts within California and has spent the past 20 years practicing law in the San Francisco Bay area.

Mr. Dincel currently practices in the areas of long-term health care, general business and commercial litigation, maritime law, construction, trade secret misappropriation, personal injury defense, employee embezzlement, contract and real estate matters. He has handled numerous trials to verdict and has argued before both the state and federal courts of appeal.

Mr. Dincel prides himself on being able to think outside of the box and on focusing on the unique needs of each individual client in order to attain the most effective and cost efficient means of client-oriented success.

Prior to pursuing his legal career, Mr. Dincel was a United States merchant marine officer and spent four years working as a navigator, chief mate and relief captain. He also spent 6 years as a lieutenant in the US Naval Reserve.

He is the father of two young boys; coaches little league; plays golf and has competitively raced sailboats around the country for 25 years.

## III. SUMMARY OF FACTS WHICH ENGENDERED THIS CLAIM

**R.J. Haas Corp. and Karen Levine entered into a construction contract on October 28, 2005, wherein the R.J. Haas Corp. was to build/re-build a single family home for the Levines at 700 Benvenue Avenue in Los Altos, California. The home was to be "substantially complete" within 330 days. The fixed contract price for construction was $821,078. The cost breakdown for this fixed price was as follows: new construction, residence: $405,300 (basic); new construction, residence: $248,976 (allowance); site work: $53,500 (allowance); soft costs, supervision, overhead and G.A.: $35,392; profit $77,860. The Levines requested approximately 34 change orders to the original contract, including the addition of a solar energy system and soundproofing of the residence.**

**Construction of the project began in November 2005 and terminated in February 2007. Correspondence between the Levines and R.J. Haas Corp. during this time frame demonstrates that the Levines did not always make timely decisions on allowances, made repeated changes to the original plans and specifications which effected scheduling, and lack of detail in demands also caused delays.**

**Throughout January 2007, the R.J. Haas Corp. attempted to work with the Levines, through their then counsel, Jay Ross of Hopkins and Carley, to remediate**

PRO03512

outstanding issues and to try to satisfy the demands of the Levines. After several attempts to resolve repair issues, on February 1, 2007, the R.J. Haas Corp. retained attorney Dave Strong for handling. Continuing into early February 2007, the R.J. Haas Corp. made attempts to resolve the issues to no avail. The Levines claimed that R.J. Haas Corp. abandoned the project in a letter from their counsel dated February 1, 2007. On February 2, 2007, Haas sent a letter to counsel for the Levines indicating that the R.J. Haas Corp. was not abandoning the project and requested that the Levines "...meet and discuss resolution of the Levine contract disputes." After further exchange between the parties, the Levines issued a letter dated February 8, 2007 informing the R.J. Haas Corp. that "...this letter is to notify you that the construction agreement between R.J. Haas Corp. and us for this project is terminated." The Levines then filed their Complaint against the R.J. Haas Corp., Ronald Haas, and the surety, Old Republic, on March 1, 2007.

In the meantime, the Levines had hired contractors/experts Scott Flegel and Les Kelly to perform work on the project. The repairs and completion of work was completed by others and the Levines have been living in the home since November 2007. Main issues involve the exterior stucco, framing and the roof.

From the time the Levines became unhappy with the construction, the personal overtones expressed by the Levines against Ronald Haas have driven the litigation. The Levines seek more than compensation for the repairs, they seek to punish Ron Haas and his reputation, and to ruin the business. This attitude has resulted in a criminal complaint against Haas related to workers compensation insurance and has carried over into the bankruptcy proceedings instituted by Haas. Valley B Corp. fdba R.J. Haas Corp. filed for Chapter 11 bankruptcy on December 11, 2007, in which the Levines participated, but was never "resolved" and then voluntarily dismissed, on October 26, 2009 (although could be re-filed).

## IV. CO-DEFENDANTS AND/OR THIRD PARTY DEFENDANTS

A. Identity of parties and B. Respective attorneys – name(s), business address(es), telephone number(s).

**Milan Corp. dba Marco Roofing Co. is represented by:**
Jill J. Lifter, Esq.
Ryan & Lifter
2010 Crow Canyon Place, Suite 300
San Ramon, CA 94583
Tele: (925) 884-2080
Fax: (925) 884-2090

**Nelson Castrillo Heating & Air Conditioning is without insurance and unrepresented.**

**The appointed Special Master is:**
William F. Pagano, Esq.
Pagano & McKinney, LLP
1424 Chapin Avenue
Burlingame, CA 994010
Tele: (650) 347-9900
Fax: (650) 373-0330

B. Factual and legal basis for plaintiffs'/cross-complainants' claims against other parties. **The work on the project was performed by trade specific subcontractors. Initially, a cross-complaint was not filed against the subcontractors because of other on-going projects and business relations. The filing of the bankruptcy by the R.J. Haas Corp. then precluded the corporation from a filing cross-complaint as a result of an automatic stay. A cross-complaint was filed by Ronald Haas, individually, against the involved subcontractors for contribution and indemnity, however, the framing subcontractor Fonseca Construction cannot be located, may never have actually had a license, and there is no known insurance. The Levines were advised to file direct actions against the subcontractors, which they refused until more recently (September 30, 2009), having named West Coast Plastering, Inc. directly, and apparently have reached a separate settlement of approximately $68,000.00 with the plaintiffs. The plumber has also apparently recently settled directly with the plaintiffs although I am unaware of the amount.**

C. Brief summary of probable exposure. **Plaintiffs claim to have spent $537, 000.00 to repair defects and damages and to complete construction; $61,000.00 for loss of use for 14 months while plaintiffs lived elsewhere during repairs/completion; $68,000.00 for other expenses incurred such as loan penalties, insurance, and interest; $60,000.00 for costs and experts; and in excess of $250,000.00 in attorneys' fees to date. Total approximately $976,000.00. At this time, this is the probable exposure. There will be a credit(s) for the separate settlements with the subcontractors.**

D. Other insurance coverage – type of policy, policy number and/or claim number, carrier name, address and phone number, claims person's name, type of other insurance clause (excess, escape or pro-rata), limit, deductible, known coverage defenses and/or reservation of rights (attach copy if available). **There were no written subcontracts and no additional insured endorsements have been located thus far. There are coverage issues between the subcontractors and their insurers, in fact the insurer of Nelson Castrillo Heating & Air recently withdrew both coverage and the defense.**

**V. WITNESSES**

A. Name, address, age and occupation and B. Event perceived. **Mike Good, former Project Manager for R.J. Haas Corp.; Tucker Langlois, former Project Manager for R.J. Haas Corp.; R.J. Haas, Jr., of R.J. Haas Corp. attempted to resolve issues with Levines in early 2007; Jennifer Haas, R.J. Haas Corp. office/admin.; Shannon Denton, former office staff for R.J. Haas Corp.; Michael Creeden and Mike Connolly as PMKs of Marco Roofing**

**Company; Nelson Castrillo as PMK of Nelson Castrillo Heating & Air Conditioning; Karel Cymbal, P.E., of Westfall Engineers, Inc. as structural engineer on the project; Robert DoAmaral of The Bob Flury Design Group as architect/designer on the project; Cindy Faulkner and Ray Linden of Valley Heating and Cooling as HVAC repair contractors on the project.**

B. Effectiveness as a witness – rate (from excellent to poor) his/her demeanor, general credibility, memory and particular tendencies as a witness. **None of these witnesses have been deposed and there has been little, if any, contact with them to this point.**

C. Other Insurance Coverage – type of policy, policy number and/or claim number, carrier name, address and phone number, claims person's name, type of other insurance clause (excess, escape or pro-rata), limit, deductible, known coverage defenses and/or reservation of rights (attach copy if available). **None.**

## VI. PLAINTIFF'S EXPERT WITNESSES

A. Name and address. **Pat Kelley, Les Kelley General Contractors, Inc., 503 Dale View Ave., Belmont, CA 94002; Bradley J. Allen, Real Estate Appraiser, 216 Brighton Lane, Redwood City, CA 95032;** For each witness so identified, specify in detail, the subject matter on which the expert is expected to testify, the substance of the facts and opinions on which each expert is expected to testify, the qualifications of each expert witness and a summary of the grounds for each expert's opinion. **Pat Kelley is a Civil Engineer and a licensed engineer and building contractor and has conducted an extensive review of the project, and has submitted photos and reports detailing defects and the scope of repairs, he is well qualified and known in this area as a detail oriented expert. Bradley Allen is a licensed Real Estate Appraiser and will opine as to the loss of use damages suffered by the plaintiffs during the time to repair/complete the home. I am not familiar with Mr. Allen.**

B. Effectiveness as a witness. **See above.**

C. Cost. **Pat Kelley is $500.00/hour and Bradley Allen is $150.00/hour for deposition.**

## VII. INSURED'S EXPERT WITNESSES

A. Name and address. **Richard A. Holm, Consulting Structural Engineer, 719 Diablo Way, Redwood City, CA 94062; Joseph Hutka, Higuera Associates, 477 Devlin Road, Napa, CA 94558; Walter Ricci, MAI, Hamilton, Ricci & Associates, 930 Montgomery St., San Francisco, CA 94133.**

B. For each witness so identified, specify in detail, the subject matter on which the expert is expected to testify, the substance of the facts and opinions on which each expert is expected to testify, the qualifications of each expert witness and a summary of the grounds for each expert's opinion. **Richard Holm is a licensed civil and structural engineer and has reviewed the plans and specifications for the project and will opine as to the scope and cost of repairs claimed by plaintiffs, he is well known and well qualified. Joseph Hutka is a licensed general building contractor and will testify as to the scope and cost of repairs claimed by plaintiffs and the standard of care for a general building contractor as it pertains to the project, Higuera is well known for the defense in this area and Hutka is a qualified member of that team. Walter Ricci will opine as to the rental value of the property and diminution in value, if any, claimed by plaintiffs.**

C. Effectiveness as a witness. **See above.**

D. Cost. **Richard Holm is $300.00/hour, Joseph Hutka is $175.00/hour, and Walter Ricci is $400.00/hour for deposition.**

VIII. CO-DEFENDANT(S) EXPERT WITNESSES

A. Name and address. **Marco Roofing: Gordon M. Bizieff, AIA, Lombard Consulting Services, 3685 Mt. Diablo Blvd., Suite 130, Lafayette, CA; Nelson Castrillo Heating & Air Conditioning: William Kolthoff and Anthony Palombi, Architectural Sheet Metal Consultants, P.O. Box 748, Corte Madera, CA.**

B. For each witness so identified, specify in detail, the subject matter on which the expert is expected to testify, the substance of the facts and opinions on which each expert is expected to testify, the qualifications of each expert witness and a summary of the grounds for each expert's opinion. **Gordon Bizieff is a Registered Architect and has extensive expertise in consulting for the legal and insurance industry in construction matters and is well known and respected in the Bay Area. He is expected to testify as to the installation of the roof tiles for the subject residence, standards of practice and cost of repairs. William Kolthoff is a licensed Sheet Metal Contractor with over 40 years experience in the industry and is very well known and respected as an expert in this area. He is expected to testify regarding standards, codes, method and cost of repair. Anthony Palombi is a Senior Associate with Mr. Kolthoff's firm and he is also expected to testify regarding standards, codes, method and cost of repair.**

C. Effectiveness as a witness. **See above.**

D. Cost. **Gordon Bizieff is $300.00/hour. William Kolthoff is $300.00/hour. Anthony Palombi is $285.00/hour.**

## IX. ANALYSIS OF CLAIM: LIABILITY AND DAMAGES

A. Plaintiff's theories. **Plaintiffs claim defects and deficiencies in the exterior Stucco, which was removed and replaced by plaintiffs; missing and misplaced Framing components which were repaired by plaintiffs; unfinished Concrete and missing footings; improperly installed or damaged Windows; undersized HVAC system; undersized Plumbing; defective/improperly installed Drywall; Hardwood floors require upgrading; and issues regarding Project Management and claims of overcharges for labor, overhead and materials.**

B. Insured's theories. **Plaintiffs allegations are generally substantiated with regard to defects and deficiencies per the Defense Response, see attached. Haas claims delays and schedule problems were caused by the Levines.**

C. Co-defendants' and/or third-party defendants' theories. **Primarily that the subcontractors followed plans and specifications, with no consequential damages to the plaintiffs.**

D. Strengths and weaknesses of A, B, and C above. **Plaintiffs spent the money to repair the problems, so the only argument for the defense is to claim the repairs were unreasonable or resulted in upgrades.**

E. Chance of defense verdict for insured, co-defendants and/or third-party defendants (discuss each separately). **There will not be a defense verdict.**

F. If the insured, co-defendants and/or third-party defendants settle, what is the probability of success in the non-settling defendant(s) obtaining "total indemnity" against the settling defendants (discuss each separately). **There is no chance of total indemnity, there are no written contracts.**

G. Causation issues, i.e., was the Insured's alleged negligence a cause in fact of the damages claimed. **Yes, Project Management was lacking regarding scheduling and supervision.**

H. Probable damages (compensatory) if the case is lost. **Approximately $1 to $1.2 million, as costs and fees will increase for plaintiffs.**

I. Punitive damage exposure? **Unlikely** Attorney's fees recoverable? **Yes**

J. Probability of contributory negligence finding (i.e., defense verdict) or probable percentage of comparative negligence (i.e., plaintiff's percentage of fault).

**Note**: In comparative negligence jurisdictions, you should indicate whether "pure", 50% or 51% rule is followed. **Perhaps, but not more than 10%.**

K. Probable apportionment of fault among defendants (assign percentages). **Each subcontractor may be responsible for their scope of work on an equitable indemnity basis;**

**however, insurance coverage issues may limit/preclude a realization or funding for indemnity. Based upon our experts' opinions, the following are proposed allocations:**

**Nelson Castrillo Heating & Air Conditioning - allocation of $26,432; demand of $35,000 (this demand includes allocations of the plaintiffs' alleged repairs costs, completion costs, loss of use damages, loan penalties and interest, and Stearman costs);**

**Marco Roofing - allocation of $31,776; demand of $40,000 (this demand includes only an allocation of the plaintiffs' Stearman costs because it does not appear that repairs to roofing resulted in any delays in the completion of the construction of the house).**

L. Net exposure (state a dollar amount) to insured after all apportionment and based on probable damages. **Likely $900,000 to $1.1 million.**

M. Settlement value and basis for evaluation. **$500,000 to $600,000 due to other issues (insurance coverage, potential bankruptcy, divorce, costs of trial)**

N. Should this case be tried? **No** Why? **It seems clear that plaintiffs will prevail but that insurance coverage issues may prevent settlement**

O. Brief summary of probable outcome as to both liability and damage issues, indicating whether you consider this a case of liability and why. **See above**

## X. SETTLEMENT DISCUSSION

A. What is the demand?

Original <u>**$1.3 million**</u> Present <u>**$985,000 as of February 9, 2010**</u>

B. What, if anything, has been offered? (If a definite offer has not been made, but an indicator or range has been discussed, so state, listing each indicator or range figure discussed) **$80,000 to $100,000 was discussed with the Special Master in September 2009; approximately $50,000 from subcontractors and $25,000 from Haas and $25,000 from ProBuilders.**

C. What can this case be settled for at this time? **Probably $500,000 given change of counsel by plaintiffs**

D. Do you believe we should settle this case? **Yes** Why? **It is a liability case**

E. Your recommendations on approach to settlement. **The Special Master should conduct a further mediation. We also need Lloyds to participate. There have been previous discussions with plaintiffs counsel and the Special Master that one possible resolution is to enter into a stipulated judgment between plaintiffs and the R.J. Haas Corp. for a specified dollar amount with a covenant not to execute against the Corp. and an agreement to stay any proceedings as against Mr. Haas individually. This would avoid the time and expense of a trial where liability is not an issue. Plaintiffs would then litigate the coverage issues**

**directly. I have requested that plaintiffs counsel place a proposal or proposed judgment in writing for review. I have not received such a proposal as of this date.**

**XI. FUTURE HANDLING**

A. In your opinion, is the investigation in this case complete? **Yes**

B. If not complete, what further investigation do you suggest and what would it cost? **N/A**

C. What further discovery is needed and what would it cost? **Depositions of plaintiffs, key percipient witnesses, subcontractors, experts. Estimated costs: $35,000 to $40,000.**

**XII. LEGAL EXPENSES/BUDGET**

A. What are the total legal expenses to date? **Approximately $25,000.**

B. If this case is tried, what would be the approximate cost of defense through trial, including expense for experts? (Attach completed Trial 90 day Litigation Budget). **Estimated at $196,575.00 total, $147,075.00 in fees and $49,500.00 in expenses per attached Budget.**

ATTORNEY Paul G. Minoletti

FIRM Law Offices of Paul G. Minoletti

DATE September 16, 2010

Sheet1

# Pre-Trial 90 DAY LITIGATION BUDGET

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **BUDGET TIME FRAME:** | | Start = | 9/16/2010 | End = | Trial | **TOTAL BUDGET =** | | $196,575 |
| | | | | | # HOURS | RATE | | |
| **Case Assessment, Development and Administration** | | | | | | | | |
| | Investigation / Development | | | | 10 | $185 | | $1,850 |
| | Analysis / Strategy | | | | 60 | $185 | | $11,100 |
| | Experts / Consultants | | | | 0 | $185 | | $ |
| | Budgeting | | | | 0 | $185 | | $ |
| | Settlement | | | | 0 | $185 | | $ |
| | | | | | | | **Total =** | $12,950 |
| **Pretrial Pleadings & Motions** | | | | | | | | |
| | Pleadings | | | | 10 | $185 | | $1,850 |
| | Preliminary Injunctions / Provisional Remedies | | | | 0 | $185 | | $ |
| | Court Mandated Conferences | | | | 10 | $185 | | $1,850 |
| | Dispositive Motions | | | | 0 | $185 | | $ |
| | Other Written Motions & Submissions | | | | 24 | $185 | | $4,440 |
| | Class Action Certification & Notice | | | | 0 | $185 | | $ |
| | | | | | | | **Total =** | $8,140 |
| **Discovery** | | | | | | | | |
| | Claimant's Interrogatories | | | | | $185 | | |
| | Document Production | | | | | $185 | | |
| | Claimant's Responses to Production Report | | | | | $185 | | |
| | Claimant's Responses to Interrogatories | | | | | $185 | | |
| | Depositions | | | | 120 | $185 | | $22,200 |
| | Expert Discovery | | | | 100 | $185 | | $18,500 |
| | Discovery Motions | | | | | $185 | | |
| | Other Discovery | | | | 0 | $185 | | $ |
| | | | | | | | **Total =** | $40,700 |
| **Legal Research - Attorney or Paralegal** | | | | | | | | |
| | Research regarding plaintiffs' legal contentions | | | | 40 | $185 | | $7,400 |
| | Issue 2 | | | | 0 | $185 | | $ |
| | Issue 3 | | | | 0 | $185 | | $ |
| | | | | | | | **Total =** | $7,400 |
| **Itemization of Expenses** | | | | | | | | |
| | Expert Fees | | | | | | | $18,000 |
| | Special Master Fees | | | | | | | $4,000 |
| | Deposition Transcripts | | | | | | | $15,000 |
| | CourtCall | | | | | | | $10,000 |
| | Expert Deposition Fees | | | | | | | $5,000 |
| | Travel Expenses | | | | | | | $2,500 |
| | | | | | | | **Total =** | $49,500 |
| | | | | | | | | |
| **Trial Preparation** | | | | | | | | |
| | Mandatory settlement conference | | | | 16 | $185 | | $2,960 |
| | Exhibits, blow-ups, and models for trial | | | | 20 | $185 | | $3,700 |
| | Pre-trial motions and submissions | | | | 40 | $185 | | $7,400 |
| | Examination outlines and organization of evidence | | | | 100 | $185 | | $18,500 |
| | | | | | | | **Total =** | $32,560 |

**PRO03520**

# Pre-Trial 90 DAY LITIGATION BUDGET

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| **Trial** | | | | | | | | | |
| | Counsel attendance of trial | | | | | 225 | $185 | | $41,625 |
| | | | | | | | | **Total =** | $41,625 |
| | | | | | | | | | |
| **Post Trial** | | | | | | | | | |
| | Post-trial pleadings, motions, and submissions | | | | | 60 | $185 | | $11,100 |
| | | | | | | | | **Total =** | $11,100 |
| | | | | | | | | | |
| | Total Litigation Budget Through Trial | | | | | | | | $147,075 |
| | Estimated Expenses Through Trial | | | | | | | | $49,500 |
| | | | | | | | | **Total =** | $196,525 |